## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BEST WESTERN INTERNATIONAL, INC.,
a non-profit Arizona corporation,

        Plaintiff,

    v.

JOHN DOE, an Internet website administrator;
JANE DOES 1-X, Internet website bloggers
and Members of Best Western International, Inc.;
JOHN DOES 1-X, Internet website bloggers and
Governors of Best Western International, Inc.,

        Defendants.

U.S. District Court for the
District of Delaware
Misc. Case No. 06-219

U.S. District Court for the
District of Arizona
Case No. 2:06-cv-01537-DGC

**PUBLIC VERSION**

## DECLARATION OF WILLIAM R. DENNY IN SUPPORT OF DEFENDANT JANE DOE 1'S MOTION TO QUASH SUBPOENA *DUCES TECUM* DIRECTED TO NON-PARTY WITNESS L.N.H., INC. AND FOR A PROTECTIVE ORDER

OF COUNSEL:

Daniel McAuliffe
Todd Feltus
Gregory B. Collins
SNELL & WILMER
One Arizona Center
Phoenix, AZ  85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070

Richard T. Mullineaux
R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
One Commerce Square
4106 Charlestown Road
New Albany, IN 47150
Phone: (812) 949-2300
Facsimile: (812) 949-8556

William R. Denny (ID No. 2580)
POTTER ANDERSON & CORROON
LLP
Hercules Plaza--6th Floor
1313 North Market Street
Wilmington, Delaware  19801
(302) 984-6000
Fax:  (302) 658-1192
wdenny@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Jane Doe 1*

Date:  December 11, 2006
public version Dated:  December 15, 2006

I, WILLIAM R. DENNY, declare under penalty of perjury as follows:

1.      I am a Partner with the law firm of Potter Anderson & Corroon LLP, counsel for Defendant Jane Doe 1 in the above-captioned action. Except as otherwise stated, the matters set forth herein are within my personal knowledge.

2.      Attached as Exhibit 1 hereto is a true and correct copy of the Subpoena In a Civil Case issued to L.N.H., Inc.

3.      Attached as Exhibit 2 hereto is a true and correct copy of the First Amended Complaint for Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Breach of any Implied Contract, Breach of Fiduciary Duty, Defamation Per Se, and Tortious Interference with Contractual Relations and Injunctive Relief, filed Nov. 9, 2006 in United States District Court for the District of Arizona, Case No. CV06-1537-PHX-DGC.

4.      Attached as Exhibit 3 hereto is a true and correct copy of he decision Best Western Int'l, Inc. v. Doe, Slip Op., No. CV06-1537-PHX-DGC, 2006 WL 2091695 (D. Ariz. July 25, 2006).

5.      Attached as Exhibit 4 hereto is a true and correct copy of Exhibit B, Chart of Defamatory Statements, and Exhibits 1 through 28 of Exhibit B, to Best Western International, Inc.'s Renewed Motion to Conduct Accelerated and Expedited Discovery, filed by Plaintiff Best Western International, Inc. in *Best Western Int'l, Inc. v. John Doe*, Case No. CV06-1537-PHS-DGC (D. Ariz.) on August 18, 2006.

6.     Attached as Exhibit 5 hereto is a true and correct copy of the decision <u>Best Western Int'l, Inc. v. Doe</u>, Slip Op., No. CV06-1537-PHX-DGC (D. Ariz. Oct. 24, 2006).

7.  Attached as Exhibit 6 hereto is a true and correct copy of the decision <u>Am. Homepatient Inc. v. Collier</u>, 2006 WL 1134170 (Del. 2006).

I declare that the foregoing is true and correct to the best of my knowledge.

Executed this 11th day of December, 2006 at Wilmington, Delaware.


_____
WILLIAM R. DENNY  (ID No. 2580)

[766598]
public version:767901

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that, on this 15th day of

December 2006, a copy of the Public Version of the Declaration of William R. Denny  in

Support of Defendant Jane Doe 1's Motion to Quash Subpoena *Duces Tecum* Directed to Non-

Party Witness L.N.H., Inc. and For a Protective Order was served by first class mail, postage

prepaid, upon the following persons:

> Cynthia A. Ricketts, Esquire
> Sara K. Regan, Esquire
> Squire, Sanders & Dempsey L.L.P.
> Two Renaissance Square
> 40 North Central Avenue, Suite 2700
> Phoenix, AZ  85004-4498
>
> L.N.H., Inc.
> 260 Chapman Road, Suite 205
> Newark, DE  19702

_William R. Denny_
WILLIAM R. DENNY  (ID No. 2580)

[766598]
public version:767901

4

# EXHIBIT 1

Issued by the
**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

Best Western International, Inc., an Arizona   )    Case No. CV06-1537-PHX-DGC
corporation    )
     )
         Plaintiff,    )
     )    **SUBPOENA IN A CIVIL CASE**
       v.    )
     )    **Pending in the United States District**
John Doe, an Internet website administrator;  )    **Court for the District of Arizona**
Jane Does 1-X, Internet website bloggers    )
and Members of Best Western International,   )
Inc.; John Does 1-X, Internet website    )
bloggers and Governors of Best Western     )
International, Inc.,    )
     )
         Defendants.    )

TO:    Custodian of Records
      L.N.H., Inc.
      260 Chapman Road, Suite 205
      Newark, DE 19702

☐    YOU ARE HEREBY COMMANDED to appear in the United States District Court at the
     place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒    YOU ARE HEREBY COMMANDED to appear at the place, date, and time specified
     below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Esquire Deposition Services | December 18, 2006 at 9:00 a.m. |
| 1201 North Orange Street, Ste. 760 | |
| Wilmington, DE 19801 | |
| (302) 426-9857 | |

☒    YOU ARE HEREBY COMMANDED to produce and permit inspection and copying of
     the following documents or objects at the place, date, and time specified below (list
     documents or objects):
     **Any and all documents listed on attached to the subject matter specified in attached**
     **Exhibit "A".**

| PLACE | DATE AND TIME |
|---|---|
| Esquire Deposition Services | |

1201 North Orange Street, Ste. 760
Wilmington, DE 19801
(302) 426-9857

December 18, 2006 at 9:00 a.m.

☐     YOU ARE HEREBY COMMANDED to permit inspection of the following premises at the date and time specified below:

| PLACE | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Best Western International, Inc. | November 30, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Cynthia A. Ricketts, Squire, Sanders & Dempsey L.L.P., 40 North Central Avenue, Suite 2700, Phoenix, Arizona 85004-4441, (602) 528-4000, Attorneys for Plaintiff Best Western International, Inc.

## PROOF OF SERVICE

| SERVED | DATE | PLACE |
|---|---|---|
| SERVED ON (PRINT NAME) |  | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) |  | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material or inspect the premises except pursuant to an order of the court which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting

from the inspection and copying commanded.

(3)  (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or,

if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# EXHIBIT A

## DEFINITIONS

The following definitions are submitted in conjunction with the following document request:

A.      As used herein, the term "BWI" means plaintiff Best Western International, Inc.

B.      As used herein, the terms "document" and "documents" shall have the meanings ascribed to them under Rule 1001 of the Federal Rules of Evidence and include, without limitation the original (or copy if original is unavailable) of any printed, electronic, typewritten, handwritten, tangible, photocopied, or otherwise reproduced item relating to information requested herein, which are in your possession, custody or control or are available to you through the exercise of reasonable diligence, including but not limited to: communications; e-mail messages; electronic files and documents; computer storage devices, including but not limited to CDs, DVDs, memory sticks, hard drives, tapes and computer diskettes; websites and website postings; blogs; letters; memoranda; messages; handwritten notes; telegrams; agreements; deeds; contracts; stock certificates; promissory notes; appraisals and valuation estimates of any kind; financial data; books of account; accounting ledgers and journals; credit and loan applications; tax returns and records; financial statements; audit reports; pro formas; cash flow records; financial projections; operating statements; balance sheets; accounts payable and receivable; bank records; checks; canceled checks; invoices; sales receipts; charge receipts; expense records; personal receipts; insurance records; diaries; calendars; logs; pre-petition court filings; transcripts of interviews or testimony given before any person, officer, or tribunal (whether sworn or unsworn) and any written summaries, reports, or statements thereof; notes of conversations, meetings, investigations, opinions, interviews and/or testimony; books; pamphlets; brochures; newspapers; magazines; periodicals; catalogs; price lists; prospectuses; charts; graphs; maps; telephone records; audio or video tape recordings; telefax copies; computer printouts, data card programs or other input or output of data

processing systems; photographs (positive print or negative), microfilm or microfiche; and other data compilations and every other device or medium on which or through which information of any type is transmitted, recorded or preserved. The terms "document" and "documents" shall also include each copy that is not identical to the original or to any other produced copy of, as well as any preliminary drafts of any document or working paper related thereto, and documents containing handwritten notations.

C.    As used herein, the term "communication" means oral, graphic, demonstrative, telephonic, verbal, electronic, written or like conveyance of information, including documents.

D.    As used herein, the term "relating to" means concerning, referring to, pertaining to, consisting of, containing, describing, evidencing, constituting, reflecting, bearing upon or having any logical or factual connection with the subject matter dealt with or alluded to in the subparagraph of the Request.

E.    As used herein, "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the Request inclusive rather than exclusive; the singular includes the plural and the plural includes the singular. The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense. The masculine gender shall be construed in the generic sense.

F.    As used herein, "you" refers to LNH, Inc., any of its predecessors and successors in interest, subsidiaries and affiliates, and any persons acting on its behalf, including its officers, agents, employees, representatives and attorneys. Such term also refers to any and all websites operated by you.

## INSTRUCTIONS

A.    You are requested to segregate the documents produced pursuant to this Request according to the paragraph and subparagraphs hereof in response to and under which they are produced.

B.    Unless otherwise specified, this Request seeks documents dated, prepared or pertaining to the time period beginning on May 11, 2006, through the date of your response to this Request.

C.    This Request shall be deemed to be continuing and, in the event that you, your agents, spouse, attorneys, or representatives become aware of additional documents responsive thereto after the date of production specified hereinabove, you are requested to furnish such Documents.

D.    The person upon whom this Request is directed shall respond by stating with respect to each item or category set forth herein that inspection will be permitted as requested unless objected to, in which event the reasons for objection shall be stated. If an objection is made to part of an item or category, that part should be specified.

E.    If you consider any responsive document to be privileged, with respect to each such document, provide separately the following information:

1.    a general description of the document;

2.    a full explanation of the factual and legal bases of the privilege claimed;

3.    the identity of the author(s) and all recipients of the document;

4.    the identity of the present custodian of the document;

5.    identify each person who was present when the document was prepared and who has seen the document; and

6.    identify every other document which refers to or otherwise describes the contents of such document.

F.    Each document produced pursuant to this Request shall be produced as it is kept in the usual course of business (i.e., in the file folder or binder in which such documents were located when the Request was served) or shall be organized and labeled to correspond to the categories of documents requested.

G.    Produce each document that is stapled, clipped, or otherwise attached to a requested document (attached in the same manner as the original), regardless of whether the production of that document is otherwise required by this Request.

H.    If more than one copy of a requested document is in your possession, custody or control, produce each copy that in any way differs from any other copy, including, without limitation, difference caused by writings placed thereon by any person, number of pages comprising the document, or documents attached hereto by staple, clip, or otherwise.

I.    You are instructed to produce all documents that are in your possession, custody or control. Possession, custody or control includes constructive possession whereby you have a right to compel the production of a matter from a third-party (including an agent, authority, custodian, or representative).

J.    To the extent the location of any document called for by this Request is unknown to you, so state. If an estimate can reasonably be made as to the location of an unknown document, describe the document with sufficient particularity so that it can be identified, set forth your best estimate of the document's location, and describe the basis upon which the estimate is made.

K.    If any document has been lost or destroyed, the document so lost or destroyed shall be identified by author, date, subject matter, date of loss or destruction, the identify of the person responsible for the loss or destruction, and if destroyed, the reason for such destruction.

## DOCUMENTS REQUESTED

1.    Any and all documents, including the Terms of Service and Privacy Policy, which relate or refer to or were posted on the website (the "FreeWrites Website") to which the domain www.freewrites.net (the "FreeWrites Domain") resolves or resolved.

2.    Any and all documents that identify the registrant of the FreeWrites Domain or any user or administrator of the FreeWrites Website.

3.    Any and all documents that identify the name of the registrant of the FreeWrites Domain or any user or administrator of the FreeWrites Website.

4.    Any and all documents that identify the address of the registrant of the FreeWrites Domain or any user or administrator of the FreeWrites Website.

5.    Any and all documents which identify any Internet Service Provider or Internet Access Provider through which any person posted a message on the FreeWrites Website.

6.    Any and all documents which identify the Internet Protocol address of any computer from which any post was made on the FreeWrites Website.

7.    Any and all documents which identify the end user or other intermediary using the IP addresses **74.128.214.64** and **65.66.40.26** to post on the FreeWrites Website or to open/send e-mail messages sent to/from submit@freewrites.net or support@freewrites.net.

8.    Any and all documents which identify the name of the end user or other intermediary using the IP addresses **74.128.214.64** and **65.66.40.26** to post on the FreeWrites Website or to open/send e-mail messages sent to/from submit@freewrites.net or support@freewrites.net.

9.    Any and all documents which identify the address of the end user or other intermediary using the IP addresses **74.128.214.64** and **65.66.40.26** to post on the FreeWrites Website or to open/send e-mail messages sent to/from submit@freewrites.net or support@freewrites.net.

10.    Any and all documents which identify any Internet Service Provider or Internet Access Provider through which the end user or other intermediary accessed the FreeWrites Website or opened/sent e-mail messages sent to/from submit@freewrites.net or support@freewrites.net using the IP addresses **74.128.214.64** and **65.66.40.26**.

11.    Any and all documents which identify the Internet Protocol address of any computer from which any post was made by the end user or other intermediary using the IP addresses **74.128.214.64** and **65.66.40.26** to post on the FreeWrites Website.

12.    Any and all documents that identify the physical address of any router, computer or other device associated with the IP addresses 74.128.214.64 and 65.66.40.26.

13.    Any and all documents that identify the identity of any person or entity that owns, leases, rents, uses or exercises control over any router, computer or other device associated with the IP addresses 74.128.214.64 and 65.66.40.26.

14.    Any and all documents that identify any domain names (the "Alternate Domain(s)" associated with the alternate site (the "Alternate Website") referenced in the FreeWrites Website's "SITE MASTER NOTICE" posted on June 13, 2006.

15.    Any and all documents that relate or refer to or were posted on the Alternate Website.

16.    Any and all documents that identify the registrant of the Alternate Domain(s) or any user or administrator of the Alternate Website.

17.    Any and all documents that identify the name of the registrant of the Alternate Domain(s) or any user or administrator of the Alternate Website.

18.    Any and all documents that identify the address of the registrant of the Alternate Domain(s) or any user or administrator of the Alternate Website.

19.    Any and all documents that identify any Internet Service Provider or Internet Access Provider through which any person posted a message on the website Alternate Website.

20.    Any and all documents that identify the Internet Protocol address of any computer from which any post was made on the Alternate Website.

21.    Any and all documents that identify the Internet Protocol address of any computer from which any post was made by the end user or other intermediary using the IP addresses 74.128.214.64 and 65.66.40.26 to post on the Alternate Website.

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that, on this 8th day of December

2006, a copy of the Declaration of William R. Denny in Support of Defendant Jane Doe 1's

Motion to Quash Subpoena *Duces Tecum* Directed to Non-Party Witness L.N.H., Inc. and For a

Protective Order was served by first class mail, postage prepaid, upon the following persons:

> Cynthia A. Ricketts, Esquire
> Sara K. Regan, Esquire
> Squire, Sanders & Dempsey L.L.P.
> Two Renaissance Square
> 40 North Central Avenue, Suite 2700
> Phoenix, AZ  85004-4498
>
> L.N.H., Inc.
> 260 Chapman Road—Suite 205
> Newark Delaware  19702

_William R. Denny_
WILLIAM R. DENNY (ID No. 2580)

[766598]

3

# EXHIBIT 2

1   Cynthia A. Ricketts (Arizona Bar No. 012668)
2   cricketts@ssd.com
    Sara K. Regan (Arizona Bar No. 021988)
3   sregan@ssd.com
    Two Renaissance Square
4   40 North Central Avenue, Suite 2700
    Phoenix, AZ  85004-4498
5   +1.602.528.4000
6   Attorney for Plaintiff
7   Best Western International, Inc.

8              IN THE UNITED STATES DISTRICT COURT

9                 FOR THE DISTRICT OF ARIZONA

10  Best Western International, Inc., a non-       )  Case No. CV06-1537-PHX-DGC
11  profit Arizona corporation,                    )
                                                   )  **FIRST AMENDED COMPLAINT**
12            Plaintiff,                            )  **FOR BREACH OF CONTRACT,**
                                                   )  **BREACH OF AN IMPLIED**
13        vs.                                      )  **COVENANT OF GOOD FAITH**
                                                   )  **AND FAIR DEALING, BREACH**
14  John Doe, an Internet website                  )  **OF AN IMPLIED CONTRACT,**
    administrator; James Furber, an Internet       )  **BREACH OF FIDUCIARY**
15  website administrator; James Dial, an          )  **DUTY, DEFAMATION PER SE,**
    Internet website blogger and Member of         )  **AND TORTIOUS**
16  Best Western International, Inc., Jane Does     )  **INTERFERENCE WITH**
17  1-X, Internet website bloggers and             )  **CONTRACTUAL RELATIONS**
    Members of Best Western International,          )  **AND INJUNCTIVE RELIEF**
18  Inc.; John Does 1-X, Internet website           )
    bloggers and Governors of Best Western         )  **(JURY TRIAL REQUESTED)**
19  International, Inc.,                            )
20            Defendant.                           )
                                                   )
21                                                 )
                                                   )
22                                                 )
                                                   )

23

24        Plaintiff, Best Western International, Inc. ("BWI"), for its Complaint against

25  defendants John Doe, an Internet website administrator ("John Doe Site Administrator"),

26  James Furber, an Internet website administrator ("Furber"), James Dial, an Internet

27  website blogger and Member of Best Western International, Inc. ("Dial"), Jane Does 1-X,

28  Internet website bloggers and Members of BWI ("Member Bloggers"), and John Does 1-

    X, Internet website bloggers and Governors of BWI ("Governor Bloggers") (hereinafter

collectively referred to as "defendants"), inclusive, states:[1]

## NATURE OF THE ACTION

1.    This action arises from an extensive and ongoing course of wrongful conduct by defendants, who have collectively engaged in deliberate, continuous and unlawful use of BWI's computer software and communications equipment ("BWI's Equipment"), BWI's protected name, and disclosure of confidential and/or proprietary information, among other things, to BWI's considerable detriment.

2.    Upon information and belief, defendants have materially breached, and continue to materially breach, their Membership Application and Agreement ("Membership Agreement"), attached hereto as Exhibit A, and BWI's Rules and Regulations ("BWI's Rules"), attached hereto as Exhibit B, which expressly regulate the use of BWI's Equipment, BWI's trademarks, and BWI's business information, by creating an Internet blog and posting comments on that Internet blog in which defendants have publicly disclosed confidential and/or proprietary information during the course of their membership, governorship, and business relationship with BWI.

3.    Upon information and belief, all defendants have made written false statements of purported fact regarding BWI, its business, and its Board of Directors to third parties, and have harmed BWI's reputation and standing with its Members, employees, customers and/or prospective customers, and current and/or prospective business relationships.

4.    Upon information and belief, John Doe Site Administrator, Dial, Member Bloggers, and Governor  Bloggers have engaged in such wrongful conduct while Members and Governors of BWI. Defendants' actions have caused and, unless enjoined by this Court, will continue to cause immediate and irreparable injury to BWI, its Member relations, its employee relations, its customer relationships, its business relations, its trademarks, and its confidential and proprietary information.  BWI asserts

---

[1] BWI submits this First Amended Complaint pursuant to the Court's October 24, 2006 Order. BWI has omitted the claims that the Court dismissed in that Order, but BWI's failure to allege those claims in this First Amended Complaint is not intended to waive and shall not waive those claims.  Instead, BWI only complies with the Court's October 24, 2006 Order dismissing those claims.

claims against defendant John Doe Site Administrator for breach of contract, breach of an implied covenant of good faith and fair dealing, breach of an implied contract, breach of fiduciary duty, defamation per se, and tortious interference with business relations. BWI asserts claims against defendant Furber for defamation per se and tortious interference with business relations. BWI asserts claims against defendants Dial and Member Bloggers for breach of contract, breach of an implied covenant of good faith and fair dealing, breach of an implied contract, defamation per se, and tortious interference with business relations. BWI asserts claims against defendants Governor Bloggers for breach of contract, breach of an implied covenant of good faith and fair dealing, breach of an implied contract, breach of fiduciary duty, defamation per se, and tortious interference with business relations.

**JURISDICTION AND VENUE**

5.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331, as there is a federal question at issue between the parties.

6.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    Venue in this District is proper under 28 U.S.C. § 1391(a)(2), as a substantial part of the events giving rise to BWI's claims herein occurred in this judicial district and BWI resides in this State and in this district.

8.    Arizona is the choice of law and forum state for the Membership Agreement. Exhibit A, ¶ 37. The contract was executed and performed in Arizona.

9.    Under BWI's Rules for the management of BWI, the laws of the State of Arizona govern the rights and obligations of the Members of BWI, and Arizona law governs any dispute between BWI and its Members and Governors concerning the Members' and Governors' duties to BWI.

**PARTIES**

10.    BWI is a non-profit member corporation formed under the laws of the State of Arizona, with its principal place of business in Phoenix, Arizona.

- 3 -

1       11.    BWI's Members own and operate more than 2,400 hotels and other lodging

2   properties under the BWI name and marks.

3       12.    BWI's Board of Directors communicates with BWI Members through

4   Regional Governors who are appointed to oversee a specific geographic district.

5   Governors are also Members of BWI.

6       13.    The true names or capacities, whether individual, corporate, associate, or

7   otherwise, of defendants John Doe Site Administrator, Member Bloggers, and Governor

8   Bloggers are currently unknown to BWI, who therefore sues said defendants by such

9   fictitious names. When their true names and capacities are known to BWI, BWI will

10  amend this Complaint by inserting their true names and capacities herein. BWI is

11  informed and believes, and therefore alleges, that each of the defendants designated

12  herein is legally responsible in some manner for the events and happenings herein

13  referred to, and legally caused injury and damages proximately thereby to BWI as herein

14  alleged.

15      14.    BWI is informed and believes, and therefore alleges, that defendant John

16  Doe Site Administrator is responsible for the creation, operation, and administration of an

17  Internet weblog called FreeWrites.net which was previously located at the Internet

18  domain http://www.freewrites.net and now is located at the Internet domain

    https://freewrites.net/ (the "Blog"), and is a Member and/or Governor of BWI.

19      15.    BWI is informed and believes, and therefore alleges, that defendant Furber

20  is responsible for the creation, operation, and administration of the Blog.

21      16.    BWI is informed and believes, and therefore alleges, that defendants Dial

22  and Member Bloggers are Members of BWI who are posting Internet blog comments on

23  the Blog.

24      17.    BWI is informed and believes, and therefore alleges, that defendants

25  Governor Bloggers are Governors of BWI who are posting Internet blog comments on

26  the Blog.

27      18.    Further, BWI is informed and believes, and therefore alleges, that

28  defendants are responsible for proximately causing BWI's damages as herein alleged.

19. BWI is informed and believes, and therefore alleges, that defendant Furber resides in Indiana.

20. BWI is informed and believes, and therefore alleges, that defendant Dial resides in Indiana.

21. BWI is informed and beliefs, and therefore alleges, that defendant Dial is a Member of BWI, and is an owner of the Best Western Green Tree Inn in Clarksville, Indiana.

## GENERAL ALLEGATIONS

## THE RELATIONSHIP BETWEEN BWI AND ITS MEMBERS

22. As set forth above, BWI is in the hospitality business.

23. BWI Members are owners and operators of hotels bearing the BWI name and logo under license from BWI. The BWI name and logo are registered trademarks.

24. In applying for and agreeing to membership in BWI, all members complete and sign the Membership Agreement.

25. Pursuant to the Membership Agreement, Dial and other Members agree, among other things, to properly use BWI's Equipment. Exhibit A, ¶ 16(a)(i). Members agree to use BWI's Equipment to make reservations and conduct hotel operations.

26. Pursuant to the Membership Agreement, Dial and other Members agree, among other things, to properly use and preserve the integrity of the Best Western name, logo, symbols, trademarks, service marks, and other identifying information ("BWI's Marks"). Exhibit A, ¶ 16(a)(i). Dial and other Members agree to use BWI's Marks only in connection with the hotel and according to the Brand Identity Manual.

27. BWI was founded in 1946. Shortly thereafter, BWI adopted and began using "Best Western" as a trademark identifying hotel services provided by member hotels that were affiliated with BWI. BWI has continuously and extensively promoted its trade name and trademark in interstate commerce since 1946. As a result of this extensive promotion, the trade name and trademark have become famous among the public as a source-identifying symbol.

28. BWI owns numerous federal registrations for BWI's Marks, including

- 5 -

Registration No. 1,432,431 for the standard character mark BEST WESTERN, issued by the United States Patent & Trademark Office on March 10, 1987. Many of BWI's trademark registrations, including its "BEST WESTERN" registration, are in full force and effect, unrevoked and uncancelled, and have become incontestable under 15 U.S.C. § 1065.

29.    BWI has developed BWI's Marks at great expense over the past decades.

30.    BWI's Marks are inherently distinctive and possess strong secondary meaning.

31.    BWI's Marks are the property of BWI.

32.    Pursuant to their membership, Dial and other Members are entrusted with confidential and proprietary information pertaining to BWI's customers, contracts, business relations, business transactions, and business development, as well as the marketing and implementation of the same. As such, Dial and other Members are afforded access to BWI's most valuable confidential and proprietary information ("BWI's Confidential Information").

33.    BWI's Confidential Information is BWI's property.

34.    BWI's Confidential Information is not generally known to its customers, contracting parties, and/or in the industry in which BWI competes.

35.    BWI's Confidential Information is available to the Members of BWI by virtue of their membership.

36.    Because Dial and other Members have access to BWI's Confidential Information, BWI Members who have access to such information are aware of the need to maintain and preserve the confidentiality of the information.

37.    The confidentiality of BWI's Confidential Information must be preserved, maintained, and kept by BWI from competitors.

38.    BWI's Confidential Information is considered in the industry in which BWI competes to be an important component of a company's goodwill.

39.    BWI's Confidential Information would be of enormous benefit to anyone now competing against BWI and, if disclosed to competitors, would cause significant

- 6 -

damage to BWI's business.  Moreover, disclosure of BWI's Confidential Information would deprive BWI of the benefits of the considerable time, energy, resources, and personnel it expended to preserve the confidentiality of such information.

40.    BWI has begun a crucial phase in its corporate and brand development. Throughout the course of this year, BWI has formulated changes to its Bylaws and methods of operation to enable BWI to compete more effectively in the industry in which it competes and to yield increased benefits and profits for Dial and the other Members' investments in BWI.

41.    BWI's actions are time sensitive and actions taken against BWI to disparage the company and brand and actions which improperly and maliciously impede action on the proposed Bylaw changes are causing, have caused, and will continue to cause irreparable injury to BWI, such that all changes made to date will be ineffective and all changes BWI hopes to make will be thwarted.

42.    In addition, willful and malicious actions taken by defendants on the cusp of the Annual Meeting in October 2006 further impeded BWI's hope to advance its Members' ability to improve on their investments in BWI.

## THE RELATIONSHIP BETWEEN BWI AND ITS GOVERNORS

43.    BWI's Governors are appointed by BWI's Board of Directors to visit, oversee, and communicate with hotel properties, owners, and others in the district in which they were appointed to govern.  Governors are largely liaisons between the Board of Directors and the individual hotel properties and Members.

44.    Pursuant to BWI's Rules, Governors are to communicate with the Board when any Member violates his/her Membership Agreement.  Exhibit B, § 200.3(D)(2).

45.    Pursuant to BWI's Rules, Governors are to protect and properly use BWI's Marks.  Exhibit B, §§ 300.9, 300.11.

46.    BWI's Marks are the property of BWI.

47.    Pursuant to BWI's Rules, Governors are to abide by BWI's ethics policies. Exhibit B, § 200.3(I).  Pursuant to BWI's Human Resources Policy and Procedure on Business Ethics ("Ethics Policy"), attached hereto as Exhibit C, all Governors must keep

confidential all information concerning BWI's business plans and strategies (hereinafter included as part of BWI's Confidential Information).

48.    Pursuant to their governorship, Governors are entrusted with confidential and proprietary information pertaining to BWI's customers, contracts, business relations, business transactions, and business development, as well as the marketing and implementation of the same.    As such, Governors are afforded access to BWI's Confidential Information.

49.    BWI's Confidential Information is BWI's property.

50.    BWI's Confidential Information is not generally known to its customers, contracting parties, and/or in the industry in which BWI competes.

51.    BWI's Confidential Information is available to the Governors of BWI by virtue of their governorship.

52.    Because Governors have access to BWI's Confidential Information, BWI Governors who have access to such information are aware of the need to maintain and preserve the confidentiality of the information.

53.    The confidentiality of BWI's Confidential Information must be preserved, maintained, and kept secure from BWI's competitors.

54.    BWI's Confidential Information is considered in the industry in which BWI competes to be an important component of a company's goodwill.

55.    BWI's Confidential Information would be of enormous benefit to anyone now competing against BWI and, if disclosed to competitors, would cause significant damage to BWI's business.    Moreover, disclosure of BWI's Confidential Information would deprive BWI of the benefits of the considerable time, energy, resources, and personnel it expended to preserve the confidentiality of such information.

**THE CREATION AND ADMINISTRATION OF THE BLOG**

56.    Upon information and belief, on or about May 1, 2006 www.freewrites.net, an Internet blog, was created.

57.    Upon information and belief, on May 1, 2006, Furber registered the freewrites.net domain name.    Upon information and belief, on that date or shortly

thereafter, he hosted the website through which the freewrites.net domain name resolves with the company LNH Inc., doing business as hostmysite.com.

58.    Upon information and belief, on or shortly after June 14, 2006, Furber hosted the website through which the freewrites.net domain name resolves with the company Amadeus Software, doing business as neomailbox.com.

59.    Upon information and belief, Furber is a Site Administrator for the Blog.

60.    Anyone can post any comment about BWI on the Blog.

61.    Although the Blog recites that it is meant for the "Best Western Members," anyone with knowledge of the Blog can access the Blog, including BWI's competitors and others in the industry in which BWI does business.

62.    The Blog is in no way associated with BWI and BWI has never authorized or approved the creation of the Blog under BWI's name and using BWI's Marks.

63.    Upon information and belief, Furber and/or John Doe Site Administrator receive all submissions of postings for the Blog and post all the submissions received on the Blog.

64.    Since its first posting on May 11, 2006, more than 500 comments have been posted on the Blog and the Blog has received more than 4,500 visits.

### THE BLOGGERS' ACTIONS

65.    BWI believes and thereon alleges that the postings on the Blog are made by Furber, Dial, Member Bloggers, and Governor Bloggers (collectively, the "Bloggers").

66.    The defendant Bloggers have improperly, and without BWI's consent, posted on the Blog BWI's Confidential Information

67.    Since May 11, 2006, the defendant Bloggers have posted on the Blog BWI's Mark at least 290 times.

68.    As a result of defendants' improper activities and postings, the defendant Bloggers have improperly used BWI's Equipment and BWI's Marks, and have done so in violation of their obligations owed to BWI as members and/or governors of BWI.

69.    Upon information and belief, defendants continue to possess and misuse BWI's Equipment and BWI's Marks that the Bloggers are given access to as part of, and

- 9 -

in consideration for, their membership and continued membership and governorship with BWI.

70.     Upon information and belief, defendant Bloggers continue to disclose and improperly use BWI's Confidential Information, BWI's Equipment, and BWI's Marks and continue to harm and damage BWI's goodwill and reputation in the industry in which BWI competes.

71.     By engaging in such wrongful conduct, defendant Bloggers have damaged and continue to damage BWI financially and in the industry in which it competes, and have deprived and continue to deprive BWI of the benefit, effectiveness, and integrity of BWI's Equipment, BWI's Marks, and BWI's Confidential Information, among other things.

72.     In addition, defendant Bloggers have deprived and continue to deprive BWI of the benefit of the Membership Agreement and BWI's Rules.

73.     Such deprivations and continued deprivations, damages, and other harms have irreparably harmed and continue to irreparably harm BWI.

74.     Upon information and belief, defendant Bloggers have engaged in such conduct with the intent to misuse BWI's Equipment, misappropriate BWI's Marks, and improperly and without authorization disclose BWI's Confidential Information, among other things.

75.     Upon information and belief, defendant Bloggers have acted with the intent to damage BWI's reputation, success, goodwill, business relationships, and relationships with its Members and prospective Members, Governors and prospective Governors, employees and prospective employees, contracting parties and prospective contracting parties, customers, prospective customers, and others with whom BWI does business in the industry in which BWI competes.

76.     In addition, defendant Bloggers have made oral and/or written false statements of purported fact regarding BWI and its business to an indefinite number of third parties, which has harmed BWI's reputation, standing, and business relationships with its Members and/or prospective Members, Governors and prospective Governors,

1  employees and prospective employees, contracting parties and prospective contracting

2  parties, customers, prospective customers, and others with whom BWI does business in

3  the industry in which BWI competes.

4      77.    As a direct and proximate result of all defendants' wrongful acts described

5  herein, BWI sustained and continues to sustain immediate and irreparable harm and

6  injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of

7  business relations with existing and future business prospects, and loss of competitive

8  business advantage, opportunity, and/or expectancy.

9                    **ANONYMOUS FAXES**

10     78.    In addition to the specific actions of the Bloggers on the Blog, BWI has

11  recently been informed of a series of mass distribution of anonymous faxes to its

12  Members.

13     79.    BWI has received complaints from its members about the faxes, which are

14  unsolicited and unlawful.

15     80.    All identifying information in these faxes has been stripped.  BWI knows

16  neither the author(s) nor distributor(s) of these faxes.

17     81.    However, BWI believes, and thereon alleges, that these faxes are authored

18  by and are being distributed by those who are also Bloggers.

19                     **COUNT ONE**

     **(Breach Of Contract Against Defendant John Doe Site Administrator)**

20

21     82.    BWI incorporates each and every allegation previously set forth herein as if

     fully set forth in this Count One.

22

23     83.    Upon information and belief, defendant John Doe Site Administrator is a

     BWI Member and/or a BWI Governor.

24

25     84.    Upon information and belief, defendant John Doe Site Administrator has

     breached either or both the Membership Agreement and BWI's Rules.

26

27     85.    Upon information and belief, defendant John Doe Site Administrator has

     misused, and continues to misuse, BWI's Equipment to operate the Blog and has further

28  improperly used and continues to misuse BWI's Marks and BWI's Confidential

Information, among other things.

86.    Upon information and belief, defendant John Doe Site Administrator has misused BWI's Marks by creating and administering the Blog that is accessible to anyone who has knowledge of the Blog.

87.    Such actions have proximately harmed and damaged BWI.

88.    As a direct and proximate result of defendant John Doe Site Administrator's wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

89.    BWI has no adequate remedy at law.

90.    There is a substantial risk that the defendant John Doe Site Administrator will continue to irreparably injure BWI unless he/she and others acting in concert with him/her are preliminarily and/or permanently enjoined.

91.    Unless defendant John Doe Site Administrator's wrongful acts described herein is preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

92.    In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendant John Doe Site Administrator's wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

93.    Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

94.    BWI is entitled to recover its reasonable attorneys' fees and costs incurred herein.

**COUNT TWO**

**(Breach Of Contract Against Defendants Dial and Member Bloggers)**

95.    BWI incorporates each and every allegation previously set forth herein as if fully set forth in this Count Two.

96.    Upon information and belief, defendants Dial and Member Bloggers are also BWI Members.

97.    Pursuant to the Membership Agreement, Dial and the other Members are to fulfill and uphold their obligations with regard to BWI's Equipment, BWI's Marks, and BWI's Confidential Information, among other things.

98.    Thus, according to the express language in the Agreement, BWI is entitled to the protection and preservation of BWI's Equipment, BWI's Marks, and BWI's Confidential Information.

99.    During the course of their membership with BWI, Dial and the other Members acquired access to BWI's Equipment, BWI's Marks, and BWI's Confidential Information.

100.    BWI entrusted BWI's Equipment, BWI's Marks, and BWI's Confidential Information to Dial and the other Members in the performance of their duties, responsibilities, and obligations as BWI Members.

101.    BWI's Equipment and BWI's Marks are essential to the current and continued operation, success, goodwill, and integrity of BWI and its relationships with its current and prospective Members, Governors, employees, contracting parties, customers, prospective customers, and others with whom BWI does business in the industry in which BWI competes.

102.    BWI's Confidential Information is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use.

103.    BWI's Equipment and BWI's Marks are the subject of efforts and ownership of BWI that are reasonable under the circumstances to protect and prevent their continued misuse and dilution of value.

1    104. BWI's Confidential Information is the subject of efforts by BWI that are

2 reasonable under the circumstances to maintain its secrecy or confidentiality.

3    105. As set forth above, Dial and the other Members promised, by entering into

4 the Membership Agreement with BWI, that they would not improperly utilize BWI's

5 Equipment or BWI's Marks or divulge BWI's Confidential Information.

6    106. Despite this, upon information and belief, defendants Dial and Member

7 Bloggers have misused, and continue to misuse, BWI's Equipment to conduct improper

8 Internet activities.

9    107. Upon information and belief, defendants Dial and Member Bloggers have

10 misused, and continue to misuse, BWI's Marks in these improper Internet activities.

11    108. Additionally, upon information and belief, defendants Dial and Member

12 Bloggers have used, and continue to misuse, BWI's Equipment and BWI's Marks to

13 improperly post BWI's Confidential Information on the Internet.

14    109. In their activities, upon information and belief, defendants Dial and

15 Member Bloggers knew or had reason to know that they were contractually obligated not

16 to improperly use BWI's Equipment and BWI's Marks and not to improperly use or

17 disclose BWI's Confidential Information

18    110. Upon information and belief, the promises made by and the obligations of

19 defendants Dial and Member Bloggers in the Membership Agreement have not expired.

20    111. BWI has not given defendants Dial and Member Bloggers express or

21 implied consent to disclose or use BWI's Confidential Information on the Internet in the

22 manner in which such information has been used and posted.

23    112. BWI has not given defendants Dial and Member Bloggers express or

24 implied consent to disclose or use BWI's Marks on the Internet in the manner in which

25 such information has been used and posted.

26    113. BWI has not given defendants Dial and Member Bloggers express or

27 implied consent to use BWI's Equipment in the manner described herein.

28    114. BWI has performed any and all conditions precedent to the enforcement of

the promises made by defendants Dial and Member Bloggers in the Membership

- 14 -

Agreement. Therefore, enforcement of the Membership Agreement is just and reasonable.

115. Upon information and belief, defendants Dial and the other Member Bloggers have materially breached and continue to materially breach the Membership Agreement by engaging in the wrongful acts described herein including, but not limited to: (a) wrongfully, intentionally, and willfully utilizing BWI's Equipment for improper activities; (b) wrongfully, intentionally, and willfully utilizing BWI's Marks for improper activities; and, (c) wrongfully, intentionally, willfully, and improperly utilizing and/or disclosing BWI's Confidential Information.

116. The wrongful, intentional, willful, and improper acts described herein have proximately injured and impaired BWI, and continue to proximately injure and impair BWI.

117. As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

118. BWI has no adequate remedy at law.

119. There is a substantial risk that defendants Dial and Member Bloggers will continue to irreparably injure BWI unless they and others acting in concert with them are preliminarily and/or permanently enjoined.

120. Unless defendants Dial and Member Bloggers' wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

121. In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendants Dial and Member Bloggers' wrongful acts described herein, BWI has suffered

1    actual and consequential damages in an amount which BWI believes exceeds $75,000.

2    122.    Upon information and belief, the acts described herein were so willful and

3    malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. §

4    44-403(b).

5    123.    BWI is entitled to recover its reasonable attorneys' fees and costs incurred

6    herein.

7    ## COUNT THREE

8    **(Breach Of Contract Against Defendants Governor Bloggers)**

9    124.    BWI incorporates each and every allegation previously set forth herein as if

10    fully set forth in this Count Three.

11    125.    Upon information and belief, defendants Governor Bloggers are also BWI

12    Governors.

13    126.    Upon information and belief, defendants Governor Bloggers have breached

14    both the Membership Agreement and BWI's Rules.

15    127.    Upon information and belief, defendants Governor Bloggers have misused

16    and continue to misuse BWI's Equipment to post comments on the Blog which do not

17    relate to the operation of the Hotel and instead involve the improper posting of BWI's

18    Marks, BWI's Confidential Information, defamatory, and otherwise tortious material,

       among other things.

19    128.    As a direct and proximate result of defendants Governor Bloggers' breach,

20    BWI has sustained and continues to sustain immediate and irreparable harm and injury

21    including, but not limited to, substantial loss of profits, loss of goodwill, loss of business

22    relations with existing and future Members, with existing and future Governors, with

23    existing and future employees, with existing and future contracting parties, with existing

24    and future business prospects, and loss of competitive business advantage, opportunity,

25    and/or expectancy.

26    129.    BWI has no adequate remedy at law.

27    130.    There is a substantial risk that defendants Governor Bloggers will continue

28    to irreparably injure BWI unless they and others acting in concert with them are

- 16 -

preliminarily and/or permanently enjoined.

131.  Unless defendants Governor Bloggers' wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

132.  In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendants Governor Bloggers' wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

133.  Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

134.  BWI is entitled to recover its reasonable attorneys' fees and costs incurred herein.

## COUNT FOUR

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against John Doe Site Administrator)

135.  BWI incorporates each and every allegation set forth above as if fully set forth in this Count Four.

136.  As alleged herein, either or both a Membership Agreement exists between defendant John Doe Site Administrator and BWI or a contractual relationship pursuant to BWI's Rules.

137.  Upon information and belief, defendant John Doe Site Administrator has a duty to render performance under either or both the Membership Agreement and BWI's Rules.

138.  Upon information and belief, defendant John Doe Site Administrator has a duty to affirmatively perform his/her obligations under the Membership Agreement and/or BWI's Rules and fulfill the goals and purposes of those contracts.

139.  Upon information and belief, defendant John Doe Site Administrator is also bound by an implied covenant of good faith and fair dealing.

140. The purpose of the Membership Agreement is to govern the interactions between the Members and BWI and outline the rights and obligations of each party.

141. The purpose of BWI's Rules is, in part, to govern the interactions between the Governors and BWI and outline the obligations and expectations of the Governors.

142. Upon information and belief, defendant John Doe Site Administrator breached the covenant of good faith and fair dealing in the Membership Agreement and/or BWI's Rules alleged above by failing to satisfy his/her obligations under the contracts and by interfering with other Members' and Governors' rights under the contracts.

143. BWI has been denied and continues to be denied its benefits under the Membership Agreement and/or BWI's Rules.

144. As a direct and proximate result of defendant John Doe Site Administrator's breach, BWI has sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

145. BWI has no adequate remedy at law.

146. There is a substantial risk that defendant John Doe Site Administrator will continue to irreparably injure BWI unless he/she and others acting in concert with him/her are preliminarily and/or permanently enjoined.

147. Unless defendant John Doe Site Administrator's wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

148. In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendant John Doe Site Administrator's wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds

$75,000.

149.   Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

150.   BWI is entitled to recover its reasonable attorneys' fees and costs incurred herein.

## COUNT FIVE

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Dial and Member Bloggers)

151.   BWI incorporates each and every allegation set forth above as if fully set forth in this Count Five.

152.   Upon information and belief, defendants Dial and Member Bloggers are also BWI Members.

153.   As alleged herein, upon information and belief, a Membership Agreement exists between the defendants Dial and Member Bloggers and BWI.  Defendants Dial and Member Bloggers have a duty to render performance under the Membership Agreement. Defendants Dial and Member Bloggers have a duty to affirmatively perform their obligations under the Membership Agreement and fulfill the goals and purposes of that contract.  Defendants Dial and Member Bloggers are also bound by an implied covenant of good faith and fair dealing.

154.   The purpose of the Membership Agreement is to govern the interactions between defendants Dial and Member Bloggers and BWI and outline the rights and obligations of each party.

155.   Upon information and belief, defendants Dial and Member Bloggers breached the covenant of good faith and fair dealing in the Membership Agreement alleged above by failing to satisfy their obligations under the contract and by interfering with other Members' rights under the Agreement as described herein.

156.   As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including,

- 19 -

1  but not limited to, substantial loss of profits, loss of goodwill, loss of business relations
2  with existing and future Members, with existing and future Governors, with existing and
3  future employees, with existing and future contracting parties, with existing and future
4  business prospects, and loss of competitive business advantage, opportunity, and/or
5  expectancy.

6  157.  BWI has no adequate remedy at law.

7  158.  There is a substantial risk that defendants Dial and Member Bloggers will
8  continue to irreparably injure BWI unless they and others acting in concert with them are
9  preliminarily and/or permanently enjoined.

10  159.  Unless defendants Dial and Member Bloggers' wrongful acts described
11  herein are preliminarily and/or permanently enjoined, BWI will continue to sustain
12  immediate and irreparable harm and injury.

13  160.  In the alternative and in addition to the irreparable harm and injury
14  described herein, upon information and belief, as a direct and proximate result of
15  defendants Dial and Member Bloggers' wrongful acts described herein, BWI has suffered
16  actual and consequential damages in an amount which BWI believes exceeds $75,000.

17  161.  Upon information and belief, the acts described herein were so willful and
18  malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. §
    44-403(b).

19  162.  BWI is entitled to recover its reasonable attorneys' fees and costs incurred
20  herein.

21  **COUNT SIX**
22  **(Breach of Implied Covenant of Good Faith and Fair Dealing**
23  **Against Governor Bloggers)**

24  163.  BWI incorporates each and every allegation set forth above as if fully set
25  forth in this Count Six.

26  164.  Upon information and belief, certain of defendants Governor Bloggers are
27  also BWI Governors.

28  165.  As alleged herein, defendants Governor Bloggers have a duty to render

- 20 -

performance under BWI's Rules. Defendants Governor Bloggers have a duty to affirmatively perform their obligations under BWI's Rules and fulfill the goals and purposes of that contract. Defendants Governor Bloggers are also bound by an implied covenant of good faith and fair dealing.

166. The purpose of BWI's Rules is to govern the interactions between defendants Governor Bloggers and BWI and outline the rights and obligations of each party.

167. Upon information and belief, defendants Governor Bloggers breached the covenant of good faith and fair dealing in BWI's Rules alleged above by failing to satisfy their obligations under the contract and by interfering with other Governors' and Members' rights as described herein.

168. As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity and/or expectancy.

169. BWI has no adequate remedy at law.

170. There is a substantial risk that defendants Governor Bloggers will continue to irreparably injure BWI unless they and others acting in concert with them are preliminarily and/or permanently enjoined.

171. Unless defendants Governor Bloggers' wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

172. In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendants Governor Bloggers' wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

1    173.  Upon information and belief, the acts described herein were so willful and

2    malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. §

3    44-403(b).

4    174.  BWI is entitled to recover its reasonable attorneys' fees and costs incurred

5    herein.

6    **COUNT SEVEN**

7    **(Breach of an Implied Contract Against John Doe Site Administrator)**

8    175.  BWI incorporates and realleges the allegations set forth herein as if fully set

9    forth in this Count Seven.

10    176.  As alleged herein, either or both a Membership Agreement exists between

11    defendant John Doe Site Administrator and BWI or a contractual relationship pursuant to

12    BWI's Rules.

13    177.  Upon information and belief, BWI has an implied contract with defendant

14    John Doe Site Administrator by way of the Membership Agreement, BWI's Rules, and

15    other BWI policies and procedures for conducting business with BWI and within the

16    BWI corporate structure and by way of the relationship between John Doe Site

17    Administrator and BWI.

18    178.  Inherent within these contracts and defendant John Doe Site

19    Administrator's relationship with BWI is an agreement to preserve and protect BWI's

20    Confidential Information.

21    179.  In consideration for agreeing to preserve and protect BWI's Confidential

22    Information, defendant John Doe Site Administrator was granted Member and/or

23    Governor status with BWI.

24    180.  BWI has performed of all its obligations pursuant to the Membership

25    Agreement, BWI's Rules, and other policies and procedures.

26    181.  In creating and administering the Blog intended to disclose BWI's

27    Confidential Information and in specifically disclosing BWI's Confidential Information

28    on the Blog, defendant John Doe Site Administrator has failed to perform his/her

    corresponding obligations.

- 22 -

182.   As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

183.   BWI has no adequate remedy at law.

184.   There is a substantial risk that defendant John Doe Site Administrator will continue to irreparably injure BWI unless he/she and others acting in concert with him/her are preliminarily and/or permanently enjoined.

185.   Unless defendant John Doe Site Administrator's wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

186.   In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendant John Doe Site Administrator's wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

187.   Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

188.   BWI is entitled to recover its reasonable attorneys' fees and costs incurred herein.

## COUNT EIGHT

### (Breach of an Implied Contract Against Dial and Member Bloggers)

189.   BWI incorporates and realleges the allegations set forth herein as if fully set forth in this Count Eight.

190.   As alleged herein, a Membership Agreement exists between Dial and the

Member Bloggers and BWI.

191.   Upon information and belief, BWI has an implied contract with defendants Dial and Member Bloggers by way of the Membership Agreement and other BWI policies and procedures for conducting business with BWI and within the BWI corporate structure and by way of the relationship between defendants Dial and Member Bloggers and BWI.

192.   Inherent within these contracts and defendants Dial and Member Bloggers' relationship with BWI is an agreement to preserve and protect BWI's Confidential Information.

193.   In consideration for agreeing to preserve and protect BWI's Confidential Information, defendants Dial and Member Bloggers were granted Member status with BWI.

194.   BWI has performed of all its obligations pursuant to the Membership Agreement and other policies and procedures.

195.   In authoring comments and submitting them for posting on the Blog that disclose and were intended to disclose BWI's Confidential Information, defendants Dial and Member Bloggers have failed to perform their corresponding obligations.

196.   As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

197.   BWI has no adequate remedy at law.

198.   There is a substantial risk that defendants Dial and Member Bloggers will continue to irreparably injure BWI unless they and others acting in concert with them are preliminarily and/or permanently enjoined.

199.   Unless defendants Dial and Member Bloggers' wrongful acts described

- 24 -

herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

200.   In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendants Dial and Member Bloggers' wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

201.   Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

202.   BWI is entitled to recover its reasonable attorneys' fees and costs incurred herein.

## COUNT NINE
### (Breach of an Implied Contract Against Governor Bloggers)

203.   BWI incorporates and realleges the allegations set forth herein as if fully set forth in this Count Nine.

204.   As alleged herein, a Membership Agreement and a contractual relationship pursuant to BWI's Rules exist between defendants Governor Bloggers and BWI.

205.   Upon information and belief, BWI has an implied contract with defendants Governor Bloggers by way of the Membership Agreement, BWI's Rules, and other BWI policies and procedures for conducting business with BWI and within the BWI corporate structure and by way of the relationship between defendants Governor Bloggers and BWI.

206.   Inherent within these contracts and defendants Governor Bloggers' relationship with BWI is an agreement to preserve and protect BWI's Confidential Information.

207.   In consideration for agreeing to preserve and protect BWI's Confidential Information, defendants Governor Bloggers were granted Member and Governor status with BWI.

208.   BWI has performed of all its obligations pursuant to the Membership

Agreement, BWI's Rules, and other policies and procedures.

209. In authoring comments and submitting them for posting on the Blog that disclose and were intended to disclose BWI's Confidential Information, defendants Governor Bloggers have failed to perform their corresponding obligations.

210. As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

211. BWI has no adequate remedy at law.

212. There is a substantial risk that defendants Governor Bloggers will continue to irreparably injure BWI unless they and others acting in concert with them are preliminarily and/or permanently enjoined.

213. Unless defendants Governor Bloggers' wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

214. In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of defendants Governor Bloggers' wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

215. Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

216. BWI is entitled to recover its reasonable attorneys' fees and costs incurred herein.

**COUNT TEN**

**(Breach of Fiduciary Duty Against John Doe Site Administrator)**

217.   BWI incorporates and realleges the allegations set forth herein as if fully set forth in this Count Ten.

218.   Upon information and belief, defendant John Doe Site Administrator is a BWI Member and/or a BWI Governor.

219.   To the extent that defendant John Doe Site Administrator is a BWI Governor, as a Governor of BWI, defendant John Doe Site Administrator owed and continues to owe fiduciary duties of loyalty and care to BWI to act in BWI's best interests and not intentionally damage BWI, its corporate image, structure, and business relationships.

220.   To the extent that defendant John Doe Site Administrator is a BWI Governor, as a Governor of BWI, defendant John Doe Site Administrator additionally owed and continues to owe duties not to engage in activities which would breach his/her fiduciary duties to BWI and not to allow, aid, or promote others' breach of their duties to BWI.

221.   To the extent that defendant John Doe Site Administrator is a BWI Governor, as a Governor of BWI, upon information and belief, during the continued course of his/her governorship, defendant John Doe Site Administrator has breached and continues to breach his/her express and implied fiduciary duties to BWI by, among other things, (i) creating the Blog which is intended for the distribution of BWI's Marks, BWI's Confidential Information, defamatory, disparaging, false, misleading, improper, and otherwise tortious material; (ii) posting on the Blog BWI's Marks, BWI's Confidential Information, defamatory, disparaging, false, misleading, improper, and otherwise tortious material; (iii) diverting and encouraging others to divert from business relationships, contracts, and other involvements in and/or with BWI; and (iv) generally scheming and conspiring to damage BWI, its business, its relationships, its contracts, and its corporate and business marketing, advertising, outreach, and development.

222.   As a direct and proximate result of the wrongful acts described herein, BWI

1  sustained and continues to sustain immediate and irreparable harm and injury including,
2  but not limited to, substantial loss of profits, loss of goodwill, loss of business relations
3  with existing and future Members, with existing and future Governors, with existing and
4  future employees, with existing and future contracting parties, with existing and future
5  business prospects, and loss of competitive business advantage, opportunity and/or
6  expectancy.
7        223.   BWI has no adequate remedy at law.
8        224.   There is a substantial risk that defendant John Doe Site Administrator will
9  continue to irreparably injure BWI unless he/she and others acting in concert with
10 him/her are preliminarily and/or permanently enjoined.
11       225.   Unless defendant John Doe Site Administrator's wrongful acts described
12 herein are preliminarily and/or permanently enjoined, BWI will continue to sustain
13 immediate and irreparable harm and injury.
14       226.   In the alternative and in addition to the irreparable harm and injury
15 described herein, upon information and belief, as a direct and proximate result of
16 defendant John Doe Site Administrator's wrongful acts described herein, BWI has
17 suffered actual and consequential damages in an amount which BWI believes exceeds
18 $75,000.
19       227.   Upon information and belief, the acts described herein were so willful and
20 malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. §
21 44-403(b).
22       228.   BWI is entitled to recover its reasonable attorneys' fees and costs incurred
23 herein.

                                **COUNT ELEVEN**
                **(Breach of Fiduciary Duty Against Governor Bloggers)**

24       229.   BWI incorporates and realleges the allegations set forth herein as if fully set
25 forth in this Count Eleven.
26       230.   Upon information and belief, certain of defendants Governor Bloggers are
27 also BWI Governors.

                                      - 28 -

231. As Governors of BWI, defendants Governor Bloggers owed and continue to owe fiduciary duties of loyalty and care to BWI to act in BWI's best interests and not intentionally damage BWI, its corporate image, structure, and business relationships.

232. Defendants Governor Bloggers additionally owed and continue to owe duties not to engage in activities which would breach their fiduciary duties to BWI and not to allow, aid, or promote others' breach of their duties to BWI.

233. During the continued course of their governorship, defendants Governor Bloggers have breached and continue to breach their express and implied fiduciary duties to BWI by, among other things, (i) creating the Blog which is intended for the distribution of BWI's Marks, BWI's Confidential Information, defamatory, disparaging, false, misleading, improper, and otherwise tortious material; (ii) posting on the Blog BWI's Marks, BWI's Confidential Information, defamatory, disparaging, false, misleading, improper, and otherwise tortious material; (iii) diverting and encouraging others to divert from business relationships, contracts, and other involvements in and/or with BWI; and (iv) generally scheming and conspiring to damage BWI, its business, its relationships, its contracts, and its corporate and business marketing, advertising, outreach, and development.

234. As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity and/or expectancy.

235. BWI has no adequate remedy at law.

236. There is a substantial risk that defendants Governor Bloggers will continue to irreparably injure BWI unless they and others acting in concert with them are preliminarily and/or permanently enjoined.

237. Unless defendants Governor Bloggers' wrongful acts described herein are

1    preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and

2    irreparable harm and injury.

3        238.  In the alternative and in addition to the irreparable harm and injury

4    described herein, upon information and belief, as a direct and proximate result of

5    defendants Governor Bloggers' wrongful acts described herein, BWI has suffered actual

6    and consequential damages in an amount which BWI believes exceeds $75,000.

7        239.  Upon information and belief, the acts described herein were so willful and

8    malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. §

9    44-403(b).

10       240.  BWI is entitled to recover its reasonable attorneys' fees and costs incurred

11   herein.

12                           **COUNT TWELVE**

13                **(Defamation Per Se Against All Defendants)**

14       241.  BWI incorporates and realleges the allegations previously set forth herein

15   as if fully set forth in this Count Twelve.

16       242.  Upon information and belief, certain of defendant Bloggers are also BWI

17   Governors.

18       243.  Upon information and belief, certain of defendant Bloggers are also BWI

19   Members.

20       244.  On the Blog, upon information and belief, defendants Furber, Dial, Member

21   Bloggers and/or defendants Governor Bloggers made oral and/or written false statements

22   of purported fact regarding BWI and its business that tend to harm BWI's reputation and

23   standing with its Members and/or prospective Members, Governors and/or prospective

24   Governors, employees and/or prospective employees, contracting parties and/or

25   prospective contracting parties, and customers and/or prospective customers, and have

26   harmed BWI's reputation and standing with its Members and/or prospective Members,

27   employees and/or prospective employees, contracting parties and/or prospective

28   contracting parties, and customers and/or prospective customers.

245. Upon information and belief, defendants Furber, Dial, Member Bloggers and/or defendants Governor Bloggers communicated such statements to a certain third party or parties via the Internet, and/or intentionally made such statements on the Blog via the Internet, which is (and was) accessible to third-parties with knowledge of the Blog.

246. As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial losses in revenues, loss of profits, loss of goodwill, loss of business relations with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

247. As a direct and proximate result of the wrongful acts described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial loss of profits, loss of goodwill, loss of business relations with existing and future Members, with existing and future Governors, with existing and future employees, with existing and future contracting parties, with existing and future business prospects, and loss of competitive business advantage, opportunity and/or expectancy.

248. BWI has no adequate remedy at law.

249. There is a substantial risk that defendants Furber, Dial, Member Bloggers and/or defendants Governor Bloggers will continue to irreparably injure BWI unless they and others acting in concert with them are preliminarily and/or permanently enjoined.

250. Unless defendants Furber, Dial, Member Bloggers' and/or defendants Governor Bloggers' wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

251. In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate of defendants Furber, Dial, Member Bloggers' and/or defendants Governor Bloggers' wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

252. Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

## COUNT THIRTEEN

### (Tortious Interference With Prospective Economic Advantage Against All Defendants)

253. BWI incorporates and realleges the allegations set forth herein as if fully set forth in this Count Thirteen.

254. BWI has a valid business relationship with customers, Members, and others with whom BWI does business and a reasonable expectation of a valid business relationship with customers, prospective customers, Members, prospective Members, and others with whom BWI does business or with whom BWI may reasonably expect to do business in the hotel industry, as described herein. This expectancy is based, in part, on the considerable time, energy, resources, and personnel it takes to develop and run a hotel, develop, create, and maintain the goodwill and reputation associated with BWI's Marks and name, and to maintain confidential and proprietary information and customer relations.

255. At all material times hereto, all defendants were aware of these valid business relationships and/or prospective economic business advantages, opportunities, and/or expectancies.

256. As described herein, all defendants intentionally and/or purposefully interfered with BWI's valid business relationships and/or prevented BWI's business expectancy from ripening by unlawfully interfering with BWI's economic business advantages, opportunities, and expectancies.

257. The wrongful acts of interference described herein proximately impaired and/or are likely to continue to impair BWI's valid business relationships and BWI's prospective economic business advantages, opportunities, and/or expectancies in the hotel industry with customers and others who, as a result of the wrongful acts described herein, have refused or may refuse to do business with BWI.

- 32 -

258.  As a direct and proximate result of the wrongful, improper, and intentional interference with BWI's valid business relationships and/or BWI's prospective economic business advantages, opportunities, and/or expectancies described herein, BWI sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, substantial losses in revenues, loss of profits, loss of goodwill, loss of business relations with existing and future business prospects, and loss of competitive business advantage, opportunity, and/or expectancy.

259.  There is a substantial risk that all defendants will continue to tortiously interfere with BWI's valid business relationships and BWI's prospective economic business advantages, opportunities and/or expectancies unless all defendants are preliminarily and/or permanently enjoined.

260.  BWI has no adequate remedy at law.

261.  There is a substantial risk that all defendants will continue to irreparably injure BWI unless they and others acting in concert with them are preliminarily and/or permanently enjoined.

262.  Unless all defendants' wrongful acts described herein are preliminarily and/or permanently enjoined, BWI will continue to sustain immediate and irreparable harm and injury.

263.  In the alternative and in addition to the irreparable harm and injury described herein, upon information and belief, as a direct and proximate result of all defendants' wrongful acts described herein, BWI has suffered actual and consequential damages in an amount which BWI believes exceeds $75,000.

264.  Upon information and belief, the acts described herein were so willful and malicious that they warrant an award of exemplary damages to BWI pursuant to A.R.S. § 44-403(b).

**WHEREFORE,** BWI prays for judgment against all defendants, jointly and severally, as follows:

A.    For a preliminary and permanent injunction enjoining and restraining John Doe Site Administrator, Furber, Dial, Member Bloggers, and Governor Bloggers, from:

- 33 -

(1)    engaging in acts that are a further material breach of the Membership Agreement;

(2)    engaging in acts that are a further material breach of BWI's Rules;

(3)    operating the Blog or similar Blogs;

(4)    operating the Blog or similar Blogs under its current goals and purposes;

(5)    posting comments on the Blog;

(6)    posting comments on the Blog which violate the legal rights of BWI;

(7)    violating BWI's Confidential Information

(8)    otherwise injuring BWI and its business reputation by using BWI's Marks and posting BWI's Confidential Information on the Blog.

B.    For an order directing John Doe Site Administrator and Furber to temporarily, preliminarily, and/or permanently shut down the Blog.

C.    For an order directing John Doe Site Administrator, Furber, Dial, Member Bloggers, and Governor Bloggers to perform the obligations they covenanted to perform in their agreements with BWI.

D.    For an award of general, compensatory, and special damages, if any, in an amount exceeding $75,000.

E.    For an award of exemplary damages pursuant to A.R.S. § 44-403(b).

F.    For an award of BWI's attorneys' fees and costs incurred herein on Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten, and Eleven; and

G.    For such other and further relief as the Court deems appropriate and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(c) of the Federal Rules of Civil Procedure.

1    RESPECTFULLY SUBMITTED this 9th day of November, 2006.

2

3                                          s/Cynthia A. Ricketts

4                                          Cynthia A. Ricketts
                                           Sara K. Regan
5                                          Squire, Sanders & Dempsey L.L.P.
                                           Two Renaissance Square
6                                          40 North Central Avenue, Suite 2700
                                           Phoenix, AZ 85004-4498
7

8                                          Attorneys for Plaintiff
                                           Best Western International, Inc.
9

10

11   ORIGINAL of the foregoing electronically filed this
     9th day of November, 2006, with:
12

13   United States District Court Clerk
     401 West Washington Street, Suite 130, SPC 1
14   Phoenix, Arizona 85003-2118

15   COPY of the foregoing and Notice of Electronic filing
     mailed and/or hand-delivered this 9th day of November, 2006, to:
16

17   Honorable David G. Campbell
     United States District Court, Suite 623
18   401 West Washington Street, SPC 58
     Phoenix, AZ 85003-2156
19

20   COPY of the foregoing electronically delivered
     this 9th day of November, 2006, to:
21

22   Daniel McAuliffe
     Snell & Wilmer L.L.P.
23   One Arizona Center
     Phoenix, Arizona 85004-2202
24

25

26

27

28

                              - 35 -

1    Richard T. Mullineaux
2    R. Jeffrey Lowe
     Kightlinger & Gray, LLP
3    One Commerce Square
     4106 Charlestown Road
4    New Albany, Indiana  47150
5
     Attorneys for Defendant H. James Dial
6
7    By:    s/ Jennifer Cambra
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A



# BEST WESTERN INTERNATIONAL, INC.

## MEMBERSHIP APPLICATION AND AGREEMENT

Date:_____

Current Hotel Name (if applicable):_____

City and State/Province (Hotel Location):_____

### Description of Membership Application and Agreement

1.      This Membership Application and Agreement contains four parts. The Application for Membership section sets out the terms which will be applicable to the application process. If the application is approved in writing by Best Western, the Membership Agreement and License Agreement sections will control the relationship between Applicant and Best Western. The General Provisions section applies to the entire Membership Application and Agreement.

2.      This Membership Application and Agreement is submitted to affiliate with Best Western the hotel identified at the top of this page ("Hotel"). A guest room is any sleeping facility available through or managed through the Hotel front desk. If the Hotel is currently being operated as a "Best Western", the date of sale or transfer to Applicant is _____.

3.      This Membership Application and Agreement is made jointly by the owner or lessee of the Hotel and a natural person known as the voting member. The owner or lessee of the Hotel is _____. The voting member is _____. THE OWNER OR LESSEE AND THE VOTING MEMBER ARE EACH PERSONALLY RESPONSIBLE, JOINTLY AND SEVERALLY, FOR ALL OBLIGATIONS TO BEST WESTERN ARISING UNDER THIS MEMBERSHIP APPLICATION AND AGREEMENT OR RELATING TO THE AFFILIATION OF THE HOTEL WITH BEST WESTERN. Throughout this document the owner or lessee and the voting member are jointly referred to as "Applicant".

### Part I. Application for Membership

#### Application Fees

4.      All application fees referenced herein are payable in U.S. funds or Canadian funds that are equivalent to the U.S. funds (see Canadian Fee Schedule). Applicant has submitted, in connection with this application, an entrance fee which includes an affiliation fee and an evaluation fee. The evaluation fee is non-refundable and is to cover the administrative costs of processing the application. Payment of the evaluation fee entitles Applicant to an administrative work-up of the application. Payment of any fee or submission of this application does not give Applicant any right to affiliation with Best Western under any circumstances. The Board of Directors ("Board") may deny this application for any or no reason. The affiliation fee will be refunded without interest in the event that this application is denied or in the event that the application is withdrawn before Best Western approval.

(r) 6/18/04

Current "Best Western"

5.     In the event that the Hotel is currently receiving services from Best Western, Best Western may permit Applicant to continue operating the Hotel as a "Best Western". In that event, Applicant agrees to pay the usual fees and charges relating to Best Western membership, beginning upon the earlier of Applicant's possession or ownership of the property or Hotel. During the pendency of this application, Applicant agrees to abide by all terms of the Membership Agreement and License Agreement as though Applicant were affiliated with Best Western. If this application is denied, Applicant agrees to be subject to the obligations and remedies provided in the License Agreement.

Conditions of Application

6.     As a condition to presentation of this application to the Board, unless waived in writing by Best Western:
     (a)     If the Hotel is currently operated as a "Best Western", Applicant shall pay all past due fees, dues, assessments and charges, and the cost of all goods and services which have been incurred by prior members in connection with the Hotel, whether or not Applicant has received the goods or services or membership benefits.
     (b)     Applicant shall cure any past or current obligations or defaults to Best Western at other "Best Western" hotels owned or operated by Applicant.

Approval of Application

7.     Except as provided in this paragraph all fees will become non-refundable upon approval of this application by Best Western. Best Western approval may be subject to certain additional applicant-specific conditions which will be communicated in writing along with Best Western's approval of this application. If the approval is subject to additional applicant-specific conditions, Applicant may reject the conditions within fifteen (15) days of the notification, in which case the application will be deemed to have been withdrawn. If Applicant does not reject the additional conditions, the application will be deemed approved subject to the conditions imposed by Best Western and all fees will become non-refundable.

8.     In the event that approval is subject to additional applicant-specific conditions, the approval for membership shall be "conditional". Strict compliance with each condition and with each representation made by the Applicant, and strict adherence and compliance with all Best Western specifications, are required for the granting of membership. Time is of the essence. Best Western shall have no obligation to extend the time for Applicant's compliance with the conditions, even if the Applicant has attempted to perform all conditions in good faith and has substantially met all conditions. Unless specifically provided by Best Western, a "conditional" approval conveys no membership rights to the Applicant and conveys no rights to the Applicant to use the Best Western name or identification symbols, or to use any of the services provided by Best Western.

Application Not Confidential

9.     Best Western may inform nearby Best Western hotels of this application. Applicant expressly consents to this disclosure and waives any right which Applicant may have to the confidentiality of this application.

<u>Part II.  Membership Agreement</u>

10.     This "Membership Agreement" section becomes operative only upon Best Western's written approval of the application and is subject to any condition that may be imposed under paragraph 7.

(r) 6/18/04

## Membership Rights and Obligations

11.     Best Western is a membership organization providing rights and obligations as set forth by the membership in the "Bylaws" and as set forth by the Board in the "Rules and Regulations". In connection only with the Hotel, Best Western agrees to provide to Applicant all rights, and Applicant agrees to abide by all obligations, as may be established from time to time in the duly adopted Bylaws and Rules and Regulations.  APPLICANT ACKNOWLEDGES THAT APPLICANT HAS RECEIVED, READ AND UNDERSTOOD THE CURRENT BYLAWS AND RULES AND REGULATIONS.

12.     Applicant agrees to timely pay all fees, dues, charges and assessments imposed generally on the membership by the Board, and the cost of all goods or services provided by or ordered through Best Western. Past due amounts shall bear interest at the rate of one and one half percent (1.5%) per month from the due date until paid, provided that such interest charge shall in no way authorize or excuse late payments or limit Best Western's rights and remedies against Applicant.

13.     Where grounds for termination exist because of a default under this agreement, the Board may, in lieu of termination, impose additional conditions to membership.  These may include, for example, higher quality assurance requirements, additional design requirements, or restriction of rights or services.

## Agreement Term

14.     The term of this Membership Agreement is through the end of Best Western's current fiscal year, which ends on November 30. Thereafter, this agreement may be renewed for additional one year terms as provided in the Best Western Bylaws. Applicant may terminate this Membership Agreement at any time without penalty. In the event that the Hotel continues to operate as a "Best Western" after termination of the Membership Agreement, Applicant shall pay full fees, dues, charges and assessments until the Hotel ceases operation as a "Best Western".

## Member Market Area

15.     A new application for membership for a property located within the member market area of a qualified hotel will not be accepted. An exception to this will only apply if the voting member responsible for each affected qualified hotel advises the Board of Directors in writing that the member has no objection to the approval of the application. For definitions of terms used in this section, and to determine if or how this section may apply to or affect the applicant, applicant should refer to Best Western's Bylaws & Articles, Article II, Section 3 (A & B).

## Reservations & Communications Equipment; High Speed Internet Access

16.     (a)     Reservations & Communications Equipment

Applicant will purchase computer hardware through Best Western that will be used by the Applicant in receiving and sending reservations and in communicating with Best Western ("Hardware"). Applicant will also purchase Hardware maintenance through Best Western for three years. Best Western is not required to provide Hardware maintenance after such three years. Best Western has provided or will provide the computer software that is to be loaded into the Hardware ("Software"). Software programs are copyrighted by Best Western or licensed to Best Western by third parties. This Software is the property of Best Western and must be returned to Best Western upon demand. The Hardware and Software may be upgraded by Best Western or its designee from time to time. Best Western has provided or will provide communications equipment, (including but not limited to a satellite dish, related cabling, Personal Earth Station and optional credit card authorization equipment) for the purpose of reservations delivery and information exchange ("Communications Equipment") as long as Applicant is a member of Best Western.  Communications Equipment may be upgraded by Best Western or its designee from time to time. Communications Equipment is the property of Best Western and must be returned to Best Western upon demand. Applicant will pay a monthly fee for the Communications Equipment.

(r) 6/18/04

In addition to the above, Applicant agrees:

    (i)     to use the Hardware, Software and Communications Equipment only for reservation communications with Best Western Central Reservations and with other Members and for other business purposes relating to the operation of the Hotel as a Best Western Hotel. The Hardware, Software and Communications Equipment may be upgraded from time to time by Best Western or its designee. Applicant may be charged an upgrade fee.

    (ii)    to not copy, disclose or allow to be copied or disclosed any of the Software programs. Only Best Western authorized software may be utilized on the Hardware. Any cost of service or maintenance required as a result of using unauthorized software, shall be the obligation of the Applicant and shall include a minimum service charge of $200.00.

    (iii)    to abide in all respect with the terms of the Software licensed to Best Western, copies of which shall be provided on request, and with the terms of the Software copyrighted by Best Western. The Software licensed to Best Western and the Software copyrighted by Best Western shall be deleted or returned upon demand of Best Western and upon termination of the Membership Application and Agreement. Applicant shall provide Best Western with a signed statement that the Software has been deleted or returned.

    (iv)    to utilize Best Western for the maintenance and repair for three years of the Hardware purchased through Best Western and for the maintenance and repair as long as Applicant is a member of Best Western of the Communications Equipment provided by Best Western, both at Applicant's expense. In the event of Hardware or Communications Equipment failure or interruption of service, it will be the responsibility of the Applicant to participate in the troubleshooting process. It shall be the sole responsibility of Best Western to make final problem determination and dispatch technical resources as needed to achieve problem resolution.

    (v)    to assume and hereby assumes all risks and liabilities, whether covered by insurance or not, for loss or damage to or destruction of the Hardware, Software and Communications Equipment or any part thereof. Applicant shall replace, at its expense, any Hardware, Software, Communications Equipment or any part thereof which is lost, damaged or destroyed.

    (vi)    to return the Communications Equipment to Best Western in good condition, reasonable wear and tear excepted, upon demand.

    (b)    High Speed Internet Access

    Applicant will, at its own expense, install, maintain and provide for its guests high speed internet access ("HSIA") that is compliant in all respects (including service and cost) with that required of other Best Western members, as such HSIA requirements may be changed from time to time by the Board of Directors or a vote of the members.

**Relationship of Parties**

    17.    Best Western is a non profit corporation operated on a cooperative basis by and for its hotelier members. The relationship of Best Western to its members is one of an independent contractor. Neither party has the power to obligate or bind the other in any way. No relationship of partners, joint venturers or agents is created. BEST WESTERN ONLY PROVIDES SERVICES AS DIRECTED BY THE MEMBERSHIP. BEST WESTERN HAS NO RESPONSIBILITY FOR THE USE, CONDITION OR OPERATION OF THE HOTEL OR THE SAFETY OF THE DESIGN OF ANY STRUCTURE OR PRODUCT. BEST WESTERN HAS NO CONTROL OVER OR RESPONSIBILITY FOR ANY DECISION AFFECTING THE EMPLOYMENT OR SUPERVISION OF ANY PERSON EMPLOYED IN CONNECTION WITH THE HOTEL.

(r) 6/18/04

**Termination of Agreement**

18.    This Membership Agreement terminates:

(a)    upon sale or lease of the Hotel, or transfer of control of the Hotel, as more fully set forth in the Bylaws.

(b)    upon default of any obligation to Best Western, as more fully set forth in the Bylaws, Rules and Regulations, and Operations Manual.

### Part III. License Agreement

19.    This "License Agreement" section becomes operative only upon Best Western's written approval of the application.

**Grant of License**

20.    Best Western grants to Applicant a non-exclusive license to use, at and in connection with the Hotel, the Best Western name and those Best Western trademarks, service marks, and identification symbols as set forth from time-to-time in the Brand Identity Manual ("Best Western Symbols").

**Ownership of Signs**

21.    Any portion of any sign displaying a Best Western Symbol is and shall remain the property of Best Western. Applicant transfers title of all such portions of signs, whether now owned or acquired in the future, to Best Western.

**Termination of License**

22.    This license shall terminate upon termination of Applicant's Membership Agreement. Within fifteen (15) days of license termination, Applicant shall remove from public view and cease using all Best Western Symbols. This prohibition includes any representation, directly or indirectly that the Hotel was formerly affiliated with Best Western. Furthermore, Applicant shall actively take such steps as may be necessary to cause the cessation of all advertising and distribution of promotional material containing any Best Western Symbol.

23. Upon termination of this License Agreement, Applicant agrees not to use anything consisting of or incorporating any one or more words, letters, designs or devices which contain any part of any Best Western Symbol, or which singly or together are similar in spelling, sound, appearance or otherwise to any Best Western Symbol.

**Remedies**

24.    For each day during which any Best Western Symbol or any name, symbol or device described in paragraph 23 are used in connection with the Hotel, after fifteen (15) days following termination of this License Agreement, Best Western may elect to claim from Applicant daily damages in an amount equal to fifteen percent (15%) of the mean of the Hotel's room rates per room per day multiplied by the total number of rooms. This amount is payable by Applicant whether or not Applicant continues to exercise control over the operations of the Hotel. It is understood and agreed that said amount is fixed as liquidated damages because of the difficulty of ascertaining the exact amount of damages that may be sustained because of such use. It is further understood and agreed that said amount fixed as liquidated damages is a reasonable amount, considering the damages that Best Western will sustain in the event of such use.

(r) 6/18/04

25.    The rights provided in paragraph 24 shall be exercised solely at the option of Best Western. Best Western shall have the right to invoke any remedy at law or in equity, whether or not such remedy is herein provided. The exercise of any remedy shall not be deemed to be a waiver or exclusion of any other. If Best Western brings an injunctive action against Applicant, Applicant waives any requirement that Best Western post bond.

26.    The obligations of Applicant and the remedies available to Best Western under this License Agreement are binding upon Applicant's heirs, executors, administrators, successors, assignees, receivers, and trustees in bankruptcy.

### Part IV. General Provisions

27.    Each provision in this "General Provisions" section is applicable to the Application, Membership Agreement, and License Agreement sections of this document.

Representations to Best Western

28.    Applicant certifies that all representations made in connection with this Application and Agreement are true and constitute material representations for the purpose of inducing Best Western to grant membership. Applicant agrees that any misrepresentation shall be grounds for denial of this application or cancellation of membership. Applicant further agrees that any representations made in the future, whether in connection with renewing this agreement or otherwise, constitute material representations for the purpose of inducing Best Western to grant, continue or renew membership and that any false representation shall be grounds for denial of this Application, denial of membership renewal, or cancellation of membership.

Appointment of Voting Member as Attorney-in-Fact

29.    The undersigned owner or lessee hereby appoints the undersigned voting member, and any substituted voting member, as its attorney-in-fact with full power and authority to bind owner or lessee in any and all agreements and liabilities which voting member may enter into or undertake to Best Western in connection with the Hotel. This authorization shall continue during the term of the Membership Agreement and during any renewal or continuation thereof, until terminated in writing by the owner or lessee. This power of attorney shall survive the death or disability of the undersigned.

Remedies

30.    It is understood that Best Western shall have the right to invoke any remedy at law or in equity, whether or not other remedies are herein provided, for any breach of this Membership Application and Agreement, or for any other matter arising out of Applicant's affiliation or dealings with Best Western. All rights and remedies given to Best Western are distinct, separate and cumulative and no one of them, whether or not exercised by Best Western, shall be deemed to be an election of that remedy only or to be a waiver or exclusion of any of the others.

Limitation of Damages

31.    Applicant agrees that Applicant shall have no recourse of any kind against Best Western, its directors, officers, employees, agents or members, if this application is denied. Applicant further agrees that Applicant shall have no recourse of any kind against Best Western, its directors, officers, employees, agents or members, for failure to grant membership after conditional approval unless Applicant has strictly, absolutely and timely complied with each and every requirement imposed upon Applicant by Best Western and this agreement, to the satisfaction of Best Western.

(r) 6/18/04

32.    Applicant agrees that should the Hotel's Road Atlas and Travelers' Guide listing be omitted or if a material error occurs in any portion of the listing, whether or not through the negligence of Best Western, Applicant's sole remedy shall be the refund, without interest, of the annual dues paid on behalf of the Hotel. Best Western shall have no other liability in connection with the preparation or publication of the Road Atlas and Travelers' Guide.

33.    Applicant agrees that Applicant shall be limited to actual damages for any breach or default by Best Western of any obligation or duty owed to Applicant, and Applicant further agrees that Best Western's liability for any damages shall be limited to the amount of membership fees actually paid by Applicant in connection with the Hotel, during a single fiscal year in which the breach or default occurred.

34.    In the event that Best Western wrongfully fails to grant membership after making a "conditional" commitment for membership under paragraphs 7 and 8 of this Membership Application and Agreement, or if Best Western is found to have wrongfully failed to grant membership in any other situation, Applicant shall have no right to compel Best Western to grant a membership to Applicant. Applicant agrees that Applicant's sole remedy shall be limited to actual damages, which in no event shall exceed twice the amount of money paid by Applicant to Best Western in connection with the submission of this application.

**Indemnification**

35.    Applicant shall indemnify, defend, and hold Best Western harmless and all of its employees, agents, representatives, and insurers (hereinafter collectively referred to as "indemnitees") from any and all claims, demands, suits, actions, proceedings, loss, cause and damages of every kind and description, including but not limited to any attorneys' fees and/or costs and expenses, whether or not a lawsuit is filed, which may be brought or made against or incurred by any indemnitee (a) arising out of, or contributed to, in whole or in part, by reason of any alleged act, omission, fault, mistake, or negligence of Applicant, its employees, agents, representatives, or subcontractors, in connection with or incident to the use, condition or operation of the Hotel, or (b) arising out of workers' compensation claims, unemployment disability compensation claims, or discrimination claims of employees of Applicant and/or its subcontractors or claims under similar such laws or obligations, or (c) in connection with any valid claim made by any indemnitee against Applicant for indemnity. Applicant's obligation under this section shall extend to any liability caused by the sole or concurrent negligence of an indemnitee (including both active and passive negligence).

**Attorneys' Fees**

36.    In the event that Applicant breaches any obligation to Best Western, Applicant is liable to Best Western for all attorneys' fees, costs and expenses incurred by Best Western in connection with the breach or violation, whether or not suit is filed.

**Application of Law and Choice of Forum**

37.    This Membership Application and Agreement shall be governed and construed according to the laws of the State of Arizona, unless any obligations under this Membership Application and Agreement shall be invalid or unenforceable under such laws, in which event the laws of the jurisdiction whose law can apply to and validate the obligations under this Membership Application and Agreement shall apply. This Membership Application and Agreement shall be deemed executed in Phoenix, Arizona.

38.    Applicant acknowledges that Best Western is headquartered in Phoenix, Arizona, that the majority of Best Western's records and employees are in Phoenix, Arizona, and that Phoenix, Arizona is the most convenient locale for actions between Best Western and Applicant.

(n 6/18/04

UNLESS WAIVED BY BEST WESTERN IN WHOLE OR IN PART, THE COURTS LOCATED IN THE STATE OF ARIZONA, STATE OR FEDERAL, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ALL CLAIMS, DISPUTES AND ACTIONS ARISING FROM OR RELATED TO THE APPLICATION PROCESS, THIS MEMBERSHIP APPLICATION AND AGREEMENT OR TO ANY RELATIONSHIP BETWEEN THE PARTIES HERETO AND VENUE SHALL BE IN THE COURTS LOCATED IN MARICOPA COUNTY, ARIZONA. APPLICANT EXPRESSLY CONSENTS AND SUBMITS TO THE JURISDICTION OF SAID COURTS AND TO VENUE BEING IN MARICOPA COUNTY, ARIZONA.

Waiver

39.     Any waiver by Best Western of a breach of any provision of this Membership Application and Agreement, or of any breach of any other requirement or policy of Best Western, shall not operate or be construed as a waiver of any subsequent breach thereof. Any delay by Best Western of enforcement of obligations shall not be deemed to be a waiver of Best Western's right to enforce the obligation.

Notices

40.     All notices given by Best Western, under this Membership Application and Agreement or otherwise, shall be given to the voting member at such location as may be specified by the voting member, in writing, to the Best Western Membership Administration Department. Notice to the voting member shall constitute notice to each person or entity signing this Membership Application and Agreement. Any notice given to Best Western under this Membership Application and Agreement shall be given in writing to Best Western International, Inc., 6201 North 24th Parkway, Phoenix, Arizona 85016-2023, Attention Membership Administration, or such other location as may be specified by Best Western.

Headings

41.     The headings of the sections of this Membership Application and Agreement are for convenience only and are not to be considered part of this Membership Application and Agreement or used in determining its content or context.

Severability

42.     Any provision of this Membership Application and Agreement prohibited by law, or by court decree, in any jurisdiction shall be ineffective to the extent of such prohibition without in any way invalidating or affecting the remaining provisions of this Membership Application and Agreement.

Entire Agreement

43.     This Membership Application and Agreement embodies the whole agreement of the parties. There are no promises, terms, conditions or obligations other than those contained herein. This Membership Application and Agreement shall supersede all previous communications, representations, or agreements, either verbal or written, between the parties hereto.

(r) 6/18/04

Signature of Owner or Lessee

44.     The signature of all persons or entities having an ownership interest in the Hotel, or having a lessee interest in the lease, must sign. This means, for example, that a corporation owning the Hotel must sign through one of its authorized agents. It does not mean that each stockholder of the corporation must sign. Please refer to the Applicant Information Form for additional instructions on owner or lessee signatures. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT YOUR BEST WESTERN REPRESENTATIVE. FAILURE TO PROPERLY SIGN WILL DELAY CONSIDERATION OF THIS APPLICATION.

_____

Name

_____          _____

Social Security No.                                          Signature

Date:_____

_____

Spouse's Name*

_____          _____

Social Security No.                                          Signature

Date:_____

_____

Entity Name

By:_____

     Signature of Authorized Signer

Its:_____

     Title of Authorized Signer

Date:_____

USE ADDITIONAL PAGES IF NECESSARY

*Spouse's name and signature is required only in community property jurisdictions. Community property jurisdictions are Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Quebec, Texas and Washington.

(r) 6/18/04

**Signature of Voting Member**

45.     The voting member must sign using the voting member's name only.  Any use of a title will delay consideration of this application.  VOTING MEMBER IS PERSONALLY LIABLE FOR ALL OBLIGATIONS OF THE HOTEL TO BEST WESTERN UNDER THIS MEMBERSHIP APPLICATION AND AGREEMENT.

_____

Voting Member

_____

Signature (DO NOT USE TITLE)

_____

Social Security No.

Date:_____

(r) 6/18/04



**BEST WESTERN INTERNATIONAL, INC.**

**APPLICANT GENERAL INFORMATION FORM**

## THIS FORM MUST BE COMPLETED IN ITS ENTIRETY.
## FAILURE TO DO SO WILL RESULT IN A
## DELAY IN PROCESSING THE APPLICATION.

CHECK <u>ONE</u> BOX ONLY:

☐    **Applicant Owns The Hotel**

☐    **Applicant is Lessee of The Hotel**

**I.    INFORMATION REGARDING APPLICANT(S)**

1.    State the name and percentage of owning/leasing interest for each person or entity holding an ownership/leasing interest in the Hotel, as well as the social security number of each owner. In this sub-part do not indicate the breakdown of interest in corporations, partnerships or limited liability companies who are owners/lessees. Merely state the name of each owner/lessee and percent interest. For example: XYZ Corporation - 50%, John James - 25%, Jane James - 25%.

| Full Name | Address | Phone Number | Soc. Sec. # | % Interest |
|-----------|---------|--------------|-------------|------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

TOTAL _____ (Must Equal 100%)

2.    If any owner/lessee is not an individual (i.e. is a corporation, partnership, limited partnership, limited liability company or other entity), provide the following information for each owner/lessee:

    (1)  Corporation (answer only subparagraphs A - D);
    (2)  Partnership (answer only subparagraphs E - G);
    (3)  Limited Partnership (answer only subparagraph H);
    (4)  Limited Liability Company (answer only subparagraphs I - L); and
    (5)  Other Entity (answer only subparagraph M).

1

11/98

<u>Corporation</u>

    A.  Name of Corporation: _____

    B.  Date of incorporation and state/province of incorporation: _____

    C.  Tax identification number for corporation: _____

    D.  Names and percent of interest of each shareholder.

| Name | Soc. Sec. # | % Interest |
|------|-------------|------------|
|      |             |            |
|      |             |            |
|      |             |            |
|      |             |            |

<u>Partnership</u>

    E.  Name of Partnership: _____

    F.  Date and state/province of formation of partnership: _____

    G.  Names and percent of interest of each shareholder.

| Name | Soc. Sec. # | % Interest |
|------|-------------|------------|
|      |             |            |
|      |             |            |
|      |             |            |
|      |             |            |

<u>Limited Partnership</u>

    H.  If a limited partnership, identify each general and limited partner and state the percentage of interest of each (use additional sheets if necessary) or attach a copy of the certificate of limited partnership, including percentage of ownership.

General Partners:

| Name | Soc. Sec. # or Corp. Tax ID # | % Ownership |
|------|-------------------------------|-------------|
|      |                               |             |
|      |                               |             |
|      |                               |             |

11/98

Limited Partners:

| Name | Soc. Sec. # or Corp. Tax ID # | % Ownership |
|------|-------------------------------|-------------|
|      |                               |             |
|      |                               |             |
|      |                               |             |
|      |                               |             |

## Limited Liability Company

I.  Name of Company: _____

J.  Date and state/province of formation of company: _____

K.  Tax identification number for company: _____

L.  Names and percent of interest of each member.

| Name | Soc. Sec. # | % Interest |
|------|-------------|------------|
|      |             |            |
|      |             |            |
|      |             |            |
|      |             |            |

## Other Entity

M.  If an entity other than a corporation, partnership, limited partnership or limited liability company, fully describe the entity, identify each person having an ownership interest therein, and specify the percent interest of each person.

| Entity | Owner | Soc. Sec. # | % Ownership |
|--------|-------|-------------|-------------|
|        |       |             |             |
|        |       |             |             |
|        |       |             |             |
|        |       |             |             |

3

11/98

3.    State the date upon which each individual and/or corporation, partnership, limited partnership, limited liability company or other entity assumed an interest in the Hotel (not applicable if proposed construction).

_____

_____

_____

4.    Do any of the persons or entities listed previously own, lease or operate other hotels, motels and/or resorts. ____ Yes ____ No.  If yes, for each person, corporation, partnership, limited partnership, limited liability company or other entity, give the names and addresses for all other hotels, motels and/or resorts in which each person or entity has an interest.  State whether it is an owning, operating, or leasing interest, and the percentage of such interest in each (use a separate sheet, if necessary).

| Hotel | Address | City, State/Province | Type of Interest | % Ownership |
|-------|---------|---------------------|------------------|-------------|
|       |         |                     |                  |             |
|       |         |                     |                  |             |
|       |         |                     |                  |             |
|       |         |                     |                  |             |

5.    Have any of the persons or entities listed previously ever been involved with any Best Western properties? ____ Yes ____ No.  If yes, give the name of each person or entity name and the hotel name, address and nature of involvement in each (use a separate sheet, if necessary).

| Person/Entity | Hotel Name/Address | City, State/Province | Nature of involvement |
|---------------|--------------------|--------------------|----------------------|
|               |                    |                    |                      |
|               |                    |                    |                      |

6.    Have any of the persons or entities listed previously ever been involved in any litigation or dispute with Best Western? ____ Yes ____ No.  If yes, give the name of each person or entity name and the hotel name, address and nature of litigation/dispute (use a separate sheet, if necessary).

| Person/Entity | Hotel Name/Address | City, State/Province | Nature of litigation/dispute |
|---------------|--------------------|--------------------|------------------------------|
|               |                    |                    |                              |
|               |                    |                    |                              |

7.    Have any of the persons or entities listed previously filed or been placed in bankruptcy or a receivership, or been subject to a judicial or non-judicial foreclosure action within the last ten years? ____ Yes ____ No.  If yes, state the details below.

_____

_____

_____

11/98

## II. INFORMATION REGARDING MANAGEMENT

MANAGEMENT EXPERIENCE of person or entity who will be primarily responsible for the management of the property.

Company or Individual Name

Address

| City | State/Province | Postal Code |

Telephone Number

President

Vice President or Director of Finance

Vice President or Director of Sales and Marketing

Vice President of Operations

List all hotels and restaurants owned and/or operated by manager or management entity within the last three years. Attach a separate sheet if necessary.

Name

Address

Type of Business

Owned _____ Operated _____

From _____ to _____
         Mo/Yr      Mo/Yr

Name

Address

Type of Business

Owned _____ Operated _____

From _____ to _____
         Mo/Yr      Mo/Yr

Name

Address

Type of Business

Owned _____ Operated _____

From _____ to _____
         Mo/Yr      Mo/Yr

Name

Address

Type of Business

Owned _____ Operated _____

From _____ to _____
         Mo/Yr      Mo/Yr

5

11/98

### III.   INFORMATION REGARDING VOTING MEMBER

1.   Full Name: _____

2.   Mailing Address: _____

_____
Company Name                                    Area Code/Telephone Number

_____
Street Address – include suite number if applicable

_____
City                          State/Province                   Postal Code

3.   Street Address (for express mail deliveries, if different from mailing address):

_____
Company Name                                    Area Code/Telephone Number

_____
Street Address – include suite number if applicable

_____
City                          State/Province                   Postal Code

4.   Home Address (if different from mailing address):

_____
Street Address                                   Area Code/Telephone Number

_____
City                          State/Province                   Postal Code

5.   Telephone Number (if different from above): _____

6.   Facsimile Number: _____

7.   Social Security Number: _____

8.   Explain affiliation with any person or entity listed previously.

_____

_____   _____

_____

11/98

## IV.   GENERAL HOTEL INFORMATION

| | |
|---|---|
| NUMBER OF GUEST UNITS | NUMBER OF STORIES |
| Current Hotel Name | Hotel Telephone Number |
| Proposed Best Western Hotel Name (if application is approved) | Hotel Facsimile Number |

Hotel Street Address (if proposed construction, provide exact site location, i.e., intersections and street address)

| City (Hotel location) | State/Province | Postal Code | Name of County/Parish |
|---|---|---|---|

| City (for mailing purposes, if different than above) | State/Province | Postal Code |
|---|---|---|

### Location:

General Location: _____
(Example: highway, downtown, beachfront)

Distance to Major Airport: _____ Name of Airport _____

## V.   COMPLETE THIS SECTION ONLY IF APPLICANT PROPERTY IS AN EXISTING HOTEL FACILITY (if project is proposed for construction or under construction, proceed to Section VI):

Year Built _____   Year(s) Added To _____

☐   Open and Operating Hotel

☐   Hotel is Presently Closed

☐   Hotel Will Be Closed During Renovation

If renovating, estimated Completion/Opening Date _____

Please outline below your plans for renovation, e.g., exterior and interior modifications, demolition of buildings, construction of new buildings, etc. (attach additional information or submit colorboards and renderings, if available).

_____

_____

_____

11/98

Has the Hotel ever been affiliated with any chain, franchise, or other hotel/motel organization?____Yes ____ No. If yes, provide the names and dates of each affiliation and the reasons for the termination thereof.

_____

_____

_____

## VI. COMPLETE THIS SECTION ONLY IF APPLICANT PROPERTY IS A PROJECT PROPOSED FOR CONSTRUCTION OR UNDER CONSTRUCTION:

☐ Proposed Construction Hotel

Estimated Date When Construction Will Begin _____     Estimated Opening Date _____

☐ Under Construction Hotel (concrete footings have been poured)

Estimated Opening Date _____

☐ Architectural Plans Enclosed With Application     Preliminary _____ Complete _____
(For projects *under construction*, architectural plans are required at the time of application.)

☐ Architectural plans will not be available for review prior to presentation of this application to the Board of Directors; however, applicant agrees that at a minimum, preliminary plans will be submitted within 90 days from written notice of approval of application, unless otherwise specified by the Board of Directors. Applicant also agrees that plans submitted will indicate compliance with Best Western New Construction Guidelines.

NOTE: Variance request(s) must be submitted for consideration of waiver(s)/extension(s). Outline below specific details of any known variance request(s).

_____

_____

_____

_____

RENDERINGS AND COLORBOARDS TO BE SUBMITTED FOR INCLUSION WITH THE PRESENTATION OF YOUR PROJECT, IF AVAILABLE.

## ALL APPLICANTS PROCEED TO SECTION VII

8

11/98

## VII.  FACILITIES, SERVICES AND AMENITIES

Facilities:

All facilities associated with the hotel property, e.g., restaurant, lounge, gift shop, etc., are subject to Best Western inspection.  If the property is approved for Best Western membership, all such facilities will be subject to any renovation deemed necessary by Best Western.  If any of the facilities are leased, the lease(s) must allow for Best Western inspection and renovation (see suggested lease verbiage attached).  In addition, a copy of the lease(s) incorporating the required provision must be submitted prior to operating as a Best Western affiliate.

### PLEASE CHECK BOX FOR HOTEL FACILITIES, AMENITIES AND SERVICES AVAILABLE AND PROVIDE ADDITIONAL INFORMATION AS REQUIRED

☐ Indoor Swimming Pool*

☐ Outdoor Swimming Pool*

☐ Game Room

☐ Tennis Courts

_____ On premises

_____ Adjacent

☐ Golf Course

_____ On Premises

_____ Adjacent

☐ Microwave in rooms _____%

☐ Exercise Room

☐ Sauna

☐ Whirlpool

☐ Complimentary Continental Breakfast Served

☐ Continental Breakfast Served

☐ Guest Laundry

☐ Airport Courtesy Car

☐ Concierge

☐ Refrigerator in rooms _____%

☐ Cocktail Lounge on Premises          _____ Owned          _____ Leased

☐ Meeting/Function Space          _____ Total Sq. Ft.          _____ Owned          _____ Leased

☐ Banquet Service Available

☐ Gift Shop          _____ Owned          _____ Leased

☐ Hair Salon          _____ Owned          _____ Leased

*As a minimum, Best Western requires a swimming pool at the Hotel, which meets established specifications.  If not in compliance, please submit a letter outlining your situation, which will then be submitted to the Board of Directors for consideration of a waiver.

11/98

☐    Restaurant on Premises (defined as connected to or located within the lodging establishment).

_____ Owned    _____ Leased

Name of Restaurant: _____

Hours of Operation: _____ a.m. to _____ p.m.

☐    Restaurant not located within or connected to the lodging establishment (please complete the following):

| Name of Closest Restaurants(s) | Hours of Operation | Table Service | Distance in Feet From Your Hotel Lobby |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Are any of the above restaurants located in another lodging establishment? ____ Yes ____ No

If yes, state the name of the lodging establishment(s): _____

_____

Other Amenities/Facilities/Services (identify any that are leased): _____

_____

_____

_____

_____

_____

## VIII.  INSURANCE

_____
Name of Insured

_____
Insurance Company Name and Address

_____
Agent's Name and Address

_____
Policy No.                                    Policy Period

_____
Insurer Policy Limits

10                                                        11/98

## IX.   CERTIFICATION

I certify that all information in this application is true and correct.  I understand that falsification of any information shall be grounds for denial of the Membership Application and Agreement or termination of membership.

Date: _____

_____
Name Of Voting Member (Print or Type)

_____
Signature (DO NOT USE ANY TITLE)

11

11/98

# Exhibit B



# Rules & Regulations



**Adopted by the Board of Directors of Best Western International, Inc.**

The following Rules and Regulations for the management of the Corporation's business and affairs and for the governance of actions and forbearances on the part of members were adopted by the Board of Directors on September 12, 1975, and amended thereafter.

PRINTED IN THE USA

## Table of Contents

100.0    General Provisions ......................................................................................................................2

200.0    Regional Governors ..................................................................................................................2

300.0    Signs and Advertising.............................................................................................................4

400.0    Reservations System and Travel Guide ...............................................................................6

500.0    Administrative...........................................................................................................................6

600.0    Lobby and Front Office .........................................................................................................12

700.0    Buildings, Grounds and Public Areas ................................................................................12

800.0    Housekeeping Department ....................................................................................................15

900.0    Guest Rooms and Bathrooms ...............................................................................................15

1000.0   Logo Items and Room Supply Standards ...........................................................................17

1100.0   Violations and Sanctions .......................................................................................................18

1200.0   Procedure for Cancellation of Membership........................................................................19

1300.0   Procedure for Termination of Contingently-Approved Applicants...................................21

# Chapter I

### 100.0 General Provisions

100.1 The rights and obligations of members are contained in the laws of the State of Arizona and Best Western's Articles of Incorporation, Bylaws, Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, Membership Application and Agreement, annual Membership Certification Agreement, and the orders or directives of the Board (Board). Such rights and obligations shall be governed by and subject to such modifications to and amendments of the foregoing as may be duly effected from time to time by the Arizona Legislature, the membership of the Corporation or the Board of Directors as the case may be.

100.2 The Articles of Incorporation may be amended or repealed only by the members in accordance with Section 10-1034, Arizona Revised Statutes.

100.3 The Bylaws may be adopted, amended or repealed only by the members in accordance with Article VIII of the Bylaws.

100.4 The Rules and Regulations, New Construction Guidelines and Renovation & Refurbishing Guidelines may be adopted, amended or repealed, and the orders or directives of the Board may be adopted, amended, repealed or rescinded only by the Board in accordance with the Bylaws.

100.5 The Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, and orders or directives of the Board may supplement the laws of the State of Arizona, the Articles of Incorporation and the Bylaws, which are the primary repository of the rights and obligations of the members. Any inconsistency between the provisions of the Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, and orders or directives of the Board and the provisions of the laws of the State of Arizona, the Articles of Incorporation or the Bylaws is controlled by the laws, Articles or Bylaws, in that order.

100.6 The secretary of the Corporation shall maintain in current form the Articles of Incorporation, the Bylaws, the Rules and Regulations, the New Construction Guidelines, the Renovation & Refurbishing Guidelines, and orders or directives of the Board. These shall be made available for inspection by any member at the principal office of the Corporation during business hours.

100.7 Current Articles of Incorporation, Bylaws, Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, and any order or directive of the Board shall be made available for inspection by any member at all regular and special meetings of the members.

100.8 Each member shall be given a copy of the then current Articles of Incorporation, Bylaws, Rules and Regulations, New Construction Guidelines and Renovation & Refurbishing Guidelines at or before the time the membership commences. Thereafter, any modifications, revisions and amendments to any of the foregoing will be made available to members as soon after adoption as is reasonably practicable.

100.9 Terms used in these Rules and Regulations that are defined in the Bylaws shall have the same definitions here, unless the context indicates otherwise.

100.10 Except as otherwise required by law, the Articles of Incorporation or the Bylaws, the provisions of this chapter are directive, not mandatory. Non-compliance with any provision in this chapter shall not confer any right upon, waive any obligation of, or entitle to any relief, any member without a showing that the member would otherwise be substantially prejudiced.

100.11 Except as provided otherwise in the Bylaws and Rules and Regulations, membership in Best Western is personal and nontransferable. Only a natural person can hold a membership. The approval or disapproval of an application for membership rests wholly within the discretion of the Board.

# Chapter II

### 200.0 Regional Governors

200.1 A. Each Director shall annually appoint regional Governors to act as liaisons between the Board and the membership within the geographic regions covered by the respective appointments. These appointments shall be ratified by the full Board.

B. If a Governor fails to meet responsibilities, except in cases of extenuating circumstances as determined by his/her Director, he/she may not be eligible for reappointment for the next year.

C. The number, responsibilities and accountabilities of the regional Governors shall be determined at the time of appointment and may be altered or rescinded by the Board.

D. The appointment of a regional Governor may be rescinded and vacancies may be filled by the Director at any time and ratified by the full Board.

200.2 In order for an individual to be appointed as a Best Western Governor, the individual shall:

A. Be a voting member or owner;

B. Have a minimum of three years hotel/motel industry experience;

C. Have a minimum of two years Best Western experience;

D. Be a participating member in industry related associations available in his/her area;

E. Have attended his/her respective Best Western District Meeting or the Annual International Convention each year for the past two years;

2

F.   Comply with the following items at all Best Western properties where the Governor is a voting member or owner:

   1.   Attainment of a Quality Assurance score at or above the North American average, averaged over the past three inspections;

   2.   Maintenance of a customer service complaint ratio below the minimum requirement for the past 18 months;

   3.   Maintenance of a current Best Western account;

   4.   Be current on Design standards.

G.   A CHA designation is highly recommended.

H.   A Board majority may waive qualifications based on the recommendation of a Director if there are extenuating circumstances.

200.3   After appointment as a Best Western Governor, the Governor shall meet the following criteria:

A.   Continue to be a voting member or owner.

B.   Continue to be a participating member in industry related associations available in his/her area;

C.   Visit each member within their respective region no less than one time annually;

   1.   Observe the management of the property for the purpose of advising and recommending areas needing improvement.

   2.   Tour the property, discussing with management any issues of concern. The goal should be to enhance consistency among properties in the application of quality control, customer services, design and brand identity policies.

   3.   Serve as a resource to the member by discussing Best Western International for the purpose of clarification.

   4.   File a report on the visit to District Managers within 30 days; discuss serious concerns with them immediately following the visit.

D   Upon request by his/her Director, assist with issues affecting the Association or represented region:

   1.   Communicate with his/her Director on any issues concerning members in the district.

   2.   Communicate any violations of membership requirements to the staff or Director occurring within the district.

   3.   Communicate any concerns members have about Best Western International, Inc. as it may relate to governance issues, Bylaw changes or Rules and Regulations.

E.   Attend and actively participate in the following meetings:

   1.   Attend the Governors' Conference each year and, if a newly appointed Governor, attend new Governor Orientation session at Governors' Conference.

   2.   Attend either his/her respective District Meeting or the Annual International Convention each year. Attendance at both meetings is strongly encouraged.

   3.   Coordinate at least one state/provincial/area or regional meeting each year within the local area.

   4.   Attend, when possible, a Best Western training workshop annually.

F.   Upon request by his/her Director or the Board, serve in a leadership role for the organization:

   1.   Provide advisory assistance to the Board on strategy, governance and member matters.

   2.   Serve on one member advisory committee upon request.

   3.   Assume other leadership assignments when called upon by the Director.

G.   Upon request from Membership Development or the Director, visit a proposed applicant's property or site, if new construction.

   1.   File a written report with Membership Development upon completion of the visit within the required time frame as outlined by the Development Department.

   2.   Objectively evaluate the proposed member, keeping in mind the value of the proposed member property to the Association.

H.   Comply with the following items at all Best Western properties where the Governor is a voting member or owner:

   1.   Maintain a Quality Assurance score at or above the North American average, averaged over the past three inspections prior to September 1 of each year;

   2.   Maintain a customer service complaint ratio below the minimum requirement;

   3.   Maintain a current Best Western account;

   4.   Continuously operate their property/properties in a manner to ensure that grounds for cancellation of membership/contingent approval do not exist.

I.   Follow Best Western's ethics policies.

200.4   Regional Governors shall serve without pay but may receive reimbursement for expenses as determined by the Board:

A.   Mileage reimbursement is in accordance with Best Western International policy. One night's lodging will be reimbursed if travel exceeds 200 miles one way. Airfare and rental car reimbursement authorized with advance Director approval.

B.   One complimentary registration for the Governor to attend his/her regional District Meeting.

3

C. Governors will be reimbursed for travel expenses to attend the Governors' Conference including airfare, lodging and meals. Rental cars are not included.

D. Travel to District Meetings and Annual International Convention is at Governor's own expense.

E. All reimbursable expenses incurred during the course of the year are to be submitted to the Finance Department within sixty (60) days of the date of the expense. All reimbursable expenses must be submitted no later than forty-five (45) days following the end of the fiscal year in which incurred. Expenses not turned in within these time frames will not be reimbursed.

## Chapter III

**300.0   Signs and Advertising**

**300.1**   The Best Western logo shall be incorporated into all signage including outdoor billboards and displays which include the property name. The Best Western logo shall represent at least 30 percent of the total sign square footage and be displayed above or to the left of the property name. Display of credit card panels is prohibited. Budget, dated, cluttered and disjointed signage is not permitted as may be determined by Brand Identity Administration of Best Western. The member or applicant shall have the right to appeal to the Board regarding compliance with this Rule. The decision of the Board shall be final.

**300.2**   Each member shall display on the property premises an approved Best Western property name sign of no less than 50 square feet. This sign shall be the current approved sign series as outlined in the Brand Identity Manual, Sign Program Brochure and Guidelines for Best Western signs. The foregoing manual, brochure and guidelines may be amended by the Board.

**300.3**   Placement, size and type of all Best Western signage shall be approved by Brand Identity Administration of Best Western. All property signage shall comply with the current Rules and Regulations, Brand Identity Manual, Guidelines for Best Western Signs, Sign Program Brochure and Best Western Brand Identity Exterior Sign Program Design Intent Drawings. The foregoing manual, guidelines, brochure and drawings may be amended by the Board. Retrofitted sign cabinets may be permitted for a maximum of five years from the date of approval by Brand Identity Administration of Best Western. Non-conforming, unusually shaped cabinets are subject to approval by Brand Identity Administration of Best Western. The approval shall be based upon whether the cabinet coordinates with the property's architectural design and adheres to Best Western's Brand Identity typestyle, logo colors and qualified size requirements. The member or applicant shall have the right to appeal to the Board regarding compliance with this Rule. The decision of the Board shall be final.

**300.4**   In the event a member obtains an approved Best Western sign from a source other than the Association, the member shall transfer title and ownership of the logo portion or the Best Western identification portion of such sign to the Association.

**300.5**   The member shall be responsible for the cost of installation of any and all Best Western signs and shall be responsible for maintaining such signs in first-class condition.

**300.6**   Upon termination or cancellation of membership, the former Best Western member shall remove the Best Western sign, sign cabinets for NL and NM signs, as defined in Best Western's Brand Identity Manual, and any part thereof, or any display of the Best Western emblem or logo. When the sign cabinet is removed, it must be destroyed or modified so that the top of the cabinet has no curvilinear features. Best Western or its authorized agents shall have the right to enter upon the property for the purpose of removing any Best Western sign, sign cabinet for NL and NM signs and any display of the Best Western emblem or logo upon termination or cancellation of membership. The cost of removal of Best Western identification upon termination or cancellation of membership shall be the responsibility of the former member. If Best Western must take action to require or complete the removal, destruction or alteration of signs, sign cabinets and other Best Western identification, the former member shall be responsible for costs and fees, including attorneys' fees incurred by Best Western.

**300.7**   All logos not conforming to Best Western standards shall be removed or replaced to meet Best Western requirements at the member's expense.

**300.8**   In cases where zoning prohibits display of any available approved sign which meets Best Western's minimum requirements, members shall submit zoning ordinances, plus graphics and dimensions to Brand Identity Administration of Best Western for review. The member/applicant must request a variance in writing from the local city board and if denied, appeal to the next level of government. If local ordinances prevail, the member or applicant shall be required to comply with Best Western's minimum requirements in the following manner.

A. All allowed signs shall be installed in the most advantageous combination of permitted locations and sizes within the primary property entry area, including entry drive, canopy, porte cochere and main lobby entrance.

B. The balance of the required Best Western logo signs shall be provided inside the public area, located behind the front desk, or at the main lobby entrance, whichever is the most prominent. A conforming logo shall be either a minimum four square foot full color logo or a minimum eight square foot logo in natural materials.

C. Any remaining balance shall be installed in other practical, prominent public locations. If the combination of permitted exterior signs and complying interior signs in practical, prominent public areas do not equal the required total square footage, a qualified graphics consultant shall be engaged by the member at their expense to evaluate the suitability of additional locations and sizes for Best Western Brand Identification. The consultant's recommendations shall be evaluated by Best Western's Sign Consultant and Field Designer. If approved by Best Western, the graphics package shall be immediately implemented.

D. When the canopy or the porte cochere are the only locations to display the property name, then the Best Western logo shall be displayed as outlined in the Brand Identity Manual, Best Western Sign Program Brochure and Guidelines for Best Western Signs. On a multi-sided canopy, only one side shall count toward the 50 square foot requirement.

E. The member or applicant shall have the right to appeal to the Board regarding compliance with this rule. The decision of the Board shall be final.

300.9 Each member shall use either the words "Best Western" or the Best Western logo immediately preceding the individual property name in directories and travel guides, brochures, postcards/hotel letters, envelopes, business cards, Yellow Pages, courtesy cars/vans and in all media as outlined in the Brand Identity Manual or policies and directives of the Board. If the member elects to use the words "Best Western" rather than the logo immediately preceding the property name to meet this requirement, the Best Western logo shall be placed elsewhere in the advertisement or display.

300.10 The Best Western logo shall be reproduced in its true proportions and entirely and, when reproduced in color, in the approved colors, in accordance with the Brand Identity Manual distributed by Best Western.

300.11 No member shall permit the use or display of any merchandise or advertising bearing the Best Western logo in any non-member lodging facility.

300.12 No member shall permit the use or display of any merchandise or advertising of a non-member facility at, or in connection with, the advertising of a member property except as provided in the Brand Identity Manual, as may be changed from time to time by the Board of Directors.

300.13 All signs including outdoor billboards, shall conform to quality standards, engineering and design specifications and approved art as prescribed in the Brand Identity Manual. Guidelines for Best Western Signs, the Sign Program Brochure and Best Western's Brand Identity Exterior Sign Program Design Intent Drawings.

300.14 All property signs, including supporting structures and bases, shall be well-maintained, properly lighted and in a good state of repair and operation

at all times. A Signage Condition Evaluation shall be conducted in conjunction with any Quality Assurance inspection or at any other time, but no sooner than 30 days following the last Signage Condition Evaluation, at the Regional Service Manager's discretion. If a point deduction of 15 or more points occurs on any two Signage Condition Evaluations within one year, the property shall be subject to cancellation of membership as outlined in paragraph 1100.6 of the Best Western Rules and Regulations. Points deducted for specific signs or conditions may be reinstated if, within 30 days of the Signage Condition Evaluation date, acceptable proof (repair documents and/or photographs), is submitted to the Best Western Quality Assurance Department showing the sign/condition has been fully corrected.

300.15 A property may post rates on outdoor billboards and signs. However, all rate posting shall meet the following minimum standards: (a) All rooms of the advertised room type shall be offered at the advertised price; (b) all rate posting shall conspicuously indicate the type of room offered and shall indicate the number of persons accommodated at the advertised price if the posted rate is based on a number of occupants; and (c) the posted rate shall be available at all times during which the rate is being posted unless the rate posting conspicuously indicates all restrictions placed on the availability of the posted rate. Any rate posting shall conform to the Best Western rate sign posting graphic standards. All rate posting shall represent a bona fide offer to sell the advertised rooms at the advertised price.

300.16 All signs and identification of any other motel/hotel chain shall be removed before installing the Best Western sign and beginning operation as a Best Western property.

300.17 All Best Western signs obtained from a source other than the Association's approved supplier shall be manufactured in accordance with Best Western's current sign specifications. All costs incurred in the removal or replacement of signs that do not comply with current sign specifications, regulations or graphic standards shall be the responsibility of the member.

300.18 The member is cautioned that it is the member's responsibility to ensure that all signs comply with prevailing laws and ordinances. Compliance with the standards and criteria of Best Western does not assure compliance with state and local laws and ordinances.

300.19 To the extent of any inconsistency between the provisions of Chapter III of these Rules and Regulations and any manuals, brochures, guidelines, drawings or specifications adopted pursuant to Chapter III, the provisions of these Rules and Regulations shall apply.

300.20 Each member shall display a Best Western membership plaque at the entrance. The minimum size of the membership plaque is 6 1/2" x 9 1/8".

5

## Chapter IV

**400.0  Reservations System And Travel Guide**

**400.1**  Each member shall participate in and comply with such reservations system as may be approved and adopted by the Board, including any and all alterations, amendments, deletions or supplements thereto.

**400.2**  Each member shall execute such documents and agreements as Best Western deems necessary to effectuate member participation in and compliance with such reservations system.

**400.3**  The approved property-to-property reservations system is the Nova.

**400.4**  No member shall permit the referral of Best Western guests to non-member properties unless all available Best Western rooms in a given area are filled.

**400.5**  Future reservations shall be solicited of each guest at the time of check-in and check-out. This shall be done consistently as a part of the registration and check-out procedure.

**400.6**  Front desk personnel of all properties are required to be proficient in sending and receiving reservations.

**400.7**  Standards for arrival times that require guarantees and guaranteed policies will be set periodically by Best Western. Each member shall, when required by Best Western, select from these standards the desired guarantee policy for the property. Members shall comply with the selected policy for the entire period for which the selection is made.

**400.8**  Each member shall honor room reservations made with either an advance deposit or credit card guarantee or a 4pm/6pm hold if accepted by the property, at the rate confirmed at the time of booking. If for any reason a room is not available, the member shall arrange for comparable accommodations in the area, if possible at a nearby Best Western; if not, at a comparable hotel or motel. The room shall be provided at no charge to the guest for the first night's stay. Transportation and a telephone call to notify the guest's home or office of the change shall also be provided without charge.

**400.9**  Room rental rates for each Best Western and group rates, if applicable, are established by the member based on such considerations as investment, location, competition, season and any other matters deemed pertinent by the member in its sole discretion. Each member shall furnish accurate and current room rate information in a timely manner for publication in the Travel Guide and accurate and current group rate information, if applicable, for publication in the Group Rate Manual and supplement. Members are not prohibited from charging more or less than the published room or group rates. Repeated or unexplained instances in which a member increases rates above those published in the Travel Guide or the Group Rate Manual shall be deemed to be a failure to provide accurate and current room rate information and shall result in deletion of the member's property listing from the Travel Guide in accordance with paragraph 400.10 of these Rules

and Regulations. Serious, repeated or unexplained failures to provide accurate and current room rate information may be deemed to constitute continued violations, deficiencies or infractions of applicable Rules and Regulations and may result in cancellation of membership in accordance with paragraph 1100.6 and the procedure set forth in Chapter XII of these Rules and Regulations.

**400.10**  Each member shall furnish accurate and current information in a timely manner for publication in the Travel Guide. Members will be given reasonable notice of deadlines for receipt of information to be included in the Travel Guide and are responsible for complying therewith. The failure to provide accurate and current information, including room rates, prior to the publication deadline shall result in deletion of the member's property listing from the Travel Guide.

**400.11**  Each Best Western member is required to maintain a display of the current Travel Guides at the front desk or in the lobby area.

**400.12**  Members are required to make a reasonable effort to promote distribution of the Travel Guide to the traveling public.

**400.13**  An on-site representative from each property shall attend a ST*R Training Seminar each year.

**400.14**  Children 12 years old or under stay free when accompanied by a parent or grandparent in the same room.

## Chapter V

**500.0  Administrative**

**500.1**  All fees, dues and assessments payable by members to the Corporation shall be established by the Board.

**500.2**  All members shall pay such fees, dues and assessments as may be established by the Board.

**500.3**  All members shall pay a monthly fee established by the Board.

**500.4**  All monthly charges are due and payable on or before the 15th of each month. An additional charge shall be assessed for late payment.

**500.5**  Annual Dues shall be non-refundable on December 1.

**500.6**  A.  Applications for membership shall be made on application forms as prescribed by the Board and accompanied by payment in full of the appropriate fee as established by the Board. Applicants shall be elected to membership in the Association by favorable vote of a majority of the Board. Voting on membership applications may be by mail or at any special or regular meeting of the Board.

B.  The Board may in its sole discretion consider membership applications for lodging facilities which are proposed for construction or under construction. The Board may approve such applications subject to one or more contingencies or conditions imposed by the Board in its sole discretion and, in the case of facilities proposed for construction, may allow the applicant 12 months in which to begin construction (poured concrete

footings on approved site). If such conditional or contingent approval is given, the applicant shall not be entitled to membership until the Board has received proof, satisfactory to it, that all such conditions or contingencies have been timely satisfied. The Board may permit applicants who have received contingent approval for properties under construction to have listing in the Travel Guide under certain conditions. The Board may also permit applicants who have received conditional approval for properties proposed for construction to have a listing in the Travel Guide under certain conditions to include receipt of proof, satisfactory to it, prior to November 15 of the current year that construction has commenced (as previously defined). Applications given contingent or conditional approval as provided in this paragraph (B) shall not be transferable to any other location.

C. The Board may act upon membership applications by or on behalf of prospective purchasers or transferees of lodging facilities for which current memberships are held by approving such applications subject to one or more contingencies or conditions imposed by the Board in its sole discretion. If such contingent approval is given, the applicant shall not be entitled to membership until the Board has received proof, satisfactory to it, that all such conditions or contingencies have been timely satisfied. Such final approval, if granted, shall be effective from the date of close of sale or transfer. The Board may direct that customary membership services to the property remain uninterrupted during any contingency period, upon the applicant's agreement to timely comply with the stated conditions and pay the established fees, dues and assessments for said period and the cost of all goods or services provided by or ordered through Best Western whether or not the application is ultimately approved. However, in no event shall this continuation of customary membership services be construed as granting membership status to the applicant.

D. The Board may act upon other membership applications by approving such applications subject to one or more contingencies or conditions imposed by the Board in its sole discretion. If such contingent approval is given, the applicant shall not be entitled to membership until the Board has received proof, satisfactory to it, that all such conditions or contingencies have been timely satisfied. Such final approval, if granted, shall be effective from the date the final approval is granted. The Board may direct that customary membership services to the property may commence during any contingency period, upon the applicant's agreement to timely comply with the stated conditions and pay the established fees, dues and assessments for said period and the cost of all goods or services provided by or ordered through Best Western whether or not the application is ultimately approved. However, in no event shall this commencement of customary membership services be construed as granting membership status to the applicant.

500.7 A. All applicants for new membership, including those made by or on behalf of prospective purchasers or transferees of lodging facilities for which current memberships are held, shall remit a non-refundable evaluation fee with their applications. The amount of the evaluation fee shall be established by the Board from time to time to defray, in whole or in part, the administrative costs, including inspection costs, of evaluating such new membership applications.

B. All applicants shall also remit an affiliation fee with their applications in an amount established from time to time by the Board. The affiliation fee shall be non-refundable 30 days after either approval by the Board of the application or upon conditional approval by the Board of the application and the applicant's agreement to satisfy the stated conditions in timely manner. If (i) an application is initially denied by the Board or, (ii) in the case of an application for lodging facilities which are proposed for construction, the applicant withdraws the application within six months of the initial Board action on the application and prior to the start of construction, then in either such event, the affiliation fee, less any amounts owing Best Western by virtue of agreements made pursuant to paragraphs 500.6 (C) and (D) of the Rules and Regulations, shall be refunded to the applicant. The refund shall be paid only after (i) return is made to Best Western or its designated agents of any and all Best Western property in possession of the applicant, including the Best Western sign and reservations equipment, if any; and (ii) discontinuance by the applicant of any use or display of any Best Western marks, service marks, membership marks, trademarks, trade names and business symbols, including without limitation, the Best Western emblem and logo.

500.8 All applicants granted conditional approval for properties proposed for construction may apply for one 12-month extension of their conditional approval so long as construction has not yet commenced. Each such applicant seeking an extension shall submit a progress report describing as a minimum the current status of financing, architectural plans and specifications, satisfaction of zoning requirements and plans for commencement of construction. An extension of 12 months will be granted automatically upon receipt of the fee specified in rule 500.6(B) prior to 30 days of the end of the 12-month period allowed for commencement of construction pursuant to rule 500.6(B). The amount of the entrance fee required upon application for an extension shall be based upon the fee schedule current as of the date of the application for extension. The entrance fee paid upon application for extension shall be non-refundable as of the date that the extension period begins. In the event that construction is not commenced at the end of the extension period, no further extensions shall be granted and the applicant may not reapply for membership in the same location for 90 days following the end of the exten-

sion period. Any such reapplication following an extension shall be accompanied by all fees required under rule 500.6.

**500.9** All members are required to use the name "Best Western" as part of the name of their property either as the sole name or in combination with another name. All advertising of a member property bearing Best Western as its sole name, however, shall include the statement "individually owned." Legal entities such as corporations, partnerships, firms or associations that own, lease or operate properties are not permitted to use the name "Best Western" as any part of their legal name.

**500.10** All members shall accept all approved credit cards for payment of room rent and services.

**500.11** A member or designated operating manager or active management employee of each Best Western property shall attend either the Annual International Convention or a District Meeting each year.

**500.12** All new members are required to send a representative of their hotel, motel or resort to an Orientation Seminar before they are permitted to operate their facility as a Best Western property. This representative shall be an on-site employee of the property, serving in some operational or management capacity. In addition, all members shall participate in the INNVISION Program (now titled "Tools for Success") at their own expense.

**500.13** All members shall accept reservations from bona fide travel agents on a year-round, space-available basis and pay at least the standard 10 percent commission on the gross room rental, except for bookings on special package programs made at net rates as specified by Best Western.

**500.14** Each member and each contingently approved applicant shall keep in full force, at all times, a policy (or policies) of insurance which:

A.  Is a public liability and property damage policy. Coverage shall be on a commercial general liability form including the broad form endorsement or its equivalent. Coverage shall include premises and operations, owners and contractors protective, products and completed operations, personal injury and contractual liability.

B.  Is a policy covering liability for owned automobiles, non-owned automobiles and hired automobiles.

C.  Is issued by an insurance carrier which is rated no lower than "B+" in the most current edition of A.M. Best's Key Rating Guide and is licensed to do business in the state in which the member is domiciled. Any other insurance carriers, risk prevention groups, captive insurance companies or liability insuring entities must be approved by the Best Western Board before submitting the Certificate of Insurance to the Best Western. Approval shall be at the Board of Directors' sole discretion.

D.  Names Best Western International, Inc. as an additional insured, on all insurance policies including, but not limited to, primary, excess and

umbrella policies, providing coverage to Best Western for its active and passive negligence for claims arising from acts occurring at or concerning the subject property by use of ISO Form CG20-26-11-85 or its equivalent. Members not providing insurance as set forth in this paragraph (D) agree to indemnify Best Western for all claims and damages which would have been covered by insurance meeting the requirement of paragraph (D) of this rule.

E.  Provides minimum liability limits in such amounts as may be established from time to time by Best Western's Board.

F.  Provides liability coverage on an "occurrence" basis. The Best Western Board may authorize an exemption from this provision, and permit liability coverage on a "claims made" basis, where the member demonstrates an inability to obtain "occurrence" coverage. In the event that "claims made" coverage is authorized, the member shall obtain tail coverage, with liability limits as though an "occurrence" policy had been in force, providing retroactive coverage to the date of the member's last "occurrence" policy or the first date of contingent approval for membership, whichever is later.

G.  If at any time a member changes from a "claims made" to an "occurrence" form of liability insurance, one of the following coverages shall be obtained:

1.  An open-ended reporting period for losses occurring during the time of coverage under "claims made" policy, or the first date of contingent approval for membership, whichever is later.

2.  Prior acts coverage back to the member's first date of "claims made" coverage or the first date of contingent approval for membership, whichever is later.

H.  The member's insurance shall be primary in all cases. Any other insurance maintained by Best Western is for the protection of Best Western only and is not supplementary or excess insurance for the member.

I.  Provides that the insurance companies issuing such insurance shall notify Best Western in writing at least sixty (60) days prior to any cancellation, alteration or non-renewal of the policy. Each member and each contingently approved applicant shall annually provide Best Western with a Certificate of Insurance, on forms provided by Best Western, evidencing a policy or policies meeting the above requirements. The Certificate of Insurance shall be provided with the contingent applicant certification agreement or prior to or upon expiration of the current Certificate of Insurance on file with Best Western. Failure to provide the Certificate of Insurance shall result in automatic termination in accordance with the provisions of Article II, Section 7 of the Bylaws. As a condition of contingent approval, each applicant, upon notification by Best Western that Best Western intends to contingently approve the application, shall provide Best Western with a Certificate of Insurance, on

forms provided by Best Western, evidencing a policy or policies meeting the above requirements. This requirement shall be met prior to activation of services, installation or display of any Best Western signs, or advertising or disclosure of any Best Western association. Failure to maintain the insurance coverage required by this rule shall be grounds for termination of membership in accordance with the provisions of Article II, Section 8 of the Bylaws, immediate suspension of services and termination of contingent approval as may be prescribed in the Rules and Regulations of Best Western.

500.15 It is required that each Best Western affiliated member permit inspection of all accommodations, facilities and procedures by an accredited Best Western Regional Service Manager to determine compliance with these Rules and Regulations and the Best Western Member Information and Resource Guide, and as deemed necessary by the Board. Every effort will be made to provide the member with advance notification of a scheduled inspection, but it may not always be possible to do so. When possible, not less than 24 hours advance notice will be given. There will be no notice given where an unannounced inspection is intended.

500.16 The quality control inspection program is designed to assist the member and Best Western Headquarters in identifying potential problems at the property. The report measures the cleanliness and condition of the property, the amenities and services furnished, and how well the member complies with the established Rules and Regulations.

500.17 A perfect score in the inspection program is 1,000 points in the inspection report or the Guest Rooms/Public Areas Condition Report. A score of less than 850 points, a point loss of more than 50 points in housekeeping, or a point loss of more than 100 points in maintenance may result in stricter and more frequent inspection requirements. A score of less than 800 points in an inspection report or the Guest Rooms/Public Areas Condition Report will result in the member property being placed into probationary status. The Board may establish a fee for any inspection which is scheduled as a more frequent inspection under this rule. A property, once placed into probationary status, will remain in the status until such time as the inspection report or the Guest Rooms/Public Areas Condition Report score equals or is greater than 800 points or until cancellation of the membership pursuant to paragraph 1100.6 of these Rules and Regulations. The Board may impose stricter inspection requirements on probationary properties.

500.18 The complete facilities may also be inspected by a member of the Board, a Regional Governor or other member of the Best Western administrative staff.

500.19 Although not specifically required, it is desirable that the owner or manager of the property accompany the Regional Service Manager on the

inspection and review the report with the inspector prior to the Regional Service Manager's departure from the property.

500.20 A. All properties will be scheduled for inspection in the manner provided by the Best Western Member Information and Resource Guide, as may be amended.

B. All facilities associated with a member property shall be made available for inspection. These facilities include:

1. All land, buildings and improvements which are owned or leased by the member; or

2. Facilities which are represented by the member as being available to provide goods, services or amenities to the member's guests where the goods, services or amenities provided by the facility are represented as being owned, managed or controlled by the member.

C. All leases or management contracts for facilities associated with the member property shall include provisions permitting inspection and renovation, as provided in Chapter V of the Rules and Regulations.

D. All facilities associated with the member property shall be presumed to be available for inspection and renovation unless established to the contrary by the member and a waiver is secured from Best Western.

E. Waivers from the requirements of this rule may be granted by Best Western, upon such terms and conditions as it, in its absolute discretion, may determine.

500.21 A planned program shall be in effect to accomplish continual maintenance of facilities associated with the member property to reflect a fresh and high quality appearance. Each Best Western member will implement a redecorating, refurbishing and renovation program in accordance with guidelines and time schedules as may be established by the Board, so that the property shall provide high quality accommodations as required to keep pace with the current trends of the lodging industry.

500.22 It is recommended that existing members voluntarily proposing renovation or refurbishing submit proposed plans and specifications to the Design Department for review to avoid possible conflict with Best Western guidelines and avoid unnecessary expenditure for products which may be subsequently disapproved. Pursuant to a request by Best Western International, an applicant or member may be required to submit drawings, color boards and specifications to the Design Department for review before purchase or installation. Any redecorating, refurbishment and renovation not first securing the approval of the Design Department of Best Western may not, at the sole discretion of the Board, be considered to be undertaken or completed in compliance with orders, directives or conditions of the Board and may subject the membership to cancellation pursuant to paragraph

9

1100.6 of these Rules and Regulations. In the event of disagreement between the member or applicant and the Design Department and/or Review Committee relative to the review and/or correction of property deficiencies, the Board of Directors shall have the final decision.

500.23 These Rules and Regulations, together with Best Western's New Construction Guidelines and Renovation & Refurbishing Guidelines, constitute the rules for projecting a fresh and high quality appearance.

500.24 Each Best Western property shall be operated in a high ethical and moral standard consistent with Best Western's concept of providing quality accommodations at fair and reasonable prices.

500.25 Best Western members shall comply with all prevailing laws, ordinances and regulations pertaining to the operation or construction of a hotel/motel or resort property.

500.26 Each Best Western member will maintain the premises, including coffee shops, restaurants, lounges, meeting/banquet rooms and other public areas, in a clean, safe and orderly condition.

500.27 Efficient, courteous and high quality services shall be provided by each Best Western member.

500.28 Any deviation from these Rules and Regulations shall have the prior written approval of the Board. A file of all written waivers shall be maintained at the property and available for inspectors to verify waiver.

500.29 Each Best Western member shall use reasonable means to encourage the use of other Best Western affiliated hotels/motels on a worldwide basis by the traveling public.

500.30 Each transaction with the guest shall be conducted in a courteous, cordial, friendly and professional manner that reflects fair and ethical policies and practices.

500.31 Personnel shall be properly trained to serve the guests in a professional manner.

500.32 All guest contact personnel shall be neat, well-groomed and properly attired.

500.33 In order to foster, promote and continue Best Western's image as a provider of high quality service to the traveling public, including families, it is declared to be in the best interest of all members to uniformly prohibit the offer, sponsorship or provision of any entertainment which could be classified as adult, pornographic, lewd, sexually explicit or obscene. Prohibited entertainment shall include, without limitation, the showing of or offer to show any movie or film with an "X" or similar rating or any movie or film that is equivalent to "X" rated and the offering of nude dancing or modeling. The Board shall have final discretion in determining whether there has been a violation of the purpose and spirit of this rule.

500.34 All Best Western members are expected to comply with Best Western's guaranteed reservations system as prescribed in the Best Western Member Information and Resource Guide.

500.35 The owner or manager of a Best Western property shall give prompt and courteous attention to any guest criticism, regardless of its source. When complaints are received at the Best Western International Headquarters with reference to a particular property, the guest will be sent a reply stating that the complaint will be investigated and that he can expect to receive an answer directly from the property. Such a complaint letter shall be answered within seven (7) days, with a copy directed to the office of Customer Service at Best Western International Headquarters.

500.36 The acceptance of pets of guests is recommended, subject to prevailing laws that may apply. Seeing Eye dogs shall be permitted in any area accessible by their masters.

500.37 Each Best Western property shall be of sound-proof construction, in a desirable location, have an attractive exterior and provide year-round heating and/or cooling.

500.38 Each Best Western member property shall have a restaurant on or within 500 feet of the premises, except when individual circumstances warrant a variance approved by the Board. Although a restaurant is located within 500 feet of the premises, it shall not qualify the member property under this rule if that restaurant is located at any other lodging establishment.

500.39 Each Best Western member property shall offer a breakfast on-site or at immediately adjacent facilities that are inspected by Best Western. Such breakfast must meet a minimum level of product and service as defined in I., II., or III. below:

I.   A buffet style continental breakfast must include (A, B and C):

   A.   A choice of at least three of the following: pastries, sweet rolls, muffins, doughnuts, coffee cake, danish, bread, bagel, croissant, english muffin, toast, cereal.

      1.   If cereal is one of the choices offered, then milk and sugar/sweetener must also be offered.

      2.   If bread, toast, english muffins, bagel or croissant are offered as one of the choices, then butter/margarine and a selection of jams/jellies/marmalades must also be offered.

   B.   Fruit (canned or fresh), and fruit juices (one kind of fruit and one fruit juice complies, if in sufficient quantities).

   C.   Coffee, tea (including at least one decaffeinated coffee or tea) and their usual accompaniments are to be served.

II.  A plated continental breakfast, either table service or delivered to room or provided in rooms equipped with refrigerator. At a minimum, the plated continental breakfast offering must include at least one selection from list I. (A) above, fruit and fruit juice, and a choice of coffee or tea (including at least one decaffeinated coffee or tea) and their usual accompaniments.

III. A plated (table service) hot breakfast. At a minimum, the plated (table service) hot breakfast offering must include (A, B, C and D):

A. Hot eggs

B. An additional griddle item (e.g., hash browns, potatoes, waffles, pancakes, grits, meat, etc.)

C. Toast with a selection of butter or margarine and jams/jellies/marmalades

D. Coffee, tea (including at least one decaffeinated coffee or tea) and their usual accompaniments

(Note: A restaurant offering a full service breakfast menu would meet these requirements)

Table service, for the purpose of this rule only, is defined as plated food delivered to the guest at a table of standard dining table height with chairs suitable for dining and set with typical condiments (e.g., salt, pepper, sugar, sweetener, cream or non-dairy creamer) and eating utensils. Disposable plates, cups or eating utensils are not acceptable for table service.

The complying breakfast, as defined in I., II. or III. above, must be offered a minimum of three hours every morning, seven days a week. Any breakfast area must have a quality appearance, furnishings must be of the same quality if adjacent to other public areas.

In addition, each Best Western member property must:

Provide seating at a minimum rate of 20% of rooms (e.g., 10 seats per 50 rooms) with a minimum of two tables and six chairs.

or

If the property has less than the required 20% seating, the property may comply by: (1) delivering the complying plated continental or hot breakfast to the guestrooms or, (2) when a delivery charge is imposed, by providing appropriate trays (in sufficient quantity to meet guest demand) so that guests may take the breakfast to the guestrooms. Notice of delivery and/or tray availability must be provided in all guestrooms.

For properties offering a free (at no additional charge) complying breakfast, a special and prominent designation will be provided, at the property's discretion, in all channels where individual property listings include amenities/services available and Best Western has the ability to provide such designation (e.g., *Travel Guide*, internet, etc.).

To qualify for a "free continental breakfast" designation a property must offer, at a minimum, one of the two complying breakfast offerings, described in I. and II. above, at no additional charge.

To qualify for a "free hot breakfast" designation a property must offer the hot breakfast, described in III. above at no additional charge.

Becomes effective October 1, 2001.

500.40 The member shall be responsible for loss or damage to any Best Western equipment furnished in conjunction with the affiliation which is in their care, custody or control.

500.41 All Best Western members and personnel shall display a courteous and professional attitude toward officers, directors, employees and staff of Best Western International.

500.42 All members shall participate in all mandatory programs and promotions as may be adopted by the Board.

500.43 Each property shall take all steps which may be necessary to maximize guest satisfaction and minimize guest complaints. In order to assure compliance with this rule, Best Western will monitor each property during six month intervals. The intervals will be December 1 through May 31 and June 1 through November 30. The receipt of more than 1.7 guest complaints for every 10 rooms during a six-month monitoring period (the ratio of the number of complaints to the number of rooms shall not exceed .17) shall be conclusive evidence of a violation of this rule.

500.44 Members shall at all times respect the privacy of guests and shall institute reasonable measures and precautions designed to safeguard guest privacy. Violation of this rule shall be grounds for membership termination.

500.45 A. The number of rentable guest rooms of an approved or conditionally approved Best Western property, as provided by rule 500.6 of the Rules and Regulations of Best Western, may not be increased or decreased more than 10 rooms or 10%, whichever is greater, without the prior approval of the Board in accordance with the procedures established herein.

1. An application to increase or decrease the number of rentable guest rooms shall be as prescribed by the Board and accompanied with payment of fees as established by the Board. The Board may require additional information.

2. An increase or decrease of more than 10 rooms or 10%, whichever is greater, shall be determined by reference to the most recent Membership Application & Agreement or property unit count on file with the Association, whichever is greater, and shall be a cumulative total of guest rooms increased or decreased at the Best Western property since the effective date of this rule.

3. The notification, impact studies, and approval procedures shall be as prescribed in Article II, Section 2(C) of the Bylaws and the Board policies interpreting and implementing that Section 2(C), except:

a. Payment for the impact study shall be by the individual making the request to increase or decrease the unit count.

b. The impact study shall only consider the impact of the increase or decrease requested; and

11

c. The Board of Directors may waive impact studies for unit count decreases.

B. 1. Properties described in Article II, Section 1, (E)(1) of the Bylaws, pertaining generally to property whose rental units are each separately owned, may be associated with a membership and the designated Best Western property. Such an association shall be upon such terms and conditions as may be established by the Board.

2. In the event that an ambiguity or inconsistency exists in the application of the provisions of this section, or of Section 2(C) of Article II of the Bylaws, the Board shall have the right to resolve the ambiguity or inconsistency in its sole and exclusive discretion.

500.46 English speaking staff must be available if requested and be available within a reasonable time of such request having been made.

500.47 Snacks and hot beverages in guest rooms are to be available for guests.

500.48 Convenient arrangements for early morning call/alarm are to be available.

500.49 Safe deposit facilities are to be available for guests.

500.50 Each property will be billed a registration fee for the annual International Convention the month prior to the convention, commencing with the 1997 International Convention. The fee shall not increase more than the lesser of (1) five percent or (2) the rate of inflation for the previous year, as measured by the United States Bureau of Labor Statistics Consumer Price Index (all items for all urban areas).

500.51 Whenever there exists a marketing cooperative established by a majority vote of the membership in their state (including the District of Columbia), province, territory or country (including regions such as the Caribbean), each member shall participate in their respective state, province, territory or country marketing cooperative and abide by all established guidelines adopted by the cooperative.

500.52 All members are required to award Best Western International frequency program participants either points or miles, at the frequency program member's request, for all rate plans with the exception of Allstate (D), Employee/member Discount (E), FIT (FI), Leisure Club (LC), Managers Special (MR), Priceline (PL), Travel Agent Discount (TA), Group (BW Direct), wholesale, tours and other hotel negotiated rates (e.g., crew, local volume, longer than 1 week extended stay, (i.e., WE, MT, etc.)

## Chapter VI

600.0 **Lobby and Front Office**

600.1 All properties shall provide a lobby of appropriate size and furnishings commensurate with the size of the property and services offered. Ten (10) square feet per room for 40 through 150 room properties or a minimum area of 400 square feet. Six (6) square feet per room in excess of 150 rooms. Deviation on larger properties is subject to Best Western's prior approval.

600.2 The front office and registration/check-out area shall be maintained in an orderly and clean manner. An efficient, hospitable and courteous attitude shall be displayed to the guest at all times.

600.3 Business shall always be referred to the nearest Best Western, unless by so doing the guest's best interest and comfort are not adequately served.

600.4 Alternate accommodations should be provided to the guest if accommodations are not available in the contacted inn, to take advantage of the opportunity to render service to future guests and maintain the loyalty of that Best Western guest.

600.5 Additional charges shall not be made for reasonable requests for additional services, such as extra towels, soap, glasses, ironing boards, folding table and chairs, bedboards, blankets, etc.

600.6 Rooming guests in unprepared accommodations is prohibited.

600.7 The telephone switchboard shall be answered as promptly as possible in a pleasant, courteous manner. All incoming calls shall be answered using the words "Best Western." Callers should not be left holding dead lines, be asked to wait or otherwise be inconvenienced through inefficient service.

600.8 All Best Western properties shall provide for registration or checking in of guests 24 hours a day. In the event the front desk is closed for certain hours, a bell or some other arrangement shall be provided for guest services. "No vacancy" signs are not recommended.

600.9 A current Best Western Member Information and Resource Guide shall be kept available for front office use.

600.10 All front desk personnel shall be in uniform or otherwise neatly attired.

600.11 Fax facilities are to be available during normal working hours.

600.12 Facilities for storing luggage, in case of late checkouts, are to be available.

600.13 Assistance with luggage is to be available upon request.

600.14 A telephone for internal/external calls located in public areas is to be provided for guest use.

600.15 Photocopy facilities shall be available on-site, seven days a week, during normal business hours (minimum of 14 out of 24 hours). Becomes effective October 1, 2001.

600.16 Long distance access shall be offered to guests free of any long distance access charges. Becomes effective October 1, 2001.

600.17 Local calls under 30 minutes per call shall be provided to guests free of charge. Becomes effective October 1, 2001.

## Chapter VII

700.0 **Buildings, Grounds and Public Areas**

700.1 Exterior and interior of buildings shall be maintained in good condition and in a good state of repair at all times. Painted surfaces should be

12

free of peeling paint, soil and obvious cracks in masonry, and should present an attractive appearance in accordance with Best Western standards.

700.2 Adequate free parking space shall be provided. The parking area shall be paved and well marked with stripes. It shall be clean and free of refuse and obstructions.

700.3 All parking areas, curbing, concrete bumpers and driveways shall be in a good state of repair and free of excessive cracking, crumbling, chuckholes or unsightly repairs.

700.4 Snow removal shall be performed when necessary by plowing and/or use of a melting compound. Icy conditions shall be corrected with an appropriate melting compound or traction providing material.

700.5 Sufficient lighting shall be provided in all parking areas to provide for guest security and safety to automobiles. Lighting should be on timing devices to go on at dusk and off at sunrise, and should be properly adjusted as seasons change.

700.6 The entrance to a property shall be clearly identified and driveways unobscured so that incoming guests can readily locate the front office and/or restaurant and lounge facilities. Driving areas where view is obstructed should be clearly marked for slow driving.

700.7 Appropriate, attractive landscaping shall be provided. Grounds and landscaping shall be kept neat and clean. Lawn and planted areas should be free of weeds and properly edged.

700.8 Grounds shall be policed daily to remove debris and trash from shrubbery and planted areas.

700.9 Fire extinguishers shall be located in accordance with prevailing codes, be charged and in view, and bear required inspection certificates or tags.

700.10 One self-service ice machine and one soft drink machine shall be provided for each 60 rooms. Machines for one- or two-story properties shall be centrally located for convenient access by guests on each floor. One self-service ice machine and one soft drink machine should be provided on every other floor in properties of more than two stories. Automatic ice machines shall dispense a controlled portion of sanitary ice. The dispenser may be operated, at the hotel owner's option, by room key or token. Ice shall be available free of charge to guests 24 hours a day, and its location well identified.

700.11 Ice machines shall be electrically grounded and maintained in a clean, safe, attractive condition.

700.12 Drink machines shall be electrically grounded, properly stocked, clean and in good condition.

700.13 Interior corridor carpeting shall be vacuumed daily and be free of wrinkles, litter, debris and clutter. Interior corridors shall be well lighted. Ceiling and woodwork shall be clean and in good repair.

700.14 Stairways, walkways and elevators shall be kept clean, uncluttered and well lighted; metal railings, treads and floor covering shall be kept in good condition.

700.15 No storage of any kind will be permitted in any interior corridors, hallways, exterior covered corridors, walkways or breezeways.

700.16 Stairway lighting, treads, risers and hand rails shall comply with the National Safety Council, OSHA or other appropriate government agency standards. Treads and landings shall have non-slip surfaces.

700.17 Exit lights shall be on emergency circuits and in operation at all times, in accordance with applicable prevailing codes.

700.18 Swimming pools are required, except where individual circumstances warrant a variance approved by the Board. Pools shall be a minimum of 400 square feet and be heated if so advertised. Diving boards and slides are prohibited.

700.19 Swimming pool area, including deck, shall be neat, clean, attractive and maintained to a high degree of cleanliness year-round. Area shall be kept free of litter and refuse, especially breakable items such as bottles, dishes and articles made of metal or glass that could endanger the safety of guests. Exterior swimming pools that are closed to the public must have pool covers that have stretching capabilities and are securely fastened on all sides or are made of another pre-approved product to eliminate the collection of refuse or rainwater and subsequent unsightly stagnant conditions.

700.20 Pool depth should be marked to indicate every two-foot change in depth; such markings are to appear on both the vertical sides of the pool and on the pool deck or apron. Shallow and deep ends should also be clearly identified at pool deck level.

700.21 Pools shall be maintained in accordance with state regulations.

700.22 Pumps, filters and underground equipment areas shall be clean, neat, properly vented and maintained at all times. Covers for below ground equipment area shall be properly in place at all times.

700.23 Chemical balance of pool water shall be maintained at proper levels in accordance with prevailing codes. Daily tests should be conducted and recorded.

700.24 Adequate pool furniture shall be provided, commensurate with size of property. Furniture shall be maintained in good, clean condition, present no hazardous or unsafe conditions and enhance the overall appearance of the pool, deck and area.

700.25 Doors, locks and hardware shall be regularly inspected for easy, efficient operation and good appearance.

700.26 All guest room entrance doors shall be solid-core or metal. Entrance doors (other than interior corridor doors) shall be weather-stripped at top and sides for sound transmission reduction and all wooden entrance doors shall be flush panel. Hollow-core doors may be used for guest unit bathroom doors.

700.27 All guest room entrance doors shall be equipped with a lock that is self-locking. The lock shall be electronically activated and must be UL listed (CSA for Canada). All guest room entrance doors shall

be equipped with a one-inch bored-in deadbolt lock, designated as Grade 2 type. Deadbolt locks shall be operable only with a latch from the interior and emergency key from the exterior. The emergency key is any instrument specifically designed to open that locking device and should be maintained by the general manager or security of the hotel.

Combination locks with panic features shall function so that the deadbolt cannot be retracted from the outside by the use of a guest key or the master key. The deadbolt shall be retracted from the outside only by the use of an emergency key. The room number shall not be displayed on the key.

Electronically activated locking devices are required and must provide the following features:

All entrance door locksets shall be electronically activated and always remain in the locked position without having to operate an interior spanner button or any similar device. The lockset shall only unlock by the use of a guest, master or emergency key. A key is defined as a key card or any device specifically manufactured to operate the lockset.

The lockset shall be keyed to at least three levels of security - the guest key, the master key (or maid's key in some instances) and the emergency key. The emergency key shall be maintained by the general manager or security of the hotel and the master keys only by assigned hotel staff. All functions, except the fail-safe feature designed to completely override the guest room lockset, should be performed in a non-mechanical manner.

All lock sets shall automatically re code with each use of a newly assigned guest key, voiding all previously issued guest keys.

Room numbers shall not be displayed on the key.

A fail-safe feature shall be provided to allow entrance to the guest room in the event of a system or power failure.

If battery operated, a low battery warning feature shall be provided at the guest room lockset level.

An audit trail/interrogation feature is required and should be maintained only by the general manager or security staff of the hotel.

An automatic time-out feature is required at the guest room lockset level to void all keys left in the lockset past a predetermined length of time.

700.28  All guest room entrance doors are to be equipped with a chain- or bar-type door guard. This door chain/guard should be installed in such a manner that the strength of the attachment is equal to the strength of the chain. The bar-type guard or chain should allow for a maximum door opening of one inch.

700.29  All guest room entrance doors are to be equipped with one-way door viewers with a minimum of 180-degree viewing. All door viewers are to be metal, not plastic. The viewers should be installed

four feet, nine inches from the floor and installed with a substance such as "Lock-Tite" or equivalent, to ensure that it is tamper-proof.

700.30  All guest rooms with interconnecting doors shall have two solid-core or metal doors equipped with a lock that is self-locking and a one-inch bored-in deadbolt lock on each door. Locks shall have all metal components. A 1/2 inch bored-in deadbolt may be used on doors with a metal frame. It is recommended that both doors be weather-stripped to minimize sound transmission. A knob on the guest room side of the interconnecting door with a tamper-proof plate on the other side of the door complies with the self-locking requirement. When half-inch deadbolts on interconnecting doors are replaced, it is recommended that they be replaced with one-inch deadbolts.

700.31  All sliding doors are to be equipped with a hook lock built-in within the door handle, as well as a secondary locking device. This secondary locking device shall be a safety bar ("charley bar"), a sliding door deadbolt or a pin-type lock. The hook shape is to resist the parting motion of sliding door and jamb. Sliding doors shall be installed to ensure that the sliding panel is on the inside and the stationary panel is on the outside, unless otherwise waived by the Board.

700.32  All ground level wooden or metal balcony/patio doors without a walkway shall have a bored-in deadbolt. All wooden or metal private balcony/patio doors above the first floor without a walkway shall have a locking device. All other secondary doors with walkways shall have all required locking devices. A key accessible deadbolt is only required in one entry door.

700.33  All guest room windows that open shall provide a lock which secures the window in a closed position.

700.34  All public restrooms shall be clean and well-maintained and have sufficient paper and hand washing supplies. Restrooms shall be well lighted and free of offensive odors.

700.35  Every Best Western property shall provide repair and maintenance of all facilities, equipment, machinery, paving, lighting, electrical systems, plumbing, heating, air-conditioning, guest room interior, bathrooms, exterior walls, stairways, swimming pools and equipment, keys and locks, roofs and guttering.

700.36  All reports for repair should be made promptly and a system established to make certain that repairs affecting guest comfort, convenience and safety are completed.

700.37  Ice machines and vending machines shall be inspected daily by maintenance personnel.

700.38  Maintenance or building superintendent should be supervised closely by the general manager; constant checking should be done to make certain normal repair maintenance work is performed promptly.

14

700.39  It should be remembered that maintenance personnel are also guest contact personnel. They should be well-groomed, clean and properly uniformed.

700.40  Restaurant, lounges, meeting/banquet rooms and other public areas shall be maintained in good condition and in the highest degree of cleanliness.

700.41  All fencing shall be maintained in good condition and in a good state of repair at all times. Painted surfaces shall be free of peeling, excessive cracking (weather checking), or excessive fading of paint. Gates, if provided, shall be likewise in good condition and operable.

700.42  An elevator which serves all floors is required in buildings in which a guest would have to use more than one inter-floor stairway to reach the guest rooms from the main entrance.

700.43  Bottled or canned water (spring or mineral water) is to be available to the guest on site 24 hours a day, free or at charge. (an acceptable solution is to offer water in a vending machine.)
Becomes effective October 1, 2001.

Only where tap water is not safe to drink (as determined by the appropriate regulatory authority), there must be a notice in the room and a minimum of 1 liter of bottled water per day will be provided in the room, free of charge.
Becomes effective October 1, 2001.

700.44  Additional complimentary toiletries shall be available on-site to guests, on request, 24 hours daily, free of charge. The following items, if not provided in guestrooms, shall be available at reception; razor, shaving foam, toothbrush, toothpaste, comb, sanitary napkins (an acceptable solution is to offer sanitary napkins via a vending machine in a public restroom) and sewing kits. The availability of these items is to be noted in the guest service directory.
Becomes effective October 1, 2001.

## Chapter VIII

800.0  **Housekeeping Department**

800.1  The housekeeper's office and area shall be maintained in a neat, clean and safe manner and be free of refuse and fire hazards.

800.2  The housekeeping department office and area shall be adequately supplied; all equipment shall be maintained in good operating condition.

800.3  Floor shall be maintained in a good sanitary condition and in an excellent state of repair.

800.4  Maids and housemen (regularly employed) shall be neatly uniformed.

800.5  When linen shows holes, excessive stains or heavy mending, it shall be removed from service immediately.

800.6  In-house laundry is to be maintained in a clean, neat and safe condition and provide good ventilation and lighting.

800.7  Floor covering in laundry is optional; tile is recommended as bare concrete stains linens.

800.8  Laundry equipment shall be kept clean and in good operating condition. Washers shall be free of corrosion; dryers should be free of excessive lint and properly vented.

800.9  Laundry personnel shall be properly uniformed.

800.10  Every working maid shall have an operable vacuum cleaner in good condition.

800.11  Maid carts shall be kept in a good state of repair and be well painted, clean, neat, well organized, properly supplied and free of squeaks or other noises that might disturb guests.

800.12  Professional housekeeping procedures shall be followed at all times.

## Chapter IX

900.0  **Guest Rooms and Bathrooms**

900.1  Guest rooms and bathrooms shall be attractive, comfortable, professionally designed, in good taste and maintained on a daily basis in the highest degree of cleanliness and safety.

900.2  Walls, ceilings, windows and sills shall be in excellent condition, clean and free of dust, lint, stains, fingermarks and smudges.

900.3  All guest rooms are to be fully carpeted with good quality carpeting. Carpets shall be vacuumed daily; obvious debris and litter shall be removed from under the beds and other furniture. Carpet under beds shall be vacuumed at least weekly.

900.4  Rooms shall be free of odor and insects.

900.5  Pillows, box springs and mattresses shall be of motel/hotel quality and in good physical condition. Ticking should be free of stains. Pillows should be plump and bed support solid.

900.6  Each guest room shall be numbered with easily distinguishable, uniform numbers. Doors, locks, and hardware shall be regularly inspected for easy, efficient operation and good appearance. If any guest room entrance door locks are inoperable, the guest room shall be placed "out of service" and not rented until the lock is repaired.

900.7  Guest rooms shall be equipped with adequate furnishings that are attractive, comfortable, in excellent condition and free of dust, lint, fingermarks, smudges and scratches. Furniture should be constantly upgraded to eliminate worn finish or upholstery. Refer to Best Western's Renovation & Refurbishing Guidelines for furnishing requirements per room.

900.8  Every bed shall be supplied with clean bedding in good condition, that is free of odor, discoloration and stains. This includes all bedding: bedspreads, blankets, mattress pads, pillow cases and bed sheets.

900.9  Bedspreads shall be coordinated to guest room decor and be free of snags, tears, holes and frayed edges. Faded or stained spreads shall be removed from service

15

900.10   Space for two full-size pieces of luggage shall be provided either on the credenza, a free-standing bench or portable luggage racks, or some combination thereof.

900.11   Guest bedrooms shall have individually controlled thermostats to provide for guest-controlled heating and cooling; units should operate quietly and have clean filters and grills.

900.12   Each guest room shall provide one (1) light fixture at the following locations:

1.   Each night stand (Two lamps are desirable at the night stand between two double beds. One fixture with two lamps is acceptable.)

2.   Games/parsons table

3.   Credenza/mirror

4.   Desk

Shades and lamps, light fixtures and bulbs shall be dusted daily, and have no frayed cords or stained, bent or broken shades. Adequate lighting shall be provided in all areas of the room. Refer to the Best Western Renovation & Refurbishing Guidelines for adequate lighting requirements per room.

900.13   At least one light shall be operated by switch at the entrance door.

900.14   Each guest room shall contain one waste basket. (See Chapter X.)

900.15   No coin-operated devices of any type will be permitted in any room.

900.16   Bedroom draperies shall be in good condition and open and close with cords or pull wands. Drapery rods shall be firmly fastened to wall or ceiling, properly strung and in good operating condition. Refer to Best Western's Renovation & Refurbishing Guidelines for additional drapery specification requirements.

900.17   One minimum 25-inch color television set shall be supplied in each bedroom. Screen is to be cleaned daily. Television shall be connected to a master antenna system or cable to provide a good quality picture. The 25-inch size requirement becomes effective January 1, 2002, or seven years from the manufacturer's date on the non-complying television, whichever is later, and in any event, not later than January 1, 2006.

900.18   Each guest room shall contain an operating direct-dial telephone and complete dialing instructions.

900.19   Each guest room shall contain one current local telephone directory in good condition.

900.20   A telephone message pad and a pen or pencil shall be conveniently provided near the telephone in the bedroom and/or sitting room.

900.21   An indication is to be provided in each guest room on how to obtain emergency assistance, such as fire, police, ambulance and medical, as well as instruction notices.

900.22   Writing paper and envelopes shall be available in each guest room.

900.23   A directory of services shall be provided in each guest room describing the various facilities and services provided by the hotel and the hours such facilities and/or services are available. The location of vending and ice machines shall be noted.

900.24   Guest room and bathroom doors should be equipped with doorstops to eliminate noise and damage to walls or fixtures. It is recommended that doors have a stop at top corner of door or a doorknob wall-mounted stop. For bathroom doors, it is recommended that a small rubber bumper be affixed to the bath fixture if door opens against tub or toilet.

900.25   The individual property should advertise in its rooms, in good taste, its own services and promotions. Printed material should be held to a minimum to avoid a cluttered appearance. Any printed material, including endorsements when using the name and/or logo of Best Western, shall contain the current form of logo approved by Best Western. On-premises advertising or promotion of any hotel, motel or resort other than Best Western is prohibited.

900.26   Closet/clothes hanger area shall be clean and neat and shall include at least eight matching wooden or permanent hangers, two with skirt clips.

900.27   All bathrooms shall provide a tub/shower combination of ceramic or other approved materials with a non-skid surface or device.

900.28   Each bathroom shall contain two rolls of good-quality toilet tissue.

900.29   Plumbing fixtures and all chrome shall be clean, polished, in good condition and free of tarnish and water spots.

900.30   Bathroom tile walls and floors shall be cleaned and dried daily and be free of lint, hair and water spots. Tile grouting shall be clean, in a good state of repair and free of mildew or discoloration.

900.31   Vanity/dressing table, mirror and wash basin shall be of modern design, in a good state of repair, cleaned daily and free of soil, water spots and streaks. Vanities shall have at least a seven-inch skirting to conceal exposed plumbing.

900.32   Toilet seats and lids shall be clean and sanitary, with no chipped or worn surfaces, bare wood or other composition visible. Seats and lids shall be free of discoloration or stains and not be loose on hinges. Seats shall have required bumper supports. Paper bands are not recommended.

900.33   Bathrooms shall contain good quality terry cloth items of proper grade and in recommended amounts. (See Chapter X.) Sufficient towel bars shall be provided to accommodate the required amount of towels and shall be conveniently located for easy access.

900.34   Each bathroom shall contain one waste basket. (See Chapter X.)

900.35   Shower curtain and rod, tub tracks and glass doors shall be clean and free of soap residue, water minerals and mildew.

900.36 Each guest bath shall be supplied with good-quality toilet and facial tissue holders. Facial tissues of standard size shall be provided in permanently mounted holders or in a permanent decorative holder approved by Best Western.

900.37 Light fixtures, electric outlets and switches shall be operable and clean at all times.

900.38 At least one robe hook should be provided in each bath area.

900.39 Kitchen areas and kitchen equipment shall be of modern design and shall be kept clean and in excellent physical condition and appearance.

900.40 All bathrooms shall provide adequate ventilation. Window ventilation usually is adequate, but if windows are not available, exhaust vents and fans shall be provided and maintained in an operable condition.

900.41 Electric shaver points or outlets near a suitably lit mirror shall be provided.

900.42 A hair dryer shall be provided in all guestrooms.
Becomes effective October 1, 2001.

900.43 An iron and ironing board shall be provided in each guestroom. Tabletop ironing boards are not acceptable. Freestanding wall-mounted units are acceptable. The iron must be full size (not travel size).
Becomes effective October 1, 2001.

900.44 Hot and cold running water shall be provided in each guest bathroom.

900.45 A laundry bag is to be provided for each guest room.

900.46 Mechanical fans shall be available upon guest request if the property does not provide air conditioning in the guest room.

900.47 A minimum of 10% of the guestrooms shall have beds with a minimum mattress size of 72 inches by 84 inches (california king) or 76 inches by 80 inches (standard king).
Becomes effective October 1, 2001.

900.48 All guest rooms shall be required to have coffee or tea makers with complimentary tea or coffee "packets, bags or filter". Decaffeinated coffee or tea must also be provided. Normal accompaniments, i.e., sugar, sweetener, milk or non-dairy creamer, stirrer are to be provided. Disposable cups or china/ceramic cups shall be provided. Consumables (coffee, tea, accompaniments and cups) must be replenished daily.
Becomes effective October 1, 2001.

900.49 Each guestroom shall be provided with a clock. (e.g., clock radio).
Becomes effective October 1, 2001.

900.50 A dataport facility easily accessable to a desk or work surface shall be provided in each guestroom. A dataport facility is defined as a telephone jack available that can accept a phone line and gives access to an outside telephone dialing tone. The jack may be in the wall or on the phone, but

should be available to the guest without unplugging any telephone equipment. The dataport may use the same line as the guest telephone.
Becomes effective October 1, 2001.

900.51 Guest room televisions shall offer at least one english speaking channel that includes international news. A 24 hour all-news channel is not required.
Becomes effective October 1, 2001.

900.52 All guest rooms shall have a radio or some other source of music (e.g., portable radio, clock radio, radio on tv, music channel on television or hard-wired hotel music system).
Becomes effective October 1, 2001.

900.53 Hotels shall have a minimum of 50% of their guestrooms designated as non-smoking. Rooms will be identified with a permanent notice on the guestroom external door as a non-smoking room. Rooms will also have at least one notice within the room, identifying the room as a non-smoking room.
Becomes effective October 1, 2001.

# Chapter X

## 1000.0 Logo Items and Room Supply Requirements

1000.1 Following are the minimum allowable room supply requirements:

A. Two (2) tumblers per bed. Tumblers shall be sanitized in accordance with applicable government regulations. Sanitized glasses shall be placed in an approved glass bag. Alternatively, the top and rim of the glass may be covered with approved shrink-wrap plastic or a fitted heavy paper glass cap. When disposable glasses are used, they shall be pre-sanitized and pre-wrapped.

B. Each guest bathroom shall offer 2 bars of packaged soap in the shower/tub and basin/vanity area. Minimum requirements are at least one 3/4 size bar (2 1/2" x 1 1/2" x 1/4" or .6 ounces) and one 1 1/2 size bar (3" x 1 3/4" x 1/2" or 1.2 ounces). A Best Western approved soap dispenser and dispensed product are allowed in the bath area in lieu of a bar of soap provided a 1 1/2 size facial bar is available at the vanity area. It is recommended that a 1 1/2 size deodorant bar be provided in the bath area.

Each guest bathroom shall offer bottled shampoo (packet/sachets not acceptable) or a conveniently located shampoo/shower/bath gel dispenser.
Becomes effective October 1, 2001.

Extra soap and/or shampoo shall be available upon request.
Becomes effective October 1, 2001.

C. One (1) ice bucket per room (3 qt. minimum).

D. Two (2) waste baskets per room, one to be placed in the vanity area (at least one waste basket should be a minimum 13 qt. size).

E. "Do not disturb" device or sign for each room.

17

1000.2 The following minimum guest room linen standards are prescribed, the underlined verbiage is effective January 1, 2004:

1 cloth bath mat (bath towel may be substituted). Minimum weight per dozen: 6.9 lbs.

Room with one bed:

• 2 bath towels. Minimum size: 24" x 48" (24" x 50" is recommended). Minimum weight per dozen: 8.0 lbs. (10.5 lbs. is recommended).

• 2 hand towels. Minimum size: 16" x 27". Minimum weight per dozen: 3.0 lbs.

• 2 face cloths. Minimum size: 12" x 12". Minimum weight per dozen: 1.0 lbs.

Room with two beds:

• 3 bath towels. Minimum size: 24" x 48" (24" x 50" is recommended). Minimum weight per dozen: 8.0 lbs. (10.5 lbs. is recommended).

• 3 hand towels. Minimum size: 16" x 27". Minimum weight per dozen: 3.0 lbs.

• 3 face cloths. Minimum size: 12" x 12". Minimum weight per dozen: 1.0 lbs.

• Before shrinkage

Bedroom linens:

• 1 mattress pad per bed

• 2 sheets per bed (minimum T180 percale - 50 percent cotton)

• 1 blanket per bed

• 2 medium support regular size pillows and pillowcases (minimum T180 percale –50 percent cotton) per bed (except king beds, which shall be supplied with 3 regular or 2 king size of each). The pillows shall be of the following minimum standard: Fiber type 6 denier per filament, polyester fiber clusters comprised of a blend of hollow low void, high void and antimicrobial fibers with a cluster cohesion of less than 6.0 Newtons, 100% cotton T-180 ticking with the following size and weight of fill specifications:

| Size | Required Medium Support |
|---|---|
| Standard 20"x 26" | 22 oz |
| Queen 20"x 30" | 27 oz |
| King 20"x 36" | 33 oz |

If you choose to provide gentle and/or firm pillows in addition to the MEDIUM SUPPORT pillows described above, the following specifications apply. The pillows shall be of the following minimum standard: Fiber type 6 denier per filament, polyester fiber clusters comprised of a blend of hollow low void, high void and antimicrobial fibers with a cluster cohesion of less than 6.0 Newtons. 100% cotton T-180 ticking with the following size and weight of fill specifications:

| Size | Optional Gentle Support | Optional Firm Support |
|---|---|---|
| Standard 20"x 26" | 20 oz | 24 oz |
| Queen 20"x 30" | 25 oz | 29 oz |
| King 20"x 36" | 31 oz | 35 oz |

The law tag must be affixed to all pillows as required, for compliance and to fulfill assessment requirements.

• Bedding includes: bedspreads, blankets, mattresses pads, pillow cases and bed sheets which are of proper size for the box spring and mattress on which they are used.

1000.3 All members shall choose a minimum of 3 items for use at the property that shall bear the approved Best Western logo.

1000.4 A minimum of three logo items are to be displayed in the public areas in addition to signage.

1000.5 Stationery shall be provided in each guestroom as outlined in the Brand Identity Manual.

## Chapter XI

### 1100.0  Violations and Sanctions

1100.1 If a member property is operated, managed or maintained in a manner that results in violations, deficiencies or infractions of applicable Bylaws, Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, or orders or directives issued by the Board, the member property may be placed on probation.

1100.2 Probation involving inspection deficiencies requires receipt of an inspection report or a Guest Rooms/ Public Areas Condition Report made by a Best Western Regional Service Manager indicating the property has scored below the minimum of 800 points. Written notice shall then be sent to the member by certified mail with a copy of the inspection report, requiring correction of the deficiencies noted on the inspection report or a Guest Rooms/Public Areas Condition Report within a specified period.

1100.3 A property, once placed into probationary status, will remain in that status until such time as a Guest Rooms/Public Areas Condition Report score equals or is greater than 800 points, until the reason for the probation has been cured or until cancellation of the membership.

1100.4 When failure to maintain property to Best Western standards results in probation, a fee established by the Board may be assessed to cover the cost of the field staff inspection.

1100.5 If a member fails to pay dues or other fees or assessments (other than Annual Dues) within the time period provided for in the Bylaws, Rules and Regulations or orders or directives issued by the Board, and if such dues, fees or assessments remain unpaid for thirty (30) days after the date of written notice of delinquency is sent to the member by Best Western International Headquarters, or no other satisfactory arrangement has been made for liquidation of the indebtedness, the Board may cancel the membership pursuant to Article II, Section 8(C) and (D) of the Bylaws and Chapter XII of these Rules and Regulations. This section does not govern automatic termination of membership for failure to pay Annual Dues by September 15.

which is dealt with in Article II, Section 2(B)(2) of the Bylaws, and does not limit the Board's option to restrict services under rule 1100.8.

1100.6  If a member fails to conform to the obligations or meet the standards set forth in the Bylaws, Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, or orders or directives of the Board, the Board may cancel the membership pursuant to Article II, Section 8 of the Bylaws and Chapter XII of the Rules and Regulations.

1100.7  If a member property is operated, managed or maintained in a manner that results in:

A.  Receipt of two (2) consecutive inspection scores or Guest Rooms/Public Areas Condition Report scores which are below 800 points;

or

B.  Receipt of two (2) inspection scores or Guest Rooms/Public Areas Condition Report scores less than 800 points during any 18-month period;

or

C.  Receipt of three (3) inspection scores or Guest Rooms/Public Areas Condition Report scores less than 800 points during any 24-month period;

or

D.  Receipt of a single inspection score or Guest Rooms/Public Areas Condition Report score below 600 points;

the Board may cancel the membership pursuant to Article II, Section 8 of the Bylaws and Chapter XII, Paragraph 1200.2(E) of the Rules and Regulations.

1100.8  Where grounds exist for termination of membership, the Board or its designee may, in addition to any other remedy, restrict any or all membership services. During an administrative restriction, full fees continue to accrue.

## Chapter XII

### 1200.0  Procedure for Cancellation of Membership

1200.1  A.  Unless payment in full is received within the time specified or other satisfactory arrangements are made to liquidate the delinquent indebtedness contained in a notice sent to a member pursuant to paragraph 1100.5 of Chapter XI of these Rules and Regulations, the President and Chief Executive Officer or his designee shall send to the member by certified mail notice containing the following information:

1.  Statements of amounts delinquent;

2.  Nature of charges;

3.  Citation of the Bylaws, Rules and Regulations, New Construction Guidelines, or orders or directives of the Board upon which the nature, amount and delinquency of the charges are based;

and

4.  Notification that the Board will consider the cancellation of the membership and that a written demand for a hearing to show cause why the membership should not be cancelled shall be received by the President and Chief Executive Officer or his designee by certified mail within thirty (30) days after mailing of this notification.

B.  Failure to make timely written demand for a hearing shall be deemed consent by the member to any action taken by the Board with respect to cancellation of the membership.

C.  If the member makes timely written demand for a hearing, the provisions of paragraphs 1200.3 and 1200.5 of this chapter shall apply.

1200.2  A.  If the President and Chief Executive Officer or his designee believes a member is in violation of Article II, Section 8(A)(2) or 8(A)(3) of the Bylaws or paragraph 1100.6 of these Rules and Regulations, and the violation is such that a corrective period is allowed, he or his designee shall send written notice of such violation to the member by certified mail, return receipt requested. The notice shall specify in detail the violations charged to exist and the facts believed to support the charged violations, and shall cite the Bylaws, Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, or orders or directives of the Board charged to have been violated. For alleged violations of paragraph 1100.7, or violations for which no corrective period is allowed, compliance with this notice provision is not required.

B.  The Board, by policy, may from time to time establish time periods during which the charged violations may be corrected to avoid further action. Any period for correction shall in no event exceed sixty (60) days from the date of notification provided for in rule 1200.2(A). If the alleged violations contained within the notice to the member are subject to corrective period, said period shall be stated in the notice.

C.  Within twenty-one (21) days after the mailing of the notification of violation, the member shall make written answer to the charges, which shall be sent by certified mail to the President and Chief Executive Officer or his designee. The answer shall state specifically whether the charged violations will be corrected within the prescribed corrective period or whether the existence of the charged violations is challenged. If the charged violations have been corrected within the twenty-one (21) days, the answer shall so specifically state. Additionally, if corrective action may still be taken within the established corrective period, the member shall notify Best Western when the charged violations have been corrected. Such notification shall be mailed no later than the last date of the corrective period.

D.  If the President and Chief Executive Officer or his designee, upon receipt of member's written answer, determines that the violations originally charged do not exist, have been satisfactorily corrected, or will be corrected within the prescribed corrective period, no further action on the part of

19

the member or Best Western is required. In the event the member does not correct the charged violations within the prescribed corrective period and notify Best Western in writing of such event, or if the charged violations have not been corrected to Best Western's satisfaction, then the President and Chief Executive Officer or his designee shall give notice to the member by certified mail, return receipt requested, that grounds for cancellation exist. The notice shall contain:

    1.  Statement of the specific violation that has not been satisfactorily corrected;

    2.  Statement of the facts upon which the violation charged is based;

    3.  Citation of the Bylaws, Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, or orders or directives of the Board charged to be violated; and

    4.  Notification that the Board will consider the cancellation of membership and that any written demand for a hearing to show cause why the membership should not be cancelled shall be received by the President and Chief Executive Officer or his designee by certified mail within thirty (30) days, or such shorter period as may be set by the President and Chief Executive Officer or his designee by certified mail within thirty (30) days, or such shorter period as may be set by the President and Chief Executive Officer or his designee by certified mail within thirty (30) days, or such shorter period as may be set by the President and Chief Executive Officer or his designee under Article II, Section 8(D) of the Bylaws, after mailing of this notification.

E.  In the case of violation of Chapter XI, paragraph 1100.7, or in the case of a violation for which no corrective period is allowed, the President and Chief Executive Officer or his designee shall notify the member, by certified mail, return receipt requested, that grounds exist for cancellation of the membership which are not subject to corrective action. The notice shall contain the information required under subparagraph (D)(2), (3) and (4) of this section.

F.  If the member fails to make timely answer to the notification by the President and Chief Executive Officer or his designee provided for in paragraph (A) of this section, the President and Chief Executive Officer or his designee shall cause a written notice to be sent to the member containing the items set out in subparagraphs (1), (2), (3) and (4) of paragraph (D) of this section. Failure to make timely written demand for a hearing shall be deemed consent by the member to any action taken by the Board with respect to cancellation of the membership.

1200.3  A.  If a member makes timely written demand for a hearing as provided in paragraph (C), Section 8, Article II of the Bylaws, a hearing shall be held by the Board within sixty (60) days after receipt by the President and Chief Executive Officer or his designee of such demand. The President and Chief Executive Officer or his designee shall notify the

member in writing, by certified mail, return receipt requested, no fewer than fifteen (15) days before the hearing, that a hearing will be held, specifying the place, date and time for such hearing.

B.  At the time of making written demand for a hearing by the Board, the member may make written answer to the charged violations with the answer being sent to the President and Chief Executive Officer or his designee in the same manner as the demand for hearing, and which answer shall fairly meet the charges.

C.  The Board may provide a lesser notice and opportunity to be heard prior to cancellation of a membership as provided in Article II, Section 8(D) of the Bylaws.

1200.4  A.  Upon failure of the member to make written demand for a hearing, the Board may thereafter at any time cancel the membership in accordance with paragraph (C) of Section 8, Article II of the Bylaws.

B.  Failure by the member to make timely demand for a hearing shall relieve the Board of entertaining any oral argument during the Board meeting, if any, dealing with the matter of the member's cancellation. Such failure will not, however, permit the Board to dispense with the presentation of evidence or argument to support cancellation of membership or relieve the Board of any obligation to consider:

    1.  Any written response received by the Board or by the President or Chief Executive Officer or his designee

    (a)  not later than fifteen (15) days before said Board meeting; or

    (b)  before transmittal of the matter of the member's cancellation to the Board members if consideration of the matter and vote thereon is by mail or;

    2.  Any correspondence or other written matter between the Association and the member dated no later than thirty (30) days after the mailing of the notification by the President and Chief Executive Officer or his designee required under Article II, Section 8 of the Bylaws.

1200.5  In cases in which the member has been granted a hearing pursuant to a timely written demand, the following rules shall apply:

A.  Only persons having a direct interest in the cancellation proceeding shall be entitled to attend, although the Board, in its discretion, may permit such other persons to attend under such conditions as the Board may determine.

B  Any party to the cancellation proceeding may be represented by counsel, but if the member intends to be so represented, the name, address and telephone number of his counsel shall be provided to the President and Chief Executive Officer or his designee in writing no fewer than three (3) days before the scheduled hearing.

C.   No fewer than three (3) days before the scheduled hearing, there shall be provided to the President and Chief Executive Officer or his designee by or on behalf of the member, a written statement containing the following:

1.   Names and addresses of witnesses, if any, the member intends to call at the hearing;

2.   Documentary evidence or exhibits, if any, to be introduced by the member;

3.   Any special requests;

4.   Statement of issues to be presented to the Board as the member may anticipate; and

5.   Any offer of compromise.

D.   At or before the hearing, the President and Chief Executive Officer or his designee will present to each member of the Board a written statement containing the following:

1.   Name and address of the member;

2.   Name and address of the member's property;

3.   Nature and character of the uncorrected violations charged as grounds for cancellation;

4.   Detailed statement of facts upon which the charged violations are based;

5.   Citation of the Bylaws, Rules and Regulations, New Construction Guidelines, Renovation & Refurbishing Guidelines, or orders or directives of the Board charged to be violated;

6.   Listing of correspondence or other communications between the Association and the member relating to the violations charged, with a copy of each attached;

7.   Recommended action to be taken by the Board; and

8.   Statement of all sums due and owing from the member to the Association and all sums due and payable.

E.   The order of proceeding during hearings shall be as determined by the Board, provided the member has a full and fair opportunity to present relevant and material evidence in support of his position. The burden of proof of charged violations sufficient to justify cancellation of membership and of compliance with the procedures required by the Bylaws and these Rules and Regulations shall be upon the Association.

F.   The Board shall be the sole judge of the relevancy and materiality of proffered evidence; conformity to legal rules of evidence shall not be required. All evidence shall be taken in the presence of all of the parties, except any party who has been given notice of the hearing and who fails or refuses to attend other than by reason of exclusion from the hearing by the Board, unless such exclusion is based upon gross and disruptive misconduct at the hearing. In the event a party is excluded for gross and disruptive misconduct, the Board shall make a specific finding of such

misconduct before ordering the party's exclusion from the hearing. The Board may, in its sole discretion, receive and consider evidence by way of affidavit, written statement or letter or telephone call, but shall give such evidence only such weight as the Board deems appropriate.

G.   Whenever the Board deems it necessary to view and inspect the member property, it shall advise the member of its intention and of the date and time that the inspection shall take place. Whenever the member requests that any inspection be made, the Board in its sole discretion may grant or deny the request; in the event the Board shall agree to make an inspection, the member shall pay, in advance, all the expenses incurred by the Board members.

H.   Any inspection made under this rule may be made by one or more members of the Board as directed by the Board. Any interested party may be present at such inspection.

I.   A hearing on cancellation may be reopened at the sole discretion of the Board at any time before a final decision is rendered. A rehearing may be granted at the sole discretion of the Board and upon such terms and conditions as the Board may direct, provided that written petition for rehearing, specifying the grounds for the petition, shall be sent to the President and Chief Executive Officer or his designee by certified mail within fifteen (15) days of the date notice of the final decision of the Board is mailed to the member.

## Chapter XIII

**1300.0   Procedure for Termination of Contingently-Approved Applicants**

**1300.1**   Contingently-approved applicants are subject to termination of approval, as specified by rule 1300.2, for any violation of the Rules, Bylaws or Board policies which would constitute grounds for placing a member on probation or grounds for terminating a membership. By way of example, without limitation, a contingently-approved applicant is subject to termination of approval, as specified by rule 1300.2, for

A.   receipt of a single inspection score below 800 points;

B.   receipt of customer complaints, during a single six-month monitoring period, in excess of the maximum number permitted by rule 500.43; and

C.   failure to strictly and timely comply with each and every condition of approval. The Board may, as a condition of approval, impose stricter standards on contingently-approved applicants.

**1300.2**   Where grounds for termination exist, the Board may summarily terminate approval of a contingently-approved applicant or may impose additional or stricter conditions of approval. A contingently-approved applicant shall have no right to probation, no right to hearing and no right to vote until full membership has been granted.

21



**BEST WESTERN
INTERNATIONAL, INC.**

6201 N. 24th Parkway
Phoenix, Arizona 85016-2023, USA
602.957.4200
Fax 602.957.5575
www.bestwestern.com

# Exhibit C

**Best Western International, Inc.**
**Human Resources Policy & Procedure**

| | |
|---|---|
| **Subject:** | **BUSINESS ETHICS** |
| **Effective date:** | **April 2003** |

## I. PURPOSE

Best Western International, Inc.'s and its subsidiaries' ("Company") employees must maintain the highest ethical standards in the conduct of Company affairs. Each employee must conduct the Company's business with integrity, in a manner that excludes considerations of personal advantage or gain, and comply with all applicable laws.

## II. POLICY

**A. Gifts, Favors, and Payments by the Company.** Gifts and favors may be given to others at Company expense, if they meet all of the following criteria:

1. They are consistent with accepted local business practices,

2. They are of sufficiently limited value and in a form that will not be construed as a bribe or payoff,

3. They are not in violation of applicable law and generally accepted local ethical standards,

4. Public disclosure of the facts will not embarrass the Company, and

5. They are approved by the Department Vice President or higher level employee.

Payments, commissions or other compensation to or for the benefit of other companies, their employees or their family members is prohibited (except if paid to other companies pursuant to a valid written contract).

**B. Gifts, Favors, Entertainment and Payments Received by Company Employees.**

As a general rule of thumb, employees should never accept any gift or entertainment if receipt of it will, or if the employees believe it could, make them feel obligated to begin or continue a business relationship with its provider or extend any favorable treatment.

1. Employees may not seek or accept for themselves or others any gifts, favors, or entertainment without a legitimate business purpose, nor may they directly or indirectly seek or accept personal loans from any persons or business organizations that do or seek to do business with or are a competitor of the Company (other than ordinary

conventional loans at market rates from recognized lending institutions). In the application of this Policy:

a. Employees may accept for themselves and members of their families common courtesies usually associated with customary local business practices. These include but are not limited to:

- Meals with vendors, occasionally including spouses, as long as the invitation is extended by the vendor.
- Gifts from vendors of small or nominal value such as calendars, coffee mugs, notebooks and memorabilia.
- Tickets to local events (such as sports and artistic events) or to such events during a business trip scheduled for other legitimate business purposes if offered by the vendor and the vendor accompanies the employee to the event.
- Tickets to special or "championship" events (for example, the NFL Super Bowl, NCAA Final Four, FIFA World Cup Soccer Championships and Australian Open Tennis Tournament), must be approved by the Department Vice President or higher level employee. In all cases, tickets are not to be solicited by the Company employee.
- Overnight events such as seminars and conventions under the condition that individuals holding comparable positions with other companies and the vendor are in attendance. The employee must have prior approval from the Director of his or her Department or higher level employee.
- Gifts of perishable items usually given during the holidays such as hams and other meats, cookies and cakes, nuts and sweets.

b. The Company will apply a strict standard with respect to gifts, services, discounts, entertainment or considerations of any kind from suppliers.

- Day outings such as golf and fishing are acceptable with prior approval from the appropriate Department Vice President or higher employee. The vendor must be in attendance. Participation by the employee's family members is not acceptable.
- Use of a vendor's private facilities (vacation homes, etc.) by employees or families for personal use is prohibited.
- It is never permissible to accept a gift in cash or cash equivalents such as stocks or other forms of marketable securities of any amount.

2. Management employees may not accept gifts of more than limited or nominal value from those under their supervision.

3. Employees must refuse any gifts that violate this Policy and return them to the giver.

4. This Section II does not apply to awards given by the Company to its employees.

**C. Conflicts of Interest.**

1. The Company requires that all employees avoid any conflict between their personal interests and the interest of the Company in dealing with suppliers, customers and

2

other organizations or individuals doing or seeking to do business with the Company or with whom the employee does business or has any other kind of relationship. While it is not practicable to enumerate all situations that might conflict with this Policy, the following guidelines indicate some of the relationships that should be analyzed and avoided:

a. An employee, spouse and any dependent member of his/her family should not have a direct or indirect financial interest in any business organization that deals with the Company or is in direct or indirect competition with the Company. Ownership of securities quoted and sold in the open market on a nationally recognized exchange are acceptable.

b. It is a conflict of interest for any employee to serve as an officer, director or in any management capacity at another company or business organization without the approval of the Director of Human Resources and the Chief Financial Officer or Chief Executive Officer.

c. It is a conflict of interest for any employee to release any data on bids, contract rates and costs or any other "confidential information" (as defined in the Company's policies and procedures) to anyone outside the Company except when deemed necessary and essential by the Department Vice President or higher level employee.

d. When an individual who is an immediate family member of any current employee of the Company applies for a position with the Company, the employment recruiter and hiring supervisor must be apprised of the relationship before that individual can be hired. (See hiring of relatives policy.)

e. No employee may directly or indirectly, as a proprietor, partner, shareholder, lender or in any other capacity, acquire or retain a Best Western property or an interest in a Best Western property. Any employee, or prospective employee who invests or desires to invest in a non-Best Western hotel/motel property, must advise the Vice President of Human Resources before making such an investment who will determine if any potential conflicts of interest exist.

f. As a condition of employment, the Company reserves the right to review and approve outside activities of an employee which may involve (among other things) any of the above items.

2. It is the responsibility of the employee to review with his/her manager any activities that might result in a conflict of interest. The manager must notify the Director of Human Resources, who will review the case. Should a conflict or potential conflict of interest be determined, a reasonable time to correct the conflict will be provided, as determined by the Company.

**D. Confidential Information.**

"Confidential Information" is (i) information concerning the Company's business, such as plans, strategies, ways of doing business, vendor lists, and personnel records (what is commonly thought of or known as "trade secrets") that gives the Company a competitive advantage over those who do not know it, and (ii) information received

from others in confidence.  Confidential Information can be spoken; can be held in hard copy, electronic, tangible or intangible form; and can be included with non-confidential information, such as part of a report or presentation.  The disclosure of any Confidential Information without the prior authorization of the Department Vice President or higher level employee is prohibited. The misuse, unauthorized access to, or mishandling of Confidential Information is prohibited.

**E. Failure to Report.**

Failure to report another employee's violation of this Business Ethics Policy & Procedure is also a violation of this Policy.

**III. COMPLIANCE.**

Any violation of this Policy will subject the employee to discipline, up to and including immediate discharge.

4

# Policy & Procedure
## ACKNOWLEDGEMENT

I have read and understand all of the terms and conditions of the Business Ethics Policy & Procedure of Best Western International, Inc. and its subsidiaries ("Company"). I agree to abide by the Policy & Procedure, realizing that failure to do so may result in disciplinary action and/or termination.

I understand that nothing in this Business Ethics Policy & Procedure in any way creates an express or implied contract of employment between the Company and me; but rather that my employment is terminable in accordance with applicable laws.

_____          _____
Employee's Signature                                     Date


_____
Employee's Name (Printed)

5

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096393563 [Date=11/9/2006] [FileNumber=1291443-0
] [15de4c78a9e281b82e1e323451fed0512789cf9ac56b3b6a1e09881ffdc5497f3cd
92375f8209b801fbea22ae97629a461afac923f7583df48b7ef230e1bc9d7]]
**Document description:**Exhibit A
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096393563 [Date=11/9/2006] [FileNumber=1291443-1
] [58de283331a67cd39f085830f4025bcfe5bb8fc8184fea5b1a56b042c3038172db1
1b4516799a4d08816b01a6c453eee5b72edfdf044556968313be59bd1942e]]
**Document description:**Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096393563 [Date=11/9/2006] [FileNumber=1291443-2
] [18893d2ad8f7da17ea7b47f7f3257c61db9d7a2939156abc3bfd5ddff297c918aa1
dd23f7eccb12e1e89dd5c943f0345c428b029ff27445e08b80f44867b2c6e]]
**Document description:**Exhibit C
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096393563 [Date=11/9/2006] [FileNumber=1291443-3
] [1f5ae047e4b15646c65b3d6b3dd3300086213acc789ba01e8846e92e4eb352f437b
cd0d18cb6ef411575dc97d18bfe2c7a36e873fc37d594ebb18eeb157f0f5b]]

**2:06-cv-1537 Notice will be electronically mailed to:**

Gregory Blain Collins    gcollins@swlaw.com, docket@swlaw.com, jdwilliams@swlaw.com

Todd Feltus      tfeltus@swlaw.com, gcarlo@swlaw.com, docket@swlaw.com

Robert Jeffrey Lowe    jlowe@k-glaw.com

Daniel Joseph McAuliffe    dmcauliffe@swlaw.com, docket@swlaw.com

Richard T Mullineaux    rmullineaux@k-glaw.com

Sara Kathryn Regan    sregan@ssd.com, jcambra@ssd.com; phxdocketmb@ssd.com

Cynthia Ann Ricketts    cricketts@ssd.com, ksieckman@ssd.com; phxdocketmb@ssd.com

**2:06-cv-1537 Notice will be delivered by other means to:**

# EXHIBIT 3

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2091695 (D.Ariz.)
(Cite as: 2006 WL 2091695 (D.Ariz.))

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.
BEST WESTERN INTERNATIONAL, INC., a non-
profit Arizona corporation, Plaintiff,
v.
John DOE, et al., Defendants.
**No. CV-06-1537-PHX-DGC.**

July 25, 2006.

Cynthia Ann Ricketts, Sara Kathryn Regan, Squire
Sanders & Dempsey LLP, Phoenix, AZ, for Plaintiff.

Daniel Joseph McAuliffe, Snell & Wilmer LLP,
Phoenix, AZ, Richard T. Mullineaux, Robert Jeffrey
Lowe, Kightlinger & Gray LLP, New Albany, IN, for
Defendants.

**ORDER**

DAVID G. CAMPBELL, District Judge.

*1 Plaintiff Best Western International, Inc. ("BWI")
has filed this action against various John Doe De-
fendants. BWI claims that the Defendants have pos-
ted anonymous messages on an Internet site that de-
fame BWI, breach contracts with BWI, breach fidu-
ciary duties, reveal confidential information, infringe
BWI trademarks, and constitute unfair competition.
Because the Internet messages have been posted an-
onymously, BWI has been unable to identify the John
Doe Defendants.

BWI has filed a motion to conduct accelerated and
expedited discovery. Doc. # 5. The motion seeks per-
mission to serve subpoenas on various Internet Ser-
vice Providers ("ISPs") and others before an initial
conference is held pursuant to Rule 26(f) of the Fed-
eral Rules of Civil Procedure. The subpoenas seek
disclosure of the identities of the sponsor for the In-
ternet site as well as individuals who have posted
messages. BWI contends that such information is
needed before the John Doe Defendants can be

served with BWI's complaint and can participate in a
Rule 26(f) conference. Alleging that it is suffering ir-
reparable injury as a result of comments posted on
the site, BWI seeks expedited discovery and exped-
ited consideration of its motion to conduct the dis-
covery. Doc. # 6.

BWI also asks the Court to issue an order requiring
the preservation of evidence related to the identities
of the John Doe Defendants. Doc. # 7. BWI notes
that information concerning Internet users typically is
retained for only a short period of time. BWI asks the
Court to enter an order requiring the preservation of
information until it can be obtained through discov-
ery.

One of BWI's proposed subpoenas would be directed
to H. James Dial. Mr. Dial has appeared through
counsel, identified himself as one of the John Doe
Defendants, and filed an opposition to BWI's motion
for discovery and a counter-motion to stay all discov-
ery until completion of a Rule 26(f) conference. Doc.
# 11. BWI has filed a response. Doc. # 17.

This order will address four issues: (1) whether BWI
has shown good cause to conduct discovery in ad-
vance of a Rule 26(f) conference, (2) whether this
Court has jurisdiction to rule on the propriety of
BWI's proposed subpoenas, (3) what showing BWI
must make in order to conduct discovery that implic-
ates First Amendment rights of the John Doe Defend-
ants, and whether BWI has made that showing, and
(4) other relevant considerations.

**1. Good Cause.**

Rule 26(d) provides that "a party may not seek dis-
covery from any source before the parties have con-
ferred as required by Rule 26(f)." Fed.R.Civ.P. 26(d).
The rule makes clear, however, that this limitation
can be overridden by court order. Id. An order per-
mitting discovery before a Rule 26(f) conference may
be issued for "good cause." Yokohama Tire Corp. v.
Dealers Tire Supply, Inc., 202 F.R.D. 612, 614
(D.Ariz.2001).

BWI has satisfied the good cause requirement. BWI

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2091695 (D.Ariz.)
**(Cite as: 2006 WL 2091695 (D.Ariz.))**

Page 2

has established by affidavit that it is unable to identify the John Doe Defendants by means other than the subpoenas. Doc. # 9. Although Mr. Dial volunteered that he is one of the John Doe Defendants, the action is brought against an apparently large number of individuals who have posted anonymous messages on the Internet site. The case cannot proceed and a Rule 26(f) conference cannot be held until these Defendants are identified.

**\*2** In addition, courts have recognized that ISPs typically retain user information for only a limited period, ranging from a few days to a few months. *UMG Recordings, Inc. v. Does I-IV*, No. 06-0652 SBA (EMC), 2006 WL1343597, at \* 1 (N.D.Cal. Mar. 6, 2006). The loss of evidence seems particularly possible in this case, as the Internet site expressly states to users that "your identity will be totally and forever withheld *and destroyed*." Doc. # 5, Ex. A at 2 (emphasis added).

Because the identities of the John Doe Defendants is necessary for this case to proceed and there is reason to believe that those identities may be lost if discovery is delayed, the Court concludes that BWI has established good cause to conduct discovery before the Rule 26(f) conference. This conclusion does not, however, answer the question of whether discovery should be permitted in light of the First Amendment rights of the John Doe Defendants. That issue will be addressed below.

**2. The Court's Jurisdiction to Address the First Amendment Question.**

BWI's proposed subpoenas to ISPs and other individuals will be issued by federal district courts in the jurisdictions where those entities and individuals reside. Because only the court issuing a subpoena generally has power to quash it, BWI argues that this Court has no jurisdiction to address the propriety of the subpoenas.

Rule 45(c) does provide that subpoenas should be enforced by the district court which issued them, but this rule "does not alter the broader concept that the district court in which an action is pending has the right and responsibility to control the broad outline of

discovery." *Static Control Components, Inc. v. Darkprint Imaging*, 201 F.R.D. 431, 434 (M.D.N.C.2001). General discovery issues should receive uniform treatment throughout the litigation, regardless of where the discovery is pursued. Courts have also recognized that a party's " 'discovery rights [in other districts] can rise no higher than their level in the district of trial.' " *Id.* (quoting *Fincher v. Keller Indus., Inc.*, 129 F.R.D. 123, 125 (M.D.N.C.1990)).

The First Amendment implications of BWI's proposed discovery constitutes a significant issue in this case. Not only are the First Amendment rights of fundamental importance to the John Doe Defendants, but they also will be preserved or defeated by discovery orders. To the extent that Defendants have a First Amendment right to anonymous speech (a right addressed below), the right will be lost if BWI is permitted to learn the speakers' identities through discovery. This right will be at issue in every district where BWI's subpoenas are served. It makes little sense to leave such a central issue to district-by-district determination.

The Court concludes that it can and should address the First Amendment issues raised by BWI's discovery motion. As the court noted in *Static Control*, "[t]his issue extends well beyond the matter of a specific subpoena." *Id.* at 434 n. 5.

**3. First Amendment Considerations.**

**\*3** BWI is a non-profit member corporation. Doc. # 3 at ¶ 9. BWI's members own and operate more than 4,000 hotels and lodging properties under the BWI name and trademark. *Id.* at ¶ 10. BWI's board of directors communicates with BWI members through regional governors who are appointed to oversee specific geographic districts. *Id.* at ¶ 11.

BWI's complaint and motions say little about the content of the Internet messages at issue in this case. Mr. Dial asserts, however, that the Internet site was created as a place for BWI members and governors to state their views on various issues concerning BWI. Specifically, Dial asserts that recent proposed changes in BWI's method of operation have drawn extensive comment on the site. The site describes it-

Slip Copy
Slip Copy, 2006 WL 2091695 (D.Ariz.)
(Cite as: 2006 WL 2091695 (D.Ariz.))

Page 3

self as a "site for Best Western members," where members and headquarters staff "can exchange information on a 100% confidential basis." Doc. 5, Ex. A.

Several First Amendment principles are relevant.

First, the Amendment protects anonymous speech. See *Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 200 (1999).* The Supreme Court has noted that "[a]nonymity is a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357 (1995).* Indeed, "[u]nder our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent." *Id.*

Second, the protections of the First Amendment extend to the Internet. See *Reno v. ACLU, 521 U.S. 844, 870 (1997).* "Courts have recognized the Internet as a valuable forum for robust exchange and debate." *Sony Music Entm't, Inc. v. Does 1-40, 326 F.Supp.2d 556, 562 (S.D.N.Y.2004).* "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox." *Reno, 521 U.S. at 870.* Courts also recognize that anonymity is a particularly important component of Internet speech. "Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas [;] ... the constitutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded." *Doe v. 2 The Mart.com, Inc., 140 F.Supp.2d 1088, 1092, 1097 (W.D.Wash.2001).*

Third, "courts have held that civil subpoenas seeking information regarding anonymous individuals raise First Amendment concerns." *Sony, 326 F.Supp.2d at 563* (citing *NAACP v. Ala. Ex Rel Patterson, 357 U.S. 449, 462 (1958); NLRB v. Midland Daily News, 151 F.3d 472, 475 (6th Cir.1998); L.A. Mem'l Coliseum, Comm'n v. Nat'l Football League, 89 F.R.D. 489, 494-95 (C.D.Cal.1981)).*

Fourth, the right to speak anonymously is not absolute. See *McIntyre, 514 U.S. at 353; Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 59, 555-56 (1985)* (First Amendment does not protect

copyright infringement); *Doe v. Cahill, 884 A.2d 451, 456 (Del.2005)* ("Certain classes of speech, including defamatory and libelous speech, are entitled to no constitutional protection."). "Those who suffer damages as a result of tortious or other actionable communications on the Internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights." *In re Subpoena Duces Tecum to America On-Line, Inc.,* No. 40570, 2000 WL1210372, at *5 (Va.Cir.Ct. Jan. 31, 2000).

*4 These principles make clear that the John Doe Defendants have a First Amendment right to anonymous Internet speech, but that the right is not absolute and must be weighed against BWI's need for discovery to redress alleged wrongs. To ensure that the First Amendment rights of anonymous Internet speakers are not lost unnecessarily, courts typically require parties to make some showing before obtaining discovery of the speakers' identities. Courts have recognized a range of possible showings. As the Delaware Supreme Court has explained, "an entire spectrum of 'standards' ... could be required, ranging (in ascending order) from a good faith basis to assert a claim, to pleading sufficient facts to survive a motion to dismiss, to a showing of *prima facie* evidence sufficient to withstand a motion for summary judgment and, beyond that, hurdles even more stringent." *Cahill, 884 A.2d at 457.* BWI urges the Court to adopt the lowest standard--good faith. Dial suggests the more stringent summary judgment standard.

In deciding which standard to apply, the Court must consider the significance of the First Amendment rights at issue in this case. BWI cites several cases in which plaintiffs sued defendants for illegally downloading music from the Internet. Although the courts found that the downloading of information was entitled to some protection under the First Amendment, they recognized that downloading was not purely expressive and therefore was entitled only to "limited" First Amendment protection. *Sony, 326 F.Supp.2d at 564; UMG Recordings,* 2006 WL1343597 at *1 ("A person who uses the Internet to download or distribute copyrighted music without permission is engaging in the exercise of speech, but only to a limited extent[.]").

Slip Copy
Slip Copy, 2006 WL 2091695 (D.Ariz.)
(Cite as: 2006 WL 2091695 (D.Ariz.))

Page 4

The conduct of the John Doe Defendants, by contrast, is purely expressive. The Defendants are expressing their views on issues of interest to BWI members and governors in a forum specifically designed for an exchange of opinions and ideas anonymously. Such speech is entitled to substantial First Amendment protection.

Given the significant First Amendment interest at stake, the Court agrees with the Delaware Supreme Court in *Cahill,* and concludes that a summary judgment standard should be satisfied before BWI can discover the identities of the John Doe Defendants. The court in *Cahill* described the test in these words: "Before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process, he must support his defamation claim with facts sufficient to defeat a summary judgment motion." 884 A.2d at 460. This standard does not require a plaintiff to prove its case as a matter of undisputed fact, but instead to produce evidence sufficient to establish the plaintiff's *prima facie* case:

> [T]o obtain discovery of an anonymous defendant's identity under the summary judgment standard, a defamation plaintiff must submit sufficient evidence to establish a *prima facie* case for each essential element of the claim in question. In other words, the defamation plaintiff, as the party bearing the burden of proof at trial, must introduce evidence creating a genuine issue of material fact for all elements of a defamation claim *within plaintiff's control.*

*5 *Id.* at 465 (quotations and citations omitted, emphasis in original). The emphasized words "within plaintiff's control" recognize that a plaintiff at an early stage of the litigation may not possess information about the role played by particular defendants or other evidence that normally would be obtained through discovery. But a plaintiff must produce such evidence as it has to establish a *prima facie* case of the claims asserted in its complaint.

BWI's complaint provides an example of why the summary judgment standard is appropriate. The complaint alleges that Defendants have improperly posted confidential BWI information on the Internet site, wrongfully posted BWI's trademark on the site, used BWI's equipment to communicate with the site, de-

prived BWI of the benefits of its contract with Defendants, and made false statements regarding BWI and its business. Doc. # 3 ¶¶ 58-60, 64, 68. But BWI's complaint does not identify a single false statement allegedly made by the John Doe Defendants, identify a single item of confidential information posted on the site by Defendants, describe a single instance where BWI's mark was improperly used, explain how BWI was denied the benefits of its contracts, or explain how BWI equipment was improperly used. The complaint provides no factual support for BWI's claim that Defendants engaged in wrongful conduct not protected by the First Amendment.

At the same time, the Court finds no basis for concluding that BWI's complaint has been asserted in bad faith. Nor, given modern notice pleading standards, would BWI's complaint likely be subject to a motion to dismiss. Thus, if the standard for permitting discovery of the John Doe Defendants' identities required only good faith or the ability to survive a motion to dismiss, BWI's proposed discovery would be permitted and the Defendants' First Amendment right to anonymous speech would be defeated. A good faith allegation of wrongdoing, devoid of factual detail, would suffice.

The Court concludes that more is needed before a defendant's First Amendment rights may be eliminated. The Court must examine facts and evidence before concluding that a defendant's constitutional rights must surrender to a plaintiff's discovery needs. The summary judgment standard will ensure that the Court receives such facts and evidence.

Other courts have adopted a multi-part test for determining when plaintiffs should be permitted to discover the identity of anonymous defendants. This test includes "(1) a concrete showing of a *prima facie* claim of actionable harm; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) a central need for the subpoenaed information to advance the claim; and (5) the Doe defendants' expectation of privacy." *UMG,* 2006 WL1343597 at *1 (citing *Sony,* 326 F.Supp.2d at 564-65). The Court views the first element of this test--"a concrete show-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2091695 (D.Ariz.)
(Cite as: 2006 WL 2091695 (D.Ariz.))

Page 5

ing of a *prima facie* claim"--as equivalent to the summary judgment standard. *See Dendrite Int'l., Inc. v. Doe, 775 A.2d 756, 760 (N.J.App.2001)* ("[T]he plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant."). The Court need not address parts (2)-(4) of this test, as they clearly have been established by BWI. The fifth part of the test--the John Doe Defendants' expectation of privacy--should be addressed in the briefing by the parties discussed below.

*6 In summary, BWI has not made a sufficient showing to justify discovery that will disclose the identities of the John Doe Defendants. BWI may be able to make such a showing in a renewed motion, but it has not done so in the present motion. The Court therefore will deny BWI's motion for expedited discovery.

**4. Other Considerations.**

If BWI believes that it can satisfy the summary judgment standard, it may seek to do so in a renewed motion to be filed with the Court on or before **August 18, 2006.** In the meantime, the Court will issue BWI's requested motion regarding the preservation of documents. As noted above, there is reason to believe that the information sought by BWI will not be retained by the ISPs or others from whom BWI will seek discovery. The Court will enter BWI's proposed order to preserve such evidence. The Court notes that Mr. Dial did not oppose the entry of such an order.

BWI has asked the Court to require the host of the Internet site to post the preservation order on the site. The Court finds such a requirement unnecessary. BWI may itself make the existence of the order known through its own entry on the site. BWI may also send copies of the preservation order to those from whom it later will seek discovery if the summary judgment standard is satisfied.

If BWI attempts to satisfy the summary judgment standard, BWI should give notice to the John Doe Defendants over the Internet site and afford them an opportunity to oppose the discovery. "When First Amendment interests are at stake, we disfavor *ex*

*parte* discovery requests that afford the Plaintiff the important form of relief that comes from unmasking an anonymous defendant." *Cahill, 884 A.2d at 461.* Therefore, "the plaintiff must undertake reasonable efforts to notify the anonymous defendant of the discovery request and must withhold action to allow the defendant an opportunity to respond." *Id.*

BWI shall notify the anticipated recipients of its discovery requests, as well as the John Doe Defendants, through entries on the Internet site and other reasonable means, that it is seeking discovery of the Defendants' identities and that the potential discovery recipients and John Doe Defendants may respond to its motion, should they choose to do so, within three weeks of the motion's filing. Because the Court will enter BWI's requested order for preservation of documents, evidence should not be lost while these steps are undertaken. Upon receipt of any responses to BWI's renewed motion and the filing of BWI's reply, the Court will again address the question of whether discovery of the John Doe Defendants' identities should be permitted in this case.

**IT IS ORDERED:**

1. BWI's motion for expedited consideration of motion to conduct accelerated and expedited discovery (Doc. # 6) is **granted.**

2. BWI's motion to conduct accelerated and expedited discovery (Doc. # 5) is **denied.**

3. BWI's motion for expedited consideration of motion for order regarding preservation of documents (Doc. # 8) is **granted.**

*7 4. BWI's motion for order regarding preservation of documents (Doc. # 7) is **granted.** The Court will enter BWI's proposed order separately.

5. H. James Dial's motion to stay all discovery pending resolution of this motion and Rule 26(f) conference (Doc. # 11) is **granted** to the extent that no discovery will occur until after the Court considers BWI's renewed motion for discovery, but is **denied** to the extent that Mr. Dial seeks a stay of all discovery until a Rule 26(f) conference has occurred.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 6
Slip Copy, 2006 WL 2091695 (D.Ariz.)
**(Cite as: 2006 WL 2091695 (D.Ariz.))**


Slip Copy, 2006 WL 2091695 (D.Ariz.)

### Motions, Pleadings and Filings (Back to top)

• 2006 WL 1780516 (Trial Pleading) Complaint for Breach of Contract, Breach of an Implied Covenant of Good Faith and Fair Dealing, Breach of an Implied Contract, Breach of Fiduciary Duty, Defamation Per Se, Trademark Infringement, Unfair Competition and Tortious Interference with Cont ractual Relations, Injunctive Relief, and Trademark Dilution (Jun. 16, 2006)Original Image of this Document (PDF)

• 2:06cv01537 (Docket) (Jun. 14, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 5

1   WO

2

3

4

5

6   IN THE UNITED STATES DISTRICT COURT

7   FOR THE DISTRICT OF ARIZONA

8

9

10  Best Western International, Inc., a non-        )   No. CV-06-1537-PHX-DGC
    profit Arizona corporation                      )
11                                                   )   ORDER
                Plaintiff,                           )
12                                                   )
    vs.                                              )
13                                                   )
    John Doe, et al.,                                )
14                                                   )
                Defendants.                          )
15  _____             )

16          Pending before the Court are H. James Dial's motion to dismiss and Plaintiff's motion

17  to amend the complaint.  Dkt. ##18, 22.  Also pending are Plaintiff's renewed motion to

18  conduct accelerated and expedited discovery and Dial's motion for reconsideration of the

19  Court's order granting Plaintiff's motion to file its renewed motion under seal. Dkt. ##34-35.

20  For the reasons set forth below, the Court will grant the motion to amend in part, grant the

21  motion to dismiss in part, grant the renewed motion to conduct accelerated and expedited

22  discovery, and deny the motion for reconsideration.[1]

23  I.      Background.

24          Plaintiff Best Western International, Inc. has filed this action against various John Doe

25

26          _____

27          [1]The Court will deny the request for oral argument because the parties have submitted
    memoranda thoroughly discussing the law and evidence and the Court concludes that oral
28  argument will not aid its decisional process. *See Mahon v. Credit Bur. of Placer County,
    Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999).

1   Defendants. *See* Dkt. #3. ~~Plaintiff alleges that the Defendants have posted anonymous~~

2   ~~messages on an Internet site that defame Plaintiff, breach contracts with Plaintiff, breach~~

3   ~~fiduciary duties, reveal confidential information, infringe Plaintiff's trademarks, and~~

4   ~~constitute unfair competition.~~ Because the Internet messages have been posted anonymously,

5   Plaintiff has been unable to identify the Doe Defendants. *Id.* H. James Dial has voluntarily

6   entered his appearance in this action and identified himself as one of the Doe Defendants

7   named in the complaint. *See* Dkt. ##11 at 2.

8   **II.    Discussion.**

9       **A.    Dial's Motion to Dismiss and Plaintiff's Motion to Amend the Complaint.**

10          **1.    The Trademark Infringement, Unfair Competition, and Trademark Dilution Claims.**

11

12      Plaintiff's original complaint purports to allege claims for trademark infringement,

13  unfair competition, and trademark dilution under the Lanham Act and the common law.

14  Dkt. #3 ¶¶ 243-67, 280-84. Dial contends that the complaint fails to properly state these

15  claims under the Lanham Act because there is no allegation that Defendants used Plaintiff's

16  marks in commerce or in connection with goods or services. Dkt. #18 at 4-6 (citing 15

17  U.S.C. §§ 1114(a)(1), 1125; *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005)).

18  Plaintiff moves to amend the complaint to add the allegation that Defendants' use of the

19  marks occurred "in commerce." Dkt. #22 at 1 n. 1, Ex. A ¶¶ 257, 267). Dial argues that this

20  proposed amendment is futile because Plaintiff still does not allege that Defendants have

21  used Plaintiff's marks in connection with goods or services, an essential element of all of

22  Plaintiff's Lanham Act claims. Dkt. #31 at 2-6; *see* Dkt. #18 at 4-8. Plaintiff counters that

23  the proposed amendment properly states claims under the Lanham act because even if

24  Defendants do not sell any goods or services, their alleged Internet activities have affected

25  Plaintiff's goods and services and are thus "in connection with commerce." Dkt. #21 at 10-

26  11; *see* Dkt. ##22, 37.

27      The Lanham Act sections prohibiting trademark infringement and unfair competition

28  expressly require that the wrongful conduct occur in connection with goods or services.

1   15 U.S.C. §§ 1114(a), 1125(a)(1); *see Bosley Med. Inst.*, 403 F.3d at 676 (stating that the

2   Lanham Act "is designed to protect consumers who have formed particular associations with

3   a mark from buying a competing product using the same or substantially similar mark and

4   to allow the mark holder to distinguish his product from that of his rivals"). Plaintiff does

5   not allege in its original complaint or its proposed amended complaint that Defendants'

6   Internet activities occurred in connection with any goods or services. The Court accordingly

7   will grant Dial's motion to dismiss the trademark infringement and unfair competition claims

8   under the Lanham Act and deny Plaintiff's motion to amend the complaint with respect to

9   those claims. *See Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142,

10  1151-53 (D. Ariz. 2005) (granting a motion to dismiss Lanham Act claims because the

11  criticism of the plaintiff's business on the defendant's website was not an injury actionable

12  under the Lanham Act since it did not divert sales of products or services from plaintiff to

13  defendant) (citing *Bosley*, 403 F.3d at 679-80); *see also Pareto v. F.D.I.C.*, 139 F.3d 696,

14  699 (9th Cir. 1998) (stating that "conclusory allegations of law and unwarranted inferences

15  are not sufficient to defeat a motion to dismiss"); *Associated Gen. Contractors of Cal. v. Cal.*

16  *State Council of Carpenters*, 459 U.S. 519, 526 (1983) (stating that in ruling on a motion to

17  dismiss the district court may not assume that the plaintiff can prove facts different from

18  those alleged in the complaint); *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)

19  ("A district court does not err in denying leave to amend where the amendment would be

20  futile, . . . or where the amended complaint would be subject to dismissal.") (citations

21  omitted); *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (same).

22         Dial argues in his motion to dismiss that Plaintiff's common law trademark

23  infringement and unfair competition claims fail for the same reasons. Dkt. #18 at 5 nn.2-3

24  (citing *Inwood Labs. Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 861 n.2 (1982) (White, J.,

25  concurring) ("[T]he purpose of the Lanham Act was to codify and unify the common law of

26  unfair competition and trademark protection.")). Plaintiff does not address this argument in

27  its response. *See* Dkt. #21. The Court agrees with Dial. *See Inwood Labs.*, 456 U.S. at 861

28  n.2; *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("This Circuit has

- 3 -

1 consistently held that state common law claims of unfair competition . . . are 'substantially

2 congruent to claims made under the Lanham Act.") (citations omitted). The Court

3 accordingly will grant the motion to dismiss with respect to Plaintiff's common law

4 trademark infringement and unfair competition claims.

5       Plaintiff's trademark dilution claim under the Lanham Act presents a closer question.

6 The Lanham Act section prohibiting trademark dilution does not explicitly require that the

7 trademark in question be used in connection with goods or services. 15 U.S.C. § 1125(c)(1)

8 (as amended by the Trademark Dilution Revision Act of 2006, PL No. 109-312, 120 Stat.

9 1730). Rather, the section provides that the mark must be used "in commerce." *Id.* In

10 *Bosley*, however, the Ninth Circuit stated that the "use in commerce" language "is simply a

11 jurisdictional predicate to any law passed by Congress under the Commerce Clause." 403

12 F.3d at 677. The court further stated that in determining whether the unauthorized use of a

13 trademark is actionable under the Lanham Act, courts should focus on whether the "use was

14 'in connection with a sale of goods and services' rather than 'in commerce.'" *Id.* The court

15 held that if the defendant's use of the trademark "Bosley Medical" on his website was not

16 "in connection with a sale of goods and services," then the "use was 'noncommercial' and

17 did not violate the Lanham Act." *Id.*; *see Avery Dennison Corp. v. Sumpton*, 189 F.3d 868,

18 881 (9th Cir. 1989) ("Commercial use under the [Lanham] Act requires the defendant to be

19 using the trademark as a trademark, capitalizing on its trademark status."); *see also* 15 U.S.C.

20 § 1125(c)(3) ("The following shall not be actionable as dilution by blurring or dilution by

21 tarnishment under this subsection: . . . (C) any noncommercial use of a mark.").

22       As explained above, Plaintiff does not contend that Defendants' alleged unauthorized

23 use of Plaintiff's trademarks was in connection with goods or services. Nor does Plaintiff

24 allege that Defendants have earned revenue from their Internet activities or that the Internet

25 site directs visitors to any of Plaintiff's competitors. *See id.* at 675. The dangers the Lanham

26 Act was designed to address are not at issue in this case. *Id.* at 679; *see Avery Dennison*

27 *Corp.*, 189 F.3d at 881; *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th

28 Cir. 2002) (stating that the defendant's allegedly infringing website "had little to do with

- 4 -

1  commerce" where the defendant did not sell any goods or services on the website and could

2  not otherwise financially capitalize on misdirected consumers); *see also Laparello v. Falwell*,

3  420 F.3d 309, 317 (4th Cir. 2005) (holding that the Lanham Act's "critical element – use of

4  another firm's mark to capture the markholder's customers and profits – simply does not

5  exist when the alleged infringer establishes a gripe site that criticizes the markholder") (citing

6  *Interstellar Starship Servs.*, 304 F.3d at 946). The Court accordingly will grant Dial's

7  motion to dismiss and deny Plaintiff's motion to amend the complaint with respect to the

8  trademark dilution claim.

9      Plaintiff contends that Defendants used Plaintiff's marks "in commerce" because the

10  use competitively injured Plaintiff. Dkt. #21 at 7 (citing *Nissan Motor Co. v. Nissan

11  Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004); *PETA, Inc. v. Doughney*, 263 F.3d 359 (4th

12  Cir. 2001)). But Plaintiff's reliance on *Nissan Motor* and *PETA* is misplaced. In *Nissan

13  Motor*, "commercial use was undisputed, as the core function of the defendant's website was

14  to advertise his computer business." *Bosley*, 403 F.3d at 677 (citing *Nissan*, 378 F.3d at

15  1006). The theory in *PETA* that harm to a plaintiff's business constitutes use "in commerce"

16  was explicitly rejected in both *Nissan Motor* and *Bosley*. *Id.* at 679 ("To the extent that the

17  *PETA* court held that the Lanham Act's commercial use requirement is satisfied because the

18  defendant's use of the plaintiff's mark as the domain name may deter customers from

19  reaching the plaintiff's site itself, we respectfully disagree with that rationale. . . . The *PETA*

20  approach would place most critical, otherwise protected consumer commentary under the

21  restrictions of the Lanham Act. Other courts have also rejected this theory as over-

22  expansive."); *Nissan Motor*, 378 F.3d at 1016 ("Nissan Motor argues that disparaging

23  remarks or links to websites with disparaging remarks at nissan.com is commercial because

24  the comments have an effect on its own commerce. However, we have never adopted an

25  'effect on commerce' test to determine whether speech is commercial and decline to do so

26  here.") (citation omitted).

27      2.    **Plaintiff's Request to Name Dial and James Furber as Defendants.**

28  Plaintiff moves to amend the complaint to name Dial and James Furber as defendants.

1    Dkt. #22. Plaintiff seeks to name Dial because he has "voluntarily come forth as a 'member

2    of at least one . . . of the categories of fictitious defendants named in [P]laintiff's

3    [c]omplaint.'" *Id.* at 3 (quoting Dkt. #11 at 2). Plaintiff alleges that Furber is one of the

4    administrators of the Internet site. *Id.*

5        Dial does not dispute that he has voluntarily entered his appearance in this action and

6    identified himself as one of the Doe Defendants named in the original complaint. *See* Dkt.

7    ##11 at 2, 31. The Court accordingly will grant Plaintiff leave to amend the complaint to

8    formally name Dial as a defendant. *See* Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178,

9    182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so

10   requires'; this mandate is to be heeded.").

11       Furber contends that granting Plaintiff leave to amend the complaint to name him as

12   a defendant would be futile because the Court lacks personal jurisdiction over him. Dkt. #31

13   at 2, 9-14. Plaintiff argues that Furber has not met his burden of showing that the proposed

14   amendment would be futile because Plaintiff has adequately alleged that Furber purposely

15   directed tortious activities toward Plaintiff in Arizona. Dkt. #8-11; *see DCD Programs, Ltd.*

16   *v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987) (stating that the party opposing amendment

17   bears the burden of showing prejudice or one of the other permissible reasons for denying

18   a motion to amend); *Richardson v. United States*, 841 F.2d 993, 999 (9th Cir. 1988) (stating

19   that leave to amend should be freely given unless opposing party makes "an affirmative

20   showing of either prejudice or bad faith").

21       Plaintiff is a corporation formed under the laws of the State of Arizona with its

22   principal place of business in Phoenix, Arizona. Dkt. #22, Ex. A ¶¶ 9. Plaintiff alleges that

23   Furber intentionally made defamatory statements on the Internet site and that such statements

24   have harmed Plaintiff in Arizona. *Id.* ¶¶ 9, 241-49. Plaintiff further alleges that Furber

25   tortiously interfered with Plaintiff's valid business relationships and expectancies. *Id.* ¶¶

26   276-86.

27       Accepting Plaintiff's allegations as true, as the Court must at this stage of the

28   litigation, the Court cannot conclude that the proposed amendment is futile. *See Miller v.*

- 6 -

1   *Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) ("[A] proposed amendment is futile

2   only if no set of facts can be proved under the amendment to the pleadings that would

3   constitute a valid and sufficient claim or defense."); *Ziegler v. Indian River County*, 64 F.3d

4   470, 473 (9th Cir. 1995) (In tort cases, . . . jurisdiction may attach if an out-of-forum

5   defendant merely engages in conduct aimed at, and having effect in, the situs state.");

6   *Governors of the Univ. of Alberta*, 873 F.2d 1257, 1259 (9th Cir. 1989) ("[Defendant] is

7   alleged to have committed intentional torts. His communications were directed to Arizona,

8   even though he did not initiate the contact . . . . [Defendant] knew the injury and harm

9   stemming from his communications would occur in Arizona, where Brainerd planned to live

10  and work. Those contacts with the forum support personal jurisdiction over [defendant] in

11  Arizona."). The Court will grant Plaintiff leave to amend the complaint to name Furber as

12  a defendant.[2]

13       **B.    Plaintiff's Renewed Motion to Conduct Expedited Discovery.**

14       Plaintiff seeks permission to serve subpoenas on various Internet Service Providers

15  ("ISPs") and others before an initial conference is held pursuant to Rule 26(f) of the Federal

16  Rules of Civil Procedure.    The subpoenas seek disclosure of the identities of the

17  administrators of the Internet site as well as individuals who have posted messages on the

18  site. Plaintiff contends that such information is needed before the Doe Defendants can be

19  served with Plaintiff's complaint and can participate in a Rule 26(f) conference. Alleging

20  that it is suffering irreparable injury as a result of comments posted on the website, Plaintiff

21  seeks expedited discovery. *See* Dkt. ##5-6.

22       In its original motion, Plaintiff contended that it was entitled to conduct expedited

23  discovery based on its showing of "good cause." Dkt. #5. The Court denied the motion,

24  _____

25       [2]Dial moves the Court to dismiss Plaintiff's state law claims if the Court dismisses the

26  Lanham Act claims that provided the basis for the Court's federal-question jurisdiction. *See* 28 U.S.C. §§ 1331, 1367. Plaintiff alleges in the amended complaint, however, that Dial and

27  Furber are residents of Indiana and that the amount in controversy exceeds $75,000. The Court thus has diversity jurisdiction over the remaining state-law claims under 28 U.S.C. §

28  1332.

1  concluding that Plaintiff must show a *prima facie* claim of actionable harm in order to

2  conduct discovery that implicates the First Amendment rights of the Doe Defendants.

3  Dkt. #19 (7/25/06 Order).  The Court permitted Plaintiff to file a renewed motion if it

4  believed it could satisfy the *prima facie* claim standard. *Id.* at 8.  The Court required Plaintiff

5  to address in its renewed motion the issue of the Doe Defendants' expectation of privacy.

6  *Id.*

### 1.    The *Prima Facie* Claim Standard.

8        As the Court explained in its July 25 order, before Plaintiff can obtain the identities

9  of the Doe Defendants through the compulsory discovery process, Plaintiff must support a

10  claim against Defendants with facts sufficient to defeat a summary judgment motion.

11  Dkt. #19 at 6 (citing *Doe v. Cahill*, 884 A.2d 451 (Del. 2005)).  This standard does not

12  require Plaintiff to prove a claim as a matter of undisputed fact, but instead to produce

13  evidence within its control sufficient to establish a *prima facie* claim. *Id.*

14        Plaintiff argues in its renewed motion that it has presented evidence within its control

15  sufficient to create a genuine issue of material fact as to whether the Doe Defendants have

16  breached their agreements with Plaintiff and their covenants of good faith and fair dealing.

17  Dkt. #41 at 8-11; *see* Dkt. #3 ¶¶ 73-164.  To prevail on its breach of contract claims, Plaintiff

18  must prove the existence of contracts between Plaintiff and Defendants, breaches of those

19  contracts by Defendants, and resulting damage to Plaintiff. *See Coleman v. Watts*, 87 F.

20  Supp. 2d 944, 955 (D. Ariz. 1998) (citing *Clark v. Compania Ganadera de Cananea, S.A.*,

21  387 P.2d 235, 237 (Ariz. 1963)); *Commercial Cornice & Millwork, Inc. v. Camel Constr.*

22  *Servs. Corp.*, 739 P.2d 1351, 1355 (Ariz. Ct. App. 1987) ("To state a claim in contract the

23  complaint must allege an agreement, the right to seek relief, and breach by the defendant.").

24  To prevail on its claims for breach of the covenant of good faith and fair dealing, Plaintiff

25  must prove that Defendants acted in a way that impaired the reasonably expected benefits of

26  the parties' contract. *See Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986).

27        Plaintiff's Membership Agreement grants Best Western members a non-exclusive

28  license to use Plaintiff's trademarks only in connection with the members' hotels. Dkt. #3,

- 8 -

1    Ex. A ¶ 20. Plaintiff has presented evidence that the Member Defendants used Plaintiff's

2    marks on the Internet site in various contexts. Dkt. #34 Ex. D. This evidence is sufficient

3    to create a genuine issue as to whether such use was in connection with hotels.

4        Pursuant to Plaintiff's Policy and Procedure on Business Ethics, the Governor

5    Defendants were required to keep confidential certain information regarding Plaintiff's

6    business. Dkt. #3, Exs. B § 200.3(I), C ¶ D. Plaintiff has presented evidence sufficient to

7    create a genuine issue as to whether the Governor Defendants improperly revealed Plaintiff's

8    confidential information on the Internet site. Dkt. #34 Ex. G.[3]

9        An award of damages for breach of contract may include compensation for lost

10   profits, wasted promotional expenditures, and the destruction of goodwill. *See A. R. A. Mfg.*

11   *Co. v. Pierce*, 341 P.2d 928, 931 (Ariz. 1959). Damage to a corporation's goodwill is

12   difficult to calculate and may be irreparable. *See Mitchell v. Mitchell*, 732 P.2d 208, 214

13   (Ariz. 1987) ("It is a difficult task at best to arrive at a value for the intangible component

14   of a [corporation] attributable to goodwill."). "Under Arizona law, 'once a protectable

15   interest is established, irreparable injury is presumed to follow if the interest is not

16   protected.'" *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (quoting

17   *Phoenix Orthopedic Surgeons v. Peairs*, 790 P.2d 752, 757 (Ariz. Ct. App. 1989)).

18       Plaintiff claims that the messages posted on the Internet site in violation of the parties'

19   agreements have injured Plaintiff's image, reputation, business, and business relationships.

20   Dkt. #34 at 16. The Court concludes that the nature of some of the messages allegedly

21   posted by Defendants on the Internet site is sufficient to create a genuine issue as to whether

22   Plaintiff has been damaged by the messages. Plaintiff has thus made a *prima facie* showing

23   with respect to its claims for breach of contract and breach of the covenant of good faith and

24   fair dealing. *See Coleman*, 87 F. Supp. 2d at 955; *Rawlings*, 726 P.2d at 570.

25       **2.    The Doe Defendants' Expectation of Privacy.**

26       The First Amendment does not absolutely protect Defendants' identities from

27

---

28       [3]Plaintiff alleges that the Site Administrator Defendant is either a Best Western
     member or governor. Dkt. #3 ¶ 13.

1  disclosure. *See UMG Recordings, Inc. v. Does I-IV*, No. 06-0652 SBA (EMC), 2006 WL

2  1343597, at *2 (N.D. Cal. Mar. 6, 2006) (citing *Sony Music Entm't, Inc. v. Does 1-40*, 326

3  F. Supp. 2d 556, 558 (S.D.N.Y. 2004)); *Cahill*, 884 A.2d at 455 ("'[I]t is well understood that

4  the right of free speech is not absolute at all times and under all circumstances.'") (citation

5  omitted). Defendants may not use the First Amendment to improperly encroach upon the

6  valid contractual rights of Plaintiff. *See Sony*, 326 F. Supp. 2d 563; *Cahill*, 884 A.2d at 456.

7  As discussed above, Plaintiff has established *prima facie* claims of breach of contract and

8  breach of the covenant of good faith and fair dealing against Defendants.

9  Moreover, Defendants have received notice of this action. Several Internet messages

10  refer to the lawsuit, and a copy of Plaintiff's original complaint has been published on the

11  Internet site. Dkt. #34 at 17, Ex. C. In addition, Plaintiff has posted a copy of its renewed

12  motion on the site to allow Defendants an opportunity to oppose the motion. *Id.*

13  In light of the *prima facie* showing made by Plaintiff, the Court concludes that

14  Plaintiff's right to obtain the identities of Defendants through the compulsory discovery

15  process outweighs Defendants' expectation of privacy in this case. The Court will grant the

16  renewed motion to conduct accelerated and expedited discovery.

17  **C.    Dial's Motion for Reconsideration.**

18  On August 21, 2006, the Court issued an order granting Plaintiff's motion to seal its

19  renewed motion to conduct accelerated and expedited discovery. Dkt. #33; *see* Dkt. #28.

20  Dial has filed a motion for reconsideration of that order. Dkt. #35. Plaintiff has filed a

21  response to Dial's motion. Dkt. #44.

22  Dial argues that keeping Plaintiff's renewed motion under seal will prevent the Doe

23  Defendants from learning the basis of Plaintiff's claims against them and will violate their

24  First Amendment and due process rights. Dkt. #35 at 2-4. Plaintiff argues that Dial does not

25  have standing to assert the rights of the other Doe Defendants. Dkt. #44 at 2-4. The Court

26  agrees.

27  The only injury Dial addresses in his motion is an alleged injury to the Doe

28  Defendants. Dial has not alleged that he personally has suffered or will suffer any injury

- 10 -

1   from the sealing of Plaintiff's renewed motion. Nor can Dial make any such allegation since

2   he has received a copy of the motion. The Court will deny Dial's motion for reconsideration.

3   *See Flast v. Cohen*, 392 U.S. 83, 99 n.20 (1968) ("[A] general standing limitation imposed

4   by federal courts is that a litigant will ordinarily not be permitted to assert the rights of absent

5   third parties.").

6   **IT IS ORDERED:**

7       1.    H. James Dial's motion to dismiss (Dkt. #18) is **granted in part** and **denied**

8           **in part** as set forth in this order.

9       2.    Plaintiff's motion to amend the complaint (Dkt. #22) is **granted in part** and

10          **denied in part** as set forth in this order.

11      3.    Plaintiff shall file an amended complaint consistent with this order by

12          **November 10, 2006.**

13      4.    Plaintiff's renewed motion to conduct accelerated and expedited discovery

14          (Dkt. #34) is **granted.**

15      5.    Dial's motion for reconsideration (Dkt. #35) is **denied.**

16      6.    Dial's motion for expedited ruling on the motion for reconsideration (Dkt.

17          #36) is **granted.**

18      7.    Plaintiff's motion for leave to file exhibits under seal (Dkt. #38) is **granted.**

19      8.    Dial's motion to seal response to Plaintiff's renewed motion to conduct

20          accelerated and expedited discovery (Dkt. #41) is **granted.**

21      9.    Plaintiff's motion for leave to file reply in support of renewed motion to

22          conduct accelerated and expedited discovery (Dkt. #47) is **granted.**

23  DATED this 24th day of October, 2006.

24

25  *David G. Campbell*

26  ——————————————————

27             David G. Campbell

           United States District Judge

28

# EXHIBIT 6

# EXHIBIT 6

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
(Cite as: 2006 WL 1134170 (Del.Ch.))

Page 1

**C**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
AMERICAN HOMEPATIENT, INC., Plaintiff,
v.
Joseph J. COLLIER and Med-Equip, Inc., Defendants.
No. Civ.A. 274-N.

Submitted March 21, 2006.
Decided April 19, 2006.

**Background:** Employer brought action against
former employee and former
employee's present employer for breach of non-
compete agreement and settlement agreement.

**Holdings:** The Court of Chancery, New Castle
County, Chandler, Chancellor, held that:
(1) non-compete agreement and settlement agreement
were enforceable contracts;
(2) former employee's delivery of non-respiratory
durable medical equipment (DME) to present em-
ployer's patients did not constitute breach of non-
competition agreement;
(3) in obtaining execution of stale certificates of med-
ical necessity (CMNs), former employee did not
breach non-compete and settlement agreements;
(4) former employee's use of cell phone, in his work
as respiratory therapist, did not violate terms of set-
tlement agreement;
(5) employer could not state action against former
employee's present employer for tortious interference
with contractual relationship;
(6) employer failed to establish that former employee
and former employee's present employer engaged in
unfair competition; and
(7) employer failed to establish claim of tortious in-
terference with prospective economic advantage.
Judgment for defendants.

**[1] Compromise and Settlement** ⊗⇝7.1

89k7.1 Most Cited Cases
Non-compete agreement between employer and
former employee, and settlement agreement between
employer, former employee, and former employee's
current employer, were enforceable contracts; agree-
ments were result of mutual assent, agreements were
supported by consideration, and agreements, which
were limited to one year and radius of 50 miles, were
of reasonable scope and duration.

**[1] Contracts** ⊗⇝116(1)
95k116(1) Most Cited Cases

**[1] Contracts** ⊗⇝117(2)
95k117(2) Most Cited Cases
Non-compete agreement between employer and
former employee, and settlement agreement between
employer, former employee, and former employee's
current employer, were enforceable contracts; agree-
ments were result of mutual assent, agreements were
supported by consideration, and agreements, which
were limited to one year and radius of 50 miles, were
of reasonable scope and duration.

**[2] Compromise and Settlement** ⊗⇝20(1)
89k20(1) Most Cited Cases
Former employee's delivery of non-respiratory dur-
able medical equipment (DME) to present employer's
patients did not constitute breach of non-competition
agreement between employer and former employee,
or of settlement agreement between employer, former
employee and present employer; settlement agree-
ment did not specify equipment or services provided
by former employee, as respiratory therapist, must be
respiratory in nature, there was no recognized distinc-
tion between respiratory and non-respiratory DME,
present employer's practice had always been to re-
quire full time respiratory therapists to deliver all
DME, and former employee followed present em-
ployer's practice.

**[2] Contracts** ⊗⇝312(4)
95k312(4) Most Cited Cases
Former employee's delivery of non-respiratory dur-
able medical equipment (DME) to present employer's
patients did not constitute breach of non-competition

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
(Cite as: 2006 WL 1134170 (Del.Ch.))

agreement between employer and former employee, or of settlement agreement between employer, former employee and present employer; settlement agreement did not specify equipment or services provided by former employee, as respiratory therapist, must be respiratory in nature, there was no recognized distinction between respiratory and non-respiratory DME, present employer's practice had always been to require full time respiratory therapists to deliver all DME, and former employee followed present employer's practice.

[3] Compromise and Settlement ☞20(1)

89k20(1) Most Cited Cases

In obtaining execution of stale certificates of medical necessity (CMNs), former employee was only acting as liaison, as respiratory therapist, between present employer and patient's doctor, and thus there was no breach of non-compete and settlement agreements between employer, former employee, and former employee's current employer.

[3] Contracts ☞312(4)

95k312(4) Most Cited Cases

In obtaining execution of stale certificates of medical necessity (CMNs), former employee was only acting as liaison, as respiratory therapist, between present employer and patient's doctor, and thus there was no breach of non-compete and settlement agreements between employer, former employee, and former employee's current employer.

[4] Compromise and Settlement ☞20(1)

89k20(1) Most Cited Cases

Former employee's use of cell phone, in his work as respiratory therapist, did not violate terms of settlement agreement between employer, former employee, and former employee's present employer; former employee's use of cell phone was indispensable in promptly responding to patients' need, medical representatives' inquiries, and present employer's customer service, and such general responsibilities were clearly permitted by settlement agreement.

[5] Labor and Employment ☞904

231Hk904 Most Cited Cases

Former employee's actions did not constitute breach of non-compete agreement between employer and former employee, and thus employer could not state action against former employee's present employer for tortious interference with contractual relationship.

[6] Antitrust and Trade Regulation ☞54

29Tk54 Most Cited Cases

Employer failed to establish that former employee and former employee's present employer engaged in unfair competition; home respiratory and medical equipment services industry was field of robust competition, employer's expectation of business relationships with customers was not reasonable in absence of written contract with customers, and former employee and present employer could not have wrongly interfered with relationships between employer and customers given that former employee's activities were expressly permitted by terms of settlement agreement between employer, former employee, and former employee's present employer.

[7] Torts ☞241

379k241 Most Cited Cases

Employer failed to establish claim of tortious interference with prospective economic advantage against former employee's current employer; employer's expectancy of maintained business from its customers was not reasonable in light of competitive market in which employer operated, and employer failed to demonstrate any intentional interference by former employee or his present employer that caused termination of business employer had reasonably expected.

John H. Newcomer, Jr., of Duane Morris LLP, Wilmington, Delaware, for Plaintiff.

Charles Gruver III, of Charles Gruver III, P.A., Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

CHANDLER, Chancellor.

*1 American Homepatient, Inc. ("AHOM") brought this action to enforce the terms of a Confidentiality and Non-Compete Agreement (the "Non-Compete Agreement") between AHOM and its former employee, defendant Joseph J. Collier, and a Settlement Agreement (the "Settlement Agreement" and, together with the Non-Compete Agreement, the "Agreements") among AHOM, Collier, and Med-Equip, Inc. ("Med-Equip"), Collier's present employer. AHOM

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: 2006 WL 1134170 (Del.Ch.))**

alleges breach of contract and tortious interference with contract and prospective business relations. AHOM seeks damages and injunctive relief, including specific performance of a covenant not to compete.

This matter was tried over three days in August and September, 2005. The parties completed post-trial briefing on March 21, 2006. This Memorandum Opinion reflects the Court's post-trial findings of fact and conclusions of law. For the reasons set forth later, the Court concludes that the Agreements are valid and enforceable but were not breached by Collier and Med-Equip, and that Collier and Med-Equip did not tortiously interfere with AHOM's contracts and prospective business relationships.

## I. FACTUAL BACKGROUND

AHOM provides home respiratory and medical equipment services, focusing its business on in-home patient care, developed through referral sources such as hospitals, physicians and home health care agencies. Marketing efforts are not directed towards individual patients because there is no effective means of identifying an individual who may need services or equipment, and presumably because the patient will oftentimes defer to a physician's recommendation. Therefore, targeting the physician, nurse, or other individual (the "referral source") empowered to place such an order is an integral part of AHOM's business.

Collier was employed by AHOM from 1996 to 2003, working principally from the company's Newark branch. The Newark branch provides durable medical equipment ("DME"), such as walkers, wheelchairs, hospital beds, and commodes; the branch also provided respiratory services, such as oxygen and related equipment.

Collier began his employment with AHOM as a respiratory therapist, but at his request in 2000 he began working as an account executive. Account executives develop relationships with referral sources that are invaluable to the success of the company; no different from any other account executive at AHOM, Collier executed a form Non-Compete Agreement on August 8, 2001. Once on the job, Collier soon discovered he was a natural born salesman. His forward manner of

approaching potential referral sources apparently lacked inhibition. For example, patrolling the hallways of Christiana Hospital, where he served as AHOM's liaison, he would bluntly ask people he knew "Do you have anybody going home today? Do you have a patient for me?" and he was often rewarded with referrals.

Med-Equip is a competitor of AHOM, based in Folsom, Pennsylvania. Having attempted for some time to expand in the Delaware market, Med-Equip hired Collier as the branch manager of its Milford, Delaware location. AHOM quickly brought suit, and following initial discovery, a Settlement Agreement was agreed upon and signed on November 13, 2003. The Settlement Agreement effectively permitted Collier to work as a respiratory therapist, as defined in an exhibit to the Settlement Agreement, while maintaining the force and effect of the Non-Compete Agreement in all other respects.

**\*2** Over the course of the period covered by the Non-Compete and Settlement Agreements, Collier was involved in the ordering or delivery of DME that was both respiratory and not respiratory in nature. Collier was also the recipient of a company Nextel cell phone that had the capability of receiving and sending direct communications from Med-Equip's office, including customer service, and the ability to be "tweaked" (*i.e.,* used as a walkie-talkie).

In his activity logs, Collier reported contacting referral sources for certificates of medical necessity ("CMN") on a number of occasions, when prior CMNs had gone stale, and a new CMN was required. Those CMNs were therefore obtained only in respect to patients who were already Med-Equip patients. Doctors who executed such stale CMNs were already referral sources of Med-Equip before Collier became employed.

## II. ANALYSIS

### A. Breach of Contract

Plaintiff alleges that Collier breached the Non-Compete Agreement and that both Collier and Med-Equip breached the Settlement Agreement. The Court must first determine whether AHOM had enforceable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: 2006 WL 1134170 (Del.Ch.))**

Page 4

contracts with Collier and Med-Equip and, if so, whether they were breached. [FN1] Though the Agreements were enforceable, defendants did not breach the contracts.

> FN1. *See All Pro Maids, Inc. v. Layton,* 2004 Del. Ch. LEXIS 116 (Aug. 9, 2004).

*1. Enforceability*

[1] To be enforceable, a covenant not to compete must (1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities. [FN2] When seeking specific performance of a covenant not to compete, the plaintiff has the burden of establishing her case by clear and convincing evidence . [FN3]

> FN2. *TriState Courier & Carriage, Inc. v. Berryman,* 2004 Del. Ch. LEXIS 43, at *35 (Apr. 15, 2004).

> FN3. *Id.*

The Agreements satisfy the general requirements of a valid contract. Those requirements are mutual assent and consideration. [FN4] AHOM offered Collier a new position and continued employment in consideration of the Non-Compete Agreement, which Collier executed. Collier and Med-Equip executed the Settlement Agreement in consideration of AHOM dismissing the original lawsuit.

> FN4. *See Research & Trading Corp. v. Pfuhl,* 1992 Del. Ch. LEXIS 234, at *16 (Nov. 19, 1992); *Delaware Express Shuttle, Inc. v. Older,* 2002 Del. Ch. LEXIS 124, at *40 (Oct. 23, 2002).

The Agreements are of reasonable scope and duration. They are limited to a duration of one year and a radius of fifty miles. [FN5] Further, the Agreements advance the legitimate economic interest of AHOM to protect relationships cultivated by Collier while an AHOM employee, and survive a balance of the equities.

> FN5. Non-compete agreements covering limited areas for two or fewer years generally have been held to be reasonable. *See All Pro Maids,* 2002 Del. Ch. LEXIS 116, at *18 (one year restriction found reasonable); *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *54 (finding three years unreasonable because of rapid customer turnover, and reducing duration of covenant to two years); *COPI of Delaware, Inc. v. Kelly,* 1996 Del. Ch. LEXIS 136, at *12 (Oct. 25, 1996) (two year restriction reasonable for company officers and sales personnel).

*2. Alleged Breaches*

Plaintiff has failed, however, to establish the breach of the Agreements. The Settlement Agreement clearly states that the Non-Compete Agreement would be subject to the express terms of the Settlement Agreement. [FN6] The Settlement Agreement expressly permitted Collier to work for Med-Equip as a respiratory therapist. Collier's activities that have been challenged by AHOM were in fact permitted by this proviso of the Settlement Agreement. Descriptions of certain of these challenged activities follow, with an explanation of how Collier's credible trial testimony and other evidence in the record have cast sufficient doubt on Plaintiff's allegation that Collier was acting in capacities other than as a respiratory therapist.

> FN6. Settlement Agreement, ¶ 3.

a. The DME Deliveries

*3 [2] Plaintiff alleges that Collier's delivery of non-respiratory DME to Med-Equip patients alone constituted a breach of the Agreements. As mentioned above, however, the Settlement Agreement permits Collier to act as a respiratory therapist, and an attendant responsibility of a respiratory therapist is to deliver DME. The Settlement Agreement's Exhibit A does not specify that the equipment or services provided by the respiratory therapist must be respiratory in nature. Furthermore, there is no distinction between respiratory and non-respiratory DME recognized in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: 2006 WL 1134170 (Del.Ch.))**

Page 5

the industry, and Med-Equip's practice has always been to require its full time respiratory therapists to deliver all DME. Finally, Collier testified that there were only certain types of circumstances in which he delivered DME, all following Med-Equip's practice of having full time respiratory therapists deliver all DME.

b. Obtaining Execution of Stale CMNs

[3] Plaintiff alleges that in obtaining the execution of stale CMNs, Collier breached the Agreements. Close examination of the circumstances of obtaining the CMNs casts sufficient doubt on plaintiff's claim, and demonstrates that Collier was only acting as a liaison between Med-Equip and a patient's doctor, as permitted by the Settlement Agreement's description of a respiratory therapist. As discussed above, all challenged CMNs dealt with existing patients of Med-Equip, most of whom suffered from chronic pulmonary problems. The doctors executing such stale CMNs were already referral sources of Med-Equip before Collier became employed. Although plaintiff points to one entry in Collier's daily worksheets dated December 2, 2003 relating to Dr. Valoria, Collier convincingly testified that he did not actually meet with Dr. Valoria on that occasion, but only wrote the doctor's name because he did not know the names of any of Dr. Valoria's office staff at the time of the visit. Furthermore, Collier was called upon to obtain execution of stale CMNs when he was already going to be in the geographical area for other job responsibilities unchallenged by AHOM, and Collier never met with an actual doctor in such circumstances. Finally, pursuit of executed CMNs is viewed by the doctor's office as a nuisance or hindrance of their daily flow so such effort would do little to effectively solicit, market, or otherwise build goodwill. Collier's pursuit of a CMN as a respiratory therapist differed dramatically from AHOM account executives, who would host lunch meetings with doctors as part of their marketing presentation and only after would the doctor execute the CMN. Collier's obtaining the execution of stale CMNs was only the activity of a respiratory therapist and permitted by the Settlement Agreement.

c. Use of Cell Phone

[4] Plaintiff alleges that Collier's use of the cell phone violated the Settlement Agreement's prohibitions on soliciting new business, and contacting physicians or other referral sources regarding new patients (*i.e.,* patients who aren't at that point existing patients of Med-Equip). Collier's use of the cell phone proved indispensable in responding to patients' needs, medical representatives' inquiries, and Med-Equip's customer service, all on a moment's notice. These general responsibilities of Collier as a respiratory therapist were clearly permitted by the Settlement Agreement.

*4 Plaintiff points specifically to the Nextel records of the cell phone to attempt to demonstrate that certain communication exchanges and transactions were initiated by Collier. In its billing records, however, Nextel does not report tweaking and related incoming calls. Due to this lack of evidence, combined with credible testimony by Collier, and Med-Equip's customer service department daily activities worksheet, I cannot find as plaintiff urges me that Collier placed a number of soliciting calls to Christiana Care between December 5 and 7; rather, these calls were more likely in response to questions regarding the care of Med-Equip patients at the hospital. Therefore, Collier's use of his cell phone did not violate the Settlement Agreement.

*B. Tortious Interference with a Contractual Relationship*

[5] Plaintiff argues that Med-Equip's actions in hiring Collier in the face of knowledge that he was subject to the Non-Compete Agreement, as well as fostering Collier's breach of the Non-Compete Agreement, constitutes tortious interference. The elements of a claim of tortious interference with contract are: (i) the existence of a valid contract; (ii) the interferer's knowledge of the contract; (iii) intentional interference that induces or causes a breach of the contract; and (iv) damages. [FN7] Without a breach of contract, there can be no tortious interference. As discussed above, the Settlement Agreement expressly permitted Collier to work for Med-Equip as a respiratory therapist. Because Collier's activities that have been challenged by AHOM were in fact permitted by this proviso of the Settlement Agreement, there was no breach of either agreement. In other words, be-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)
**(Cite as: 2006 WL 1134170 (Del.Ch.))**

Page 6

cause plaintiff did not prove that Collier violated the terms of the Non-Compete Agreement, plaintiff has likewise failed in proving tortious interference.

> FN7. *All Pro Maids,* 2002 Del. Ch. LEXIS 116, at *25.

*C. Unfair Competition*

[6] Plaintiff alleges that by trading on the relationships that Collier developed while employed at AHOM in order to obtain new business for Med-Equip, defendants engaged in unfair competition. The elements of the tort of unfair competition are that plaintiff has a reasonable expectancy of entering a valid business relationship, with which defendant wrongfully interferes and, thereby, defeats plaintiff's legitimate expectancy and causes him harm. [FN8] The home respiratory and medical equipment services industry enjoys robust competition, and any expectation of business relationships might be a bit unreasonable without a written contract with the customer. AHOM argues that past referrals of AHOM could be expected to continue to use the company in the future absent some outside interference; such argument, however, ignores the possibilities of price and service competition, and assumes that consumers base their choice of medical equipment provider solely on incumbency. Additionally, defendants could not have wrongly interfered with such relationships when Collier's activities were expressly permitted by the Settlement Agreement that plaintiff was a party to. Finally, without delving into unnecessary detail, defendants failed to prove that their loss of business was proximately caused by Med-Equip, let alone by Collier's activities working for Med-Equip.

> FN8. *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043 (Del.Super.2001).

*D. Interference with a Prospective Economic Advantage*

*5 [7] Plaintiff alleges that Med-Equip's actions constituted tortious interference with AHOM's prospective business relationship with its referral sources. The elements of a claim of tortious interference with prospect business relation are: (i) the existence of a reasonable probability of a business expectancy; (ii) the

interferer's knowledge of the expectancy; (iii) intentional interference that induces or causes termination of the business expectancy; and (iv) damages. [FN9] Once again, AHOM's expectancy of maintained business from customers was not reasonable in light of the competitive market in which it operated. Plaintiff has failed to demonstrate any intentional interference by Collier or by Med-Equip that caused a termination of the business plaintiff had reasonably expected. Additionally, plaintiff did not demonstrate damages that were proximately caused by defendants.

> FN9. *All Pro Maids,* 2002 Del. Ch. LEXIS 116, at *25.

### III. CONCLUSION

Based on the findings of fact and conclusions of law made herein, judgment is hereby entered in favor of the defendants on all counts. An Order has been entered consistent with this Memorandum Opinion.

Not Reported in A.2d, 2006 WL 1134170 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that, on this 11th day of

December 2006, a copy of the Declaration of William R. Denny in Support of Defendant Jane

Doe 1's Motion to Quash Subpoena *Duces Tecum* Directed to Non-Party Witness L.N.H., Inc.

and For a Protective Order was served by first class mail, postage prepaid, upon the following

persons:

> Cynthia A. Ricketts, Esquire
> Sara K. Regan, Esquire
> Squire, Sanders & Dempsey L.L.P.
> Two Renaissance Square
> 40 North Central Avenue, Suite 2700
> Phoenix, AZ 85004-4498
>
> L.N.H., Inc.
> 260 Chapman Road—Suite 205
> Newark Delaware 19702

*William R. Denny*
WILLIAM R. DENNY (ID No. 2580)

[766598]

4